## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No. 356** |
| | ) | |
| CRED INC. LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| UPHOLD HQ INC., a South Carolina | ) | |
| Corporation, UPHOLD INC., a Washington | ) | |
| Corporation, and UPHOLD LTD., a Cayman | ) | |
| Islands exempted limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>COMPLAINT</u>

The Cred Inc. Liquidation Trust (the "<u>Trust</u>" or "<u>Plaintiff</u>") established in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>") of Cred Inc. and its affiliated debtors (collectively, the "<u>Debtors</u>" or "<u>Cred</u>"), by and through its undersigned counsel, sets forth the following allegations against Uphold HQ Inc., Uphold Inc., and Uphold LTD. (collectively "<u>Uphold</u>"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are as follows: Cred Inc. (8268), Cred (US) LLC (5799), Cred Capital, Inc. (4064), Cred Merchant Solutions LLC (3150), and Cred (Puerto Rico) LLC (3566). The Debtors' mailing address is 3 East Third Avenue, Suite 200, San Mateo, California 94401.

## INTRODUCTION

1.     Uphold and Cred's co-founders jointly created "CredEarn," a "yield earning" program that lost hundreds of millions of dollars' worth of retail customer cryptocurrency.  Uphold drove thousands of retail customers to lend cryptocurrency to the CredEarn program by falsely marketing it as "safe," "secured," "insured," and "fully hedged."  As thousands of retail customers found out too late, CredEarn was not "safe," "secured," "insured," or "fully hedged."

2.     Uphold aided and abetted the breaches of fiduciary duties of Cred co-founders, directors, and officers Daniel Schatt ("Schatt"), Lu Hua ("Hua"), and other key Cred officers by jointly developing CredEarn and then creating and disseminating false marketing materials to drive hundreds of millions of dollars' worth of cryptocurrency debt obligations to Cred.  While Cred sank deeper into debt under CredEarn, Uphold enjoyed substantial risk-free profits.  Cred paid Uphold commissions and other profit sharing fees irrespective of whether Cred was able to return the cryptocurrency to the retail customers.

3.     Schatt in particular was deeply conflicted.  He was Cred's co-founder (with Hua), President and Chief Executive Officer ("CEO"), and one of two Cred directors (with Hua).   Schatt also served on Uphold's Board of Directors (the "Uphold Board").   Schatt acted in Uphold's interests, not Cred's.  Accordingly, the Trust seeks to hold Uphold liable for (among other things) its aiding and abetting breaches of fiduciary duty, which caused Cred's losses.

4.     Following Cred's bankruptcy filing in November 2020, in a private text message group among Uphold senior executives,[2] one Uphold executive summarized Uphold's culpability as follows:

---

[2] Ex. A  (text messages between Uphold executives).

███████████████████████████████████████████

5.      Uphold scrambled to cover up its relationship with Cred once it was publicly reported that Cred was nearing bankruptcy.  Uphold issued false press releases attempting to distance itself from Cred.  Uphold even engaged in a clean-up campaign deleting past false advertisements and deceptive social media posts.

6.      On November 2, 2020, in a group text message between Uphold executives Juan Pablo Thieriot ("Thieriot"), Simon McLoughlin ("McLoughlin"), and other executives Rui Marinho ("Marinho"), and Tiago Ribeiro ("Ribeiro"), Marinho warned ████████████████
███████. [3]

███████████████████████████████████████████

7.      Customers were not fooled by Uphold's "cover up."  As one customer stated, "[Uphold] went on a lame initial PR campaign to distance themselves from Cred, but when that was proven to be untenable with digital receipts they've gone radio-silent to their customers."[4]

---

[3] *Id.*

[4] Ex. B (Trustpilot reviews of Uphold, available at https://uk.trustpilot.com/review/uphold.com?search=Cred).

8.      Uphold's customers lost substantial funds because of CredEarn, and Uphold's substantial assistance facilitating CredEarn.  As one customer stated, ███████████████████

████████████████████████████[5]

9.      That customer also explained how he was driven to CredEarn by repeated false marketing from Uphold, most of which has since been deleted: ████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████[6]

10.     As another CredEarn customer stated, "***Uphold is [as] guilty as Cred*** . . . I trusted [] Cred because of Uphold . . ."[7]

11.     Other customers complained about Uphold's false marketing and obvious conflicts of interest because Schatt concurrently served on the Uphold Board:

> ***Uphold promoted and advertised Cred (they called it "UpholdEarn"), as a safe platform for customers to invest their criptocurrency [sic] and earn a small interest***.  Suddenly, Uphold terminated their partnershit [sic] with Cred.  Shortly afterwards, Cred filed for bankrupcy [sic]…. Relevant fact: Cred's CEO was in Uphold's board of directors![8]

12.     As Uphold's customers correctly recognized, and for reasons discussed in greater detail below, Uphold is responsible for the losses suffered in connection with the CredEarn and

---

[5] Ex. C (October 2020 email chain between customer and Uphold).

[6] *Id.*

[7] Ex. B (Trustpilot reviews of Uphold, available at https://uk.trustpilot.com/review/uphold.com?search=Cred) (emphasis added).

[8] *Id.* (emphasis added).

CredBorrow programs.[9]  While the claim reconciliation process is ongoing, the Trust brings this action against Uphold for an amount to be proven at trial, but no less than $783,946,276.  The Trust also seeks return of the "commissions" that were fraudulently transferred to Uphold and satisfaction of an unpaid letter of credit, plus interest, attorneys' fees, and costs.

## PARTIES

13.    The Trust was created pursuant to the *Modified First Amended Combined Plan of Liquidation and Disclosure Statement of Cred Inc. and Its Subsidiaries Under Chapter 11 of the Bankruptcy Code* (D.I. 629-1) (as amended, the "Plan"), which this Court confirmed on March 11, 2021.  The Plan became effective on April 19, 2021 (the "Effective Date").  (*See* D.I. 730.)  On the Effective Date, the Trust was established and the Debtors' assets were transferred and assigned to the Trust.  (*See* Plan, § 12.3.)  The Trust is being administered by the Liquidation Trustees (as defined in the Plan).  (*See id.* at § 12.3(a).)

14.    Defendant Uphold HQ, Inc. is a South Carolina corporation with its principal executive office at 900 Larkspur Landing Circle, Suite 209, Larkspur, California 94939-1724.  Uphold HQ Inc. is registered to do business in Delaware.

15.    Defendant Uphold Inc. is a Washington corporation with its principal executive office at 6 West 18th St., 3rd Floor, New York, NY 10011.

16.    Defendant Uphold Ltd. is a Cayman Islands exempted limited liability company with its principal executive offices at 6 West 18th St., 3rd Floor, New York, NY 10011.

---

[9] In the CredBorrow program, Cred lent fiat to customers who would post Bitcoin and other cryptocurrencies as collateral.

17.     Uphold is a registered money service business with the Financial Crimes Enforcement Network and is a registered money transmitter in many jurisdictions across the United States, including Delaware.

## RELEVANT NON-PARTIES

18.     Thieriot is Uphold's former CEO and current Vice Chairman.  Thieriot co-founded Uphold in December of 2013, and served as Vice Chairman until September 2018, when he became CEO.  Thieriot stepped down as Uphold's CEO in February 2022.

19.     Schatt was retained by Uphold as an advisor in February 2018.  Schatt joined the Uphold Board in April 2018 where he remained until October 25, 2020—only weeks before Cred's bankruptcy filing.  Schatt is a co-founder and 50% owner of Cred.  Schatt previously served as Cred's President and later CEO.  Schatt was one of Cred's two directors.

20.     Hua is a co-founder and 50% owner of Cred, and the second of Cred's two directors. Hua previously served as Cred's CEO until late 2018 at which time Schatt became CEO.  Hua is also the founder of MoKredit.

21.     MoKredit is a Chinese micro-lending platform owned by Hua and to which the vast majority of CredEarn funds were funnelled.

22.     MoKredit was incorporated in the Cayman Islands and is based in Shanghai, where it provides microcredit loans to Chinese borrowers.[10]

23.     Cred implemented a highly-leveraged trading strategy by using an unlicensed and unregistered trading firm (the "Trading Firm").  The Trading Firm is a limited liability company

---

[10]  The entities comprising the defined term MoKredit are MoKredit Inc., MoKredit Technology (Hong Kong) Company Limited, MoKredit (Shanghai) Information Technology, Co. Ltd, and Shanghai Bestone Information Technology Co. Ltd.  They will be referred to collectively herein as "MoKredit."

organized in Delaware with its principal place of business in New Jersey. The Trading Firm provides cryptocurrency trading, conversion, payments, and investment services.

24.    In late 2018, Cred hired the Trading Firm as a consultant to assist Cred with its hedging strategy. Cred also hired the Trading Firm to convert BTC, ETH, and other cryptocurrencies to stablecoin, and to facilitate all cryptocurrency transactions with MoKredit. The Trading Firm enabled Cred to make risky trades that were otherwise unavailable to U.S. persons and entities.

25.    James Alexander ("Alexander") was hired as Cred's Chief Capital Officer in August 2018.

26.    Joe Podulka ("Podulka") was Cred's Chief Financial Officer ("CFO") from July 2019 to December 2020.

27.    Daniel Wheeler ("Wheeler") joined Cred as its General Counsel in August 2019. Wheeler previously served as Cred's primary outside counsel while a partner at Bryan Cave Leighton Paisner LLP from May 2012 to August 2019.

28.    Daniyal Inamullah ("Inamullah") served as Cred's Vice President of Capital Markets from January 2020 to April 2020.

## JURISDICTION AND VENUE

29.    This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under title 11 of the United States Code (the "Bankruptcy Code") and arises in and relates to cases under the Bankruptcy Code pursuant to 28 U.S.C. §§ 157 and 1334(b). This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for matters contained herein.

30.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Trust confirms its consent to the entry of final orders or judgments by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## GENERAL BACKGROUND ON CRYPTOCURRENCY AND KEY DEFINITIONS

32.     The term "cryptocurrency" refers to a digital asset on a blockchain, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," "digital assets," "coins," and "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay. Most customers purchase cryptocurrency speculating that the price of that particular cryptocurrency will increase. Some cryptocurrencies are also used to pay for goods and services. Bitcoin ("BTC") and Ethereum ("ETH") are the most popular cryptocurrencies, but there are thousands of others.

33.     A "blockchain" is an open-sourced string of code which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency. All cryptocurrencies exist on a blockchain. All transactions are recorded on the blockchain and are publicly available.[11]

34.     When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions called

---

[11] There is one exception not relevant here. Certain blockchains are "private" blockchains. In those blockchains, the transactions are not public.

"blocks." Those "blocks" are publicly available and reflect all of the cryptocurrency transactions that occurred on the blockchain at a particular point in time. Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain." That is why it is called a "block"-"chain."

35.     There are a number of cryptocurrencies called "stablecoins." Stablecoins are "stable" because their value is pegged to a "stable" asset such as the U.S. dollar or gold. The purpose of stablecoins is to allow users to transact without the volatility of other cryptocurrencies.

36.     A digital wallet ("wallet") is a software program or physical device that allows a user to store their cryptocurrency and allows for the sending and receiving of cryptocurrency transactions.

37.     A cryptocurrency exchange ("exchange") is a marketplace where users buy and sell cryptocurrencies. Many exchanges are designed to be user friendly. Although exchanges are not necessary to buy and sell cryptocurrency, exchanges are the most popular mechanism for retail customers to buy and sell cryptocurrency. The customer interface on exchanges are often very similar to online stock brokerages.

38.     Decentralized finance (or "DeFi") is a common term used for banking activities such as lending and borrowing, which are not performed by a centralized entity.

39.     "Yield earning platforms" borrow cryptocurrency from their customers and promise to pay their customers back at a later date, plus interest. Yield earning platforms essentially provide their customers unsecured notes. Cred was a yield earning platform.

40.     Yield earning platforms have increased in popularity in recent years, due to the potentially high returns for both the investor and the yield earning platform. Yield earning platforms are generally risky due to their promises of high returns. Cryptocurrency prices are highly volatile and the regulations concerning yield earning platforms are unclear. The SEC and

state regulators have begun to bring some enforcement actions against yield earning platforms arguing that they constitute the sale of unregistered securities.

## FACTUAL BACKGROUND

### I.      The Cred-Uphold Relationship

41.     Uphold is a multi-asset cryptocurrency exchange, on which users can buy and sell cryptocurrencies, fiat currencies, equities, and precious metals.[12]   Uphold primarily markets to retail customers.

42.     Uphold provides retail customers an easy to use platform for transacting and storing cryptocurrency.   Uphold specifically markets itself as easy to use for new cryptocurrency investors.[13]   Uphold markets and operates its services on a desktop and mobile "digital money platform" (the "Uphold Platform"), which provides "consumers worldwide with convenient and secure access to traditional currencies, cryptocurrencies, and other investments."

43.     Schatt first encountered Uphold in February 2018.[14]   Schatt testified that Uphold initially engaged him to provide advisory services.[15]

44.     Two months later, Uphold appointed Schatt as a director on the Uphold Board.[16]

45.     After Schatt was retained by Uphold in early 2018, Schatt and Hua established an entity named "Libra Credit" in Singapore.

---

[12] *See* Uphold, https://uphold.com/en-us.

[13] Ex. D (January 2021 Uphold marketing materials).

[14] Deposition of Dan Schatt, dated December 14, 2020 ("2020 Schatt Dep. Tr.") at 115:14-18.

[15] *Id*.

[16] *Id*.

46.     Libra Credit later became known as "Cyber Quantum Pte. Ltd."  Cyber Quantum Pte. Ltd. conducted an initial coin offering in or around May 2018 for the cryptocurrency, Libra Token ("LBA").

47.     An initial coin offering is a fund-raising event in connection with the launch of a new cryptocurrency.

48.     The proceeds of the Cyber Quantum Pte. Ltd. initial coin offering were used to fund Cred.

49.     On May 14, 2018, Schatt and Hua organized "Libra Credit (US) LLC," in Delaware.

50.     In August 2018, Libra Credit (US) LLC changed its name to "Cred LLC."

51.     Schatt and Hua also formed a subsidiary "Cred (US) LLC" in August 2018, with Cred LLC as the sole member.[17]

52.     On May 13, 2020, Cred LLC converted to Cred Inc.[18]  The Trust refers to Libra Credit, Cyber Quantum Pte. Ltd., Cred LLC, and Cred (US) LLC collectively as "Cred."

53.     Initially, Hua was Cred's CEO and Schatt was Cred's President.  In mid-to-late 2018, Hua stepped down from his role as CEO and Schatt assumed that role.  Schatt and Hua were the only two directors.

54.     Schatt and Hua were fifty percent (50%) co-owners of Cred.

55.     Schatt introduced Thieriot to Hua in or around June of 2018.

---

[17] Ex. E (Delaware Certificate of Conversion).

[18] *Id.*

56.     Uphold's team (including Thieriot) visited the MoKredit offices in China in or around August to September 2018.[19]

57.     In July of 2018, Uphold and Schatt began discussing a joint-venture to create a yield earning program.[20]

### A.     Uphold and Schatt Create an "Earn" Program

58.     Looking for new ways to make money from its customers, Uphold decided to launch a yield earning program.

59.     Cryptocurrency yield earning programs have become popular in recent years.  The customer lends his or her cryptocurrency to a company.  The company promises to repay the customer, plus interest.  Then the company seeks to earn a greater yield on the loaned cryptocurrency than it owes its customer, usually through re-lending or cryptocurrency trading strategies.

60.     The customer benefits from yield earning programs because he or she maintains ownership of the cryptocurrency while earning interest.  The company profits from yield earning programs if it earns a greater yield than the company owes customers.

61.     Initially, Uphold was going to release the yield earning program directly through Uphold under the name "UpholdEarn."[21]

62.     Cred's CEO Schatt played a substantial role in the creation of UpholdEarn.

63.     Schatt was an active Uphold director who participated in key decision-making concerning Uphold's daily operations, marketing, and new programs—including UpholdEarn.

---

[19] Ex. F (timeline of events produced by Uphold).

[20] *Id.*

[21] Ex. G (October 2018 email chain between Uphold and a PR firm).

64.     Despite an obvious conflict of interest as both Cred's CEO and an Uphold director, Schatt participated in the key decision making concerning Uphold's and Cred's plans to jointly launch a yield earning program.

65.     Uphold targeted January 2019 as the launch date for its UpholdEarn offering.

66.     Because the offering was initially going to be launched by Uphold, Cred was not referenced on early drafts of marketing materials.

67.     In early October 2018, the name of the yield earning product was the subject of internal debate at Uphold. A member of the Uphold marketing team stated that they "████████ ████████████████████████████"[22]

68.     While Uphold was initially going to launch the earn program, Uphold later decided to run the offering through Cred. This decision caused confusion at Uphold and Cred as to which entity was actually running the offering and how it should be marketed.

69.     In response to draft marketing materials, Uphold's former Chief Growth Officer Rawdon Messenger ("Messenger") emailed the Uphold marketing team stating:

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████[23]

70.     Messenger informed Cred's marketing department that Uphold would place marketing references to Cred in "appropriate spots going forward."[24]

---

[22] Ex. H (October 5, 2018 email from Uphold team member Alistair Morrison).

[23] Ex. I (October 12 2018 email from Messenger and subsequent response by marketing team).

[24] Ex. J (October 17, 2018 email from Messenger).

71. However, many of the initial marketing materials for UpholdEarn did not mention Cred. For example, the initial draft press release purporting to launch "UpholdEarn" and "UpholdBorrow" made no reference to Cred:

**Global Consumers Get New Personal Finance Tool Promising Up to Five Percent Interest**

*Uphold announces the world's first crypto equity digital line of credit giving global consumers access to credit benefits historically available to one percent of world's population*

SAN FRANCISCO – Oct. XX, 2018 – Uphold, a leading global digital money platform that has powered more than $3.5 billion in transactions across 184 countries, announced today the availability Uphold Earn and Uphold Borrow, two revolutionary consumer finance products made possible by the Blockchain.

Uphold Earn, which functions much like a traditional savings account, will offer interest rates between two and five percent. Uphold Borrow draws on a quarter-billion-US dollar credit facility to grant secured, revolving lines of credit at single digit interest rates. Both products are made possible by the Universal Dollar (UPUSD), a fully-transparent, digital asset that is collateralized 1-to-1 with U.S. dollars to be held at U.S. domiciled, FDIC-insured banks.

"The concept behind Uphold Borrow is really very simple," said JP Thieriot, Co-Founder and CEO of Uphold. "In America, homeowners can borrow against the equity in their homes with a Home Equity Line of Credit (HELOC). It's an incredibly powerful financial tool because it offers a low interest line of credit with extremely flexible terms. But it's limited to those fortunate enough to own a home. What Uphold has done today is replaced the Home Equity part of the HELOC with a consumer's digital equity – in the form of cryptocurrency – thereby allowing non-homeowners all over the world an alternative means of securing the same type of consumer-friendly credit."

With Uphold Borrow, consumers can borrow against up to 50 percent of their digital assets – anywhere from two thousand to two hundred thousand dollars – empowering them with one of the most affordable and consumer-friendly loans available.

Moreover, Uphold Borrow creates, for the first time, access to dollar-denominated loans to anyone in the world who holds digital assets, allowing them to use their accumulated capital without having to sell assets at the bottom of a pricing cycle.

72. On October 17, 2018, Cred's Director of Marketing Meghan Gardler ("Gardler") complained to Uphold, writing: █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [25]

---

[25] Ex. K (October 17, 2018 email from Gardler).

73.     The next day, on October 18, 2021, Uphold released marketing materials to its customers that did not reference Cred.[26]

74.     In response, Gardler forwarded the marketing piece to Uphold stating: "Hi guys, still seeing zero Cred branding on any messaging coming from Uphold.  I need a concrete ETA when this will be done because I was originally told it would be changing over by the beginning of this week and it still hasn't happened.  I also never received the draft of the email marketing that was going to be sent."[27]

75.     No later than November 6, 2018, ███████████████████████████████████████ ████████████████████████████████████████[28]

76.     On October 18, 2018, Schatt also sent an email to Messenger and Thieriot stating that he was "getting complaints from the Cred team that some marketing … [is] not shared with the Cred team prior to release."[29]

77.     In another email, also sent on October 18, 2018, Schatt made clear that Uphold and Cred were "one team" when it came to the CredEarn program by stating:  "[l]et's operate as one team as much as possible."[30]

78.     On December 22, 2018, Uphold and Cred finalized a launch plan for UpholdEarn.

---

[26] Ex. L (October 18, 2018 email from Schatt).

[27] *Id.*

[28] Ex.  M (November 6, 2018 email chain between Uphold team members).

[29] Ex. L (October 18, 2018 email from Schatt).

[30] *Id.*

79.    According to an email sent by Schatt on December 22, 2018, this launch plan included the following four key components:

- Early to mid-January rollout of UpholdEarn, capped at $20M
- Leverage Cred engineering and design resources to alleviate Uphold engineering/product bandwidth concerns
- Craft an integrated PR/marketing plan
- Plan for automated Uphold Earn and Borrow Product to launch in Q1 2019[31]

80.    Also as part of this December 22, 2018 plan, Schatt emailed Thieriot, Uphold's Chief Operating Officer Simon McLoughlin ("McLoughlin"), and Hua to confirm the rates and structures for participating in the UpholdEarn program, depending on whether the customers used Bitcoin, Universal Dollar, or its non-US counterpart, the Universal Euro:

- Minimum investment $5,000 or 1 BTC
- Minimum investment period: 6 months
- Annualized return: 10% (5% if you invested Universal Dollar or Euro)
- Interest paid quarterly in USD or Universal Dollar
- Principal returned at end of period in BTC (or USD or Universal Dollar)[32]

81.    Between October and December 2018, various email communications and social media posts by Uphold and Thieriot marketed the UpholdEarn offering with reference to both Uphold and Cred (Cred's twitter handle is "@ihaveCred"):

---

[31] Ex. N (December 21, 2018 email from Schatt).

[32] *Id.*





82.    Uphold knew the risks that were associated with the yield earning program.

83.    Uphold also knew:  (1) about Cred's business relationship with MoKredit; (2) more than 90% of the cryptocurrency that Uphold's customers lent to Cred would be loaned to MoKredit; (3) MoKredit only accepted and remitted stablecoin from Cred; and (4) because MoKredit only accepted and remitted stablecoin, Cred was exposed to the rise in price of BTC and other cryptocurrencies.

84.    In addition, Uphold knew that Cred was implementing a highly-risky hedging strategy, and that there was regulatory risk associated with cryptocurrency yield earning programs.

85.     Rather than take on all of these risks, Uphold and Schatt decided to shift the risks away from Uphold by running it through Cred.

86.     Despite Cred taking all of the risks, Uphold would profit by receiving 2% commissions and other benefits for driving Uphold's customers to Cred.

**B.     Uphold Decides to Launch the Earn Program Through Cred**

87.     Between late December 2018 and mid-January 2019, Uphold and Schatt decided to offload Uphold's risk to Cred, run the yield earn program entirely through Cred, and rebrand the offerings as CredEarn and CredBorrow.

88.     As Schatt was a co-owner of Cred, he owed a fiduciary duty of loyalty to Cred.

89.     As a board member of Uphold, Schatt also owed a fiduciary duty of loyalty to Uphold.

90.     The duty of loyalty requires a director to be loyal to the company at all times, and also imposes the responsibility to avoid possible conflicts of interest.

91.     As CEO of Cred, Schatt had an obligation to engage in business relationships that were in the best interests of Cred, not to Cred's detriment.

92.     Despite his fiduciary duties and obligations, Schatt entered Cred into a business relationship with Uphold that disproportionately benefitted Uphold to the detriment of Cred.

93.     Uphold substantially assisted in Schatt's breach of fiduciary duties by using its position of power, and Schatt's conflicting interests, to negotiate terms of Cred and Uphold's arrangement that benefitted Uphold to Cred's detriment.

94.     On or around January 16, 2019, Cred and Uphold entered into a Statement of Work (the "SOW") related to the CredEarn program.[33]

---

[33] Ex. O (January 16, 2019 Statement of Work for CredEarn).

95.     During the negotiations of the SOW, Schatt was conflicted as he was at the time the CEO of Cred while also serving on Uphold's Board.

96.     Under the SOW, Uphold integrated CredEarn on the Uphold website and mobile application.[34]

97.     In exchange for the integration of CredEarn on the Uphold website, the SOW required Cred to pay a "service fee" to Uphold.  This "service fee" was effectively a "commission" to Uphold for driving its customers to Cred.

98.     Under the SOW, Uphold would receive "the greater of (a) 2% of total credit extended by customers funding CredEarn accounts via Uphold [P]latform, or (b) the historical yield percentage on the assets committed to CredEarn accounts via Uphold [P]latform" (the "Uphold Fees").[35]

99.     As Schatt explained, Uphold "earned a percentage of all funds that their customers lent to Cred …. I believe it was 2 percent.  So if we gave an interest rate of 5 percent to the customer, there would be an extra 2 percent that would go to Uphold."[36]

100.    Uphold Fees were calculated based on the assets that Uphold customers committed to CredEarn.

101.    Uphold regularly invoiced Cred for the Uphold Fees.

102.    As part of this arrangement, Uphold and Cred jointly created marketing materials for Uphold to disseminate to its thousands of pre-existing and potential customers.[37]

---

[34] *Id.*

[35] *Id.*

[36] Deposition of Dan Schatt, dated July 28, 2021 ("2021 Schatt Dep. Tr.") at 246:16-22.

[37] Ex. O (January 16, 2019 Statement of Work for CredEarn).

103.    Under section 7 of the SOW, Uphold and Cred were both granted "a limited, revocable, non-exclusive, royalty-free, worldwide license to use [the other party's] trademarks, service marks, names and logos … for the sole purpose of marketing and promoting the CredEarn Offering as mutually agreed."

104.    Although CredEarn was technically offered by Cred, Uphold had complete control over CredEarn both contractually and functionally.

105.    Section 2.2.1 of the SOW states that Cred "will not change its requirements under the Cred Earn Offering or the End User Agreement without the prior written consent of [Uphold]."[38]

106.    Cred could not and did not change its core business plan without Uphold's consent.

107.    Cred could not and did not change CredEarn interest rates without Uphold's consent.

108.    Cred could not and did not change the CredEarn marketing strategy or marketing materials without Uphold's consent.

109.    Beyond contractual control, Uphold functionally controlled Cred.

110.    Uphold exerted financial control over Cred because Uphold held most of Cred's cryptocurrency.

111.    To facilitate CredEarn, Uphold held both Cred's and CredEarn customers' digital wallets for the majority of Cred's existence.

112.    Because Uphold held Cred and CredEarn customers' wallets, Uphold dictated the types of cryptocurrencies used in CredEarn by Uphold customers.

113.    Uphold held the majority of Cred's and CredEarn customers' cryptocurrency.

---

[38] *Id.*

114.    Uphold comingled the cryptocurrency it received from its customers.  Cred's cryptocurrency held at Uphold was comingled with the cryptocurrency of other Uphold customers, including CredEarn customers.

115.    The transactions between Cred and Cred's customers were executed within comingled digital wallets hosted on the Uphold Platform.

116.    The majority of transactions between Cred and CredEarn customers were only reflected in the internal recordkeeping at Uphold and were not actually recorded on any public blockchain.

117.    Accordingly, Cred relied entirely on Uphold's internal recordkeeping to determine which cryptocurrency was owned by Cred, which cryptocurrency was owned by CredEarn customers, and which cryptocurrency was owned by other Uphold customers.

118.    CredEarn-related transactions only occurred on the blockchain if one of the recipient digital wallets was not hosted by Uphold.

119.    In addition to Uphold's contractual and effective control of Cred, Uphold also sought to allocate all risks of the CredEarn program to Cred.

120.    Section 2.2.2 of the SOW stated that "all risk of loss of principal loan by [Cred] from [Uphold's customers] shall be borne by [Cred]."

121.    In short, as a result of the SOW, Uphold received risk-free commissions from Cred while Cred bore all of the risk associated with CredEarn.

122.    Yield earning platforms are subject to various risks associated with volatility in the market and risk of cyber-attacks.  To attract cryptocurrency customers, yield earning offer returns in excess of 8-12%.

123.    CredEarn was riskier than other similar programs because it had to earn enough by re-lending or trading to satisfy the exorbitant interest rates and also to pay Uphold the additional 2% commission.

124.    Regulators such as the United States Securities and Exchange Commission ("SEC") and state securities regulators have been closely monitoring cryptocurrency companies and have been aggressively investigating and taking action against yield earning platforms similar to CredEarn.[39]

125.    Schatt had a fiduciary duty to act in the best interests of Cred. Schatt's fiduciary duties to Cred required him to not allow Cred to incur debts in excess of what Cred would reasonably service.

126.    But Schatt acted both as director of Uphold and as CEO and a director of Cred during the negotiations of the SOW.

127.    Uphold developed the CredEarn program with Schatt and Hua. Uphold retained control over CredEarn.

---

[39] A recent example involves the cryptocurrency exchange BlockFi. In 2019, BlockFi began offering interest-bearing digital asset accounts. Similar to CredEarn, customers participating in BlockFi's program loaned cryptocurrency to BlockFi in exchange for a variable monthly interest payment. By 2021, BlockFi held as much as $14.7 billion in investor assets. The New Jersey Bureau of Securities sent a cease and desist order, charging that BlockFi's accounts were not registered with that office or exempt from registration, and their sale violated New Jersey securities laws. Shortly after, the SEC instituted a cease and desist proceeding of its own. *See* https://www.sec.gov/litigation/admin/2022/33-11029.pdf. BlockFi settled these actions and agreed to pay a total of $100 million in fines to the SEC and a consortium of 32 states. The penalty is the largest ever by the SEC against a crypto company, and shows that regulators are aggressively pursuing yield earning platforms.

In another example, the SEC also threatened to sue cryptocurrency exchange Coinbase over an earning product Coinbase Lend. *See* https://blog.coinbase.com/the-sec-has-told-us-it-wants-to-sue-us-over-lend-we-have-no-idea-why-a3a1b6507009. Within two weeks after the SEC issued this threat, Coinbase canceled the launch of the product. *See* https://techcrunch.com/2021/09/20/following-sec-lawsuit-threat-coinbase-cancels-launch-of-lend-product/.

128.    Schatt negotiated and knowingly commenced a relationship that gave all power and control to Uphold, while leaving Cred with none of the power, but all of the risk.

129.    Schatt negotiated and knowingly commenced a business relationship that provided Uphold a steady stream of the Uphold Fees with every new CredEarn customer and customer loan, while every new CredEarn customer caused Cred to incur new debts and liabilities.

130.    Uphold substantially assisted Schatt's breaches of fiduciary duties by developing the CredEarn program with Schatt and others at Cred.

131.    Uphold substantially assisted Schatt's breaches of fiduciary duties by continuously promoting and enrolling new CredEarn members which caused Cred to incur debts it could not reasonably service.

132.    Uphold substantially assisted Schatt's breaches of fiduciary duties by promoting CredEarn using false marketing materials to drive more debt to Cred than it could reasonably service.

133.    Uphold's substantial assistance only increased the Uphold Fees that Uphold collected, and the debt that Cred incurred.

134.    Uphold and Schatt used Uphold's dominant position over Cred to allocate all of these risks to Cred while (i) maintaining complete control over CredEarn and (ii) receiving risk-free commissions regardless of whether CredEarn succeeded and Uphold customers were ever repaid.

135.    In short, Uphold was a de facto fiduciary and controller of Cred.  Uphold also occupied a position of trust with Cred due to Uphold's complete control over CredEarn and Schatt's dual positions with Cred and the Uphold Board.

C.      **Uphold Uses Cred to Launch CredEarn**

136.    CredEarn launched on January 23, 2019.

137.    On January 24, 2019, Schatt announced that CredEarn had signed its 1,000[th] customer in less than 24 hours after launching.[40]

138.    Uphold drove all of these initial customers to Cred.

139.    CredEarn was completely integrated on Uphold's website.

140.    Schatt described this integration as follows: with a "push [of] a button [you could] sign the terms and conditions and participate in the program as an Uphold customer."[41]

141.    Cred and Uphold primarily targeted Uphold customers through advertisements on the Uphold Platform.

142.    Only a very small percentage of customers found the Cred website independently from Uphold and became CredEarn customers.

143.    To utilize the Uphold Platform, a customer had to first join Uphold as a customer before having access to CredEarn:

---

[40] Ex. P (January 23, 2019 email from Schatt).

[41] 2021 Schatt Dep. Tr. at 245:1–3.





42

144.    When Uphold customers logged in to the Uphold Platform, they immediately saw advertisements and banners associated with CredEarn urging them to "earn" with CredEarn:



43

---

[42] Ex. Q (Snapshot of CredEarn page on Uphold's website from April 22, 2020, available at (https://web.archive.org/web/20200422052159/https://uphold.com/en/credearn).

[43] *Id.* (Snapshot of Uphold's website from November 6, 2019, available at https://web.archive.org/web/20191106180122/https://uphold.com/ ).

145.    As one Uphold customer ███████████████████████████████

████   described:

████████████████████████████████████████████████████████████
████████████████████████████████████████[44]███████

146.    To participate in the CredEarn program, customers entered into "CredEarn Agreements" with Cred.

147.    Pursuant to the CredEarn agreements, customers lent cryptocurrency to Cred in exchange for a promise by Cred to repay the loan, plus interest.

148.    Cred agreed to repay loans to its CredEarn customers in the same type of cryptocurrency that the CredEarn customer lent to Cred as specified in the individual agreement. For example, CredEarn agreements would specify that "[Customer is] lending Bitcoin to CRED," "[Customer agrees] to initially lend CRED [up to 1,250] Bitcoin," and that "[i]nterest is paid in Bitcoin on the last business day of every calendar quarter."[45]

149.    To make these loans, the customers executed a transfer of cryptocurrency from their own Uphold wallet to Cred wallets also hosted by Uphold.

150.    Thus, the CredEarn program appeared to involve shifting cryptocurrency from one Uphold wallet to another Uphold wallet.

---

[44] Ex. C (October 2020 email chain between customer and Uphold) (emphasis added).

[45] Ex. R (sample CredEarn agreement).

151.    In actuality, the Uphold wallets were comingled and the CredEarn cryptocurrency transactions were primarily just recorded in internal recordkeeping at Uphold.

152.    The CredEarn process and asset flow is demonstrated by the below flowchart:



153.    The CredEarn agreements generally expired in 6-12 months, after which Cred was required to return the cryptocurrency to the CredEarn customers.

154.    Upon the expiration of a CredEarn agreement, Cred allowed customers to re-enroll into a subsequent CredEarn agreement.

155.    At expiration, many customers re-enrolled into a new CredEarn agreement.  That means that at the expiration of the 6-12 month period, Cred would not return the lent cryptocurrency.

156.    The CredEarn agreements stated that customers were "agreeing to lend [Cred] all funds in the account [and Cred agrees] to repay, with interest, all amounts [it] borrow[s] from [the

customer], subject to provisions of this Agreement that allow[s] [Cred] to deduct certain fees in some circumstances."[46]

157.   Under the CredEarn program, Cred was required to pay customers 8-12% interest.

158.   Cred took huge risks in order to generate enough yield to satisfy such interest and Uphold's commission.

159.   Cred loaned the CredEarn cryptocurrency that Cred received from customers to MoKredit.

160.   Hua, as founder of MoKredit, owed a fiduciary duty of loyalty to MoKredit.

161.   As Hua was also a co-owner and a director of Cred, he also owed a fiduciary duty of loyalty to Cred.

162.   These dual roles created significant conflicts of interest for Hua as MoKredit and Cred were counterparties whose interests were not always aligned.

163.   Hua had a fiduciary duty to not allow Cred to lend cryptocurrency and other funds to counter-parties that could not or would not repay Cred.

164.   Hua breached his fiduciary duty to Cred by allowing it to lend significant sums of cryptocurrency to MoKredit because Hua knew MoKredit would not be able to repay Cred.

165.   Uphold substantially assisted Hua's breach of the fiduciary duty of loyalty by driving customers to CredEarn which in turn drove more risky loans to MoKredit and unsecured debt to Cred.

166.   Uphold substantially assisted Hua's breach of the fiduciary duty of loyalty by promoting false marketing materials concerning CredEarn in order to drive more debt to Cred.

---

[46] *Id.*

167.   Uphold knew the cryptocurrency lent to CredEarn would be lent by Cred to MoKredit.

168.   When Cred lent CredEarn cryptocurrency to MoKredit, MoKredit then lent those funds to MoKredit's customers.   MoKredit's customers were purportedly thousands of videogamers located primarily in China who would borrow small sums at high interest rates, often exceeding 35%.

169.   Uphold knew of MoKredit's involvement in CredEarn.

170.   Uphold knew that MoKredit's business model was extremely risky and that MoKredit may not be able to satisfy the debts owed from MoKredit to Cred.

171.   Cred and MoKredit's relationship was governed by a series of agreements and tranches for additional loan amounts that are subject to those agreements.[47]

172.   In connection with the loans made to MoKredit, a Loan and Security Agreement in the principal amount of $50 million was entered into by and between Cyber Quantum Pte Ltd. as lender and MoKredit as borrower (the "Cyber Quantum LSA").  The Cyber Quantum LSA is dated January 4, 2019, but was not executed until June 5, 2019.

173.   Contemporaneously with the execution of the Cyber Quantum LSA, Cyber Quantum Pte Ltd. and MoKredit also entered into a Multi-Tranche Credit Agreement (the "Cyber Quantum Multi-Trance Credit Agreement").

174.   Finally, MoKredit and Cred executed a loan and security agreement with an effective date of December 27, 2018 (the "Cred LSA" and, together with the Cyber Quantum LSA and Cyber Quantum Multi-Trance Credit Agreement, the "MoKredit Agreements").

---

[47] Ex. S (December 27, 2018 MoKredit Loan and Security Agreement).

175.    The MoKredit Agreements governed MoKredit's borrowing of funds from Cred, which largely consisted of CredEarn loan proceeds.

176.    The Cred LSA authorized Cred to extend a line of credit of up to $100,000,000 to MoKredit, and contained an effective date of December 27, 2018.

177.    However, the Cred LSA was not actually executed until February 4, 2020, more than one year later.  By then, Cred had already lent MoKredit tens of millions of dollars of customer cryptocurrency.  Cred did not loan MoKredit any cryptocurrency after February 4, 2020.

178.    Until the Cred LSA was executed, the only contracts that existed were between MoKredit and Cyber Quantum.

179.    Under the Cred LSA, MoKredit was obligated to repay obligations outstanding under the MoKredit Agreements upon the sooner of (i) the maturity date of the loan or (ii) 30 days' notice by Cred at Cred's discretion.

180.    Cred sought to generate profits based on the spread between the interest rate offered to customers through CredEarn, and the interest Cred received from MoKredit.

181.    However, as Hua sat on both sides of the negotiating table, Hua favored MoKredit over Cred with respect to allocating risk.

182.    MoKredit refused to expose itself to the risk of loss due to fluctuations in the price of BTC and other cryptocurrencies.  Thus, at MoKredit's request, Cred loaned MoKredit fiat currency or stablecoin rather than BTC and other cryptocurrencies.

183.    CredEarn agreements specified the cryptocurrencies that Cred was obligated to repay to its customers.

184.   For example, the CredEarn agreements stated "[Customer is] lending Bitcoin to CRED," "[Customer agrees] to initially lend CRED [up to 1,250] Bitcoin," and that "[i]nterest is paid in Bitcoin on the last business day of every calendar quarter."[48]

185.   Because Cred and MoKredit only transacted with each other entirely in stablecoin and Cred owed its customers BTC and other cryptocurrencies:  (i) Cred bore the risk of loss if BTC and other cryptocurrencies increased in value during the life of a CredEarn loan; and (ii) Cred was regularly short BTC and other cryptocurrencies.

186.   Similar to Schatt, Hua also had fiduciary duties to Cred to not incur debts in excess of what Cred can reasonably service.

187.   However, by refusing to expose MoKredit to risk, Hua sought to shift all risk to Cred, in violation of his fiduciary duties to Cred.

188.   Uphold knew that MoKredit would only accept stablecoin in connection with its loans to Cred.

189.   Uphold knew that Hua was breaching his fiduciary duties to Cred by causing it to enter into these highly risky agreements with MoKredit in which Cred was exposed to an increase in the price of BTC and other cryptocurrencies.

190.   In an effort to mitigate the risk associated with an increase in prices of cryptocurrency, Cred hired the Trading Firm to create and execute a "hedging strategy."

191.   Cred and the Trading Firm entered into a consulting agreement regarding the hedging strategy, which was effective December 25, 2018.

---

[48] Ex. R (sample CredEarn agreement).

192.    Pursuant to this hedging strategy, the Trading Firm entered into options, futures, and "perpetual swaps" (or "perps") for Cred in order to hedge against an increase in the price of cryptocurrency.

193.    Uphold knew Cred's entire business model, including Cred's relationship with MoKredit and the hedging strategy.

194.    Uphold continued to substantially assist Hua's breaches of fiduciary duties by promoting false marketing materials concerning CredEarn to drive more cryptocurrency to Cred which Cred would lend to MoKredit..

195.    Uphold conducted no meaningful diligence on MoKredit.  Neither Uphold nor Cred reviewed any meaningful financial information from MoKredit.  Neither Uphold nor Cred ever requested any audited financials from MoKredit.  Indeed, MoKredit has never been audited.

196.    On January 23, 2019, Uphold launched the CredEarn program through Cred.

197.    Unbeknownst to Uphold's customers, the cryptocurrency they provided to Cred was immediately lent by Cred to MoKredit.

198.    When MoKredit failed to repay principal on its loans as required by the Cred LSA, Cred would simply allow MoKredit to "roll" the principal amounts owed to the next "tranche."

199.    Cred's former Chief Financial Officer Podulka testified about the MoKredit principal payments as follows:  "the money, when a tranche would close, wouldn't necessarily result in a flow of cash to Cred.  It could be reenrolled in another program or tranche."[49]

---

[49] Deposition of Joseph Podulka, dated July 23, 2021 ("Podulka Dep. Tr.") at 131:7-9.  The Trust conducted a series of depositions pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

200.    Despite Uphold's marketing materials in which Uphold told its customers that CredEarn was "secured," Cred did not perfect the security interests in MoKredit that were granted by the Cred LSA.

201.    Section 2.1 of the Cred LSA grants Cred a security interest in, among other things, all of MoKredit's accounts, inventory, equipment, instruments and securities (collectively, the "Collateral").

202.    Uphold published extensive marketing materials indicating that CredEarn was "secured." Schatt, Hua, and Uphold knew CredEarn marketing materials indicating that the MoKredit debt was "secured" were false.

203.    The testimony of all senior executive officers of Cred reveal that Cred took no steps to perfect Cred's security interest in the Collateral.[50]

204.    Cred never perfected any security interests in the Collateral.

205.    All of the Uphold marketing material referencing CredEarn as "secured" were false.

## II.    Uphold Disseminated False CredEarn Marketing Materials

206.    Schatt testified that Uphold distributed Cred's marketing material throughout the lifecycle of CredEarn, starting from CredEarn's launch in early 2019 up until late 2020.[51]

---

[50] *See* 2021 Schatt Dep. Tr. at 125:3-6 (Q. "Did Cred ever perfect any security interest in any collateral from MoKredit? A. I don't believe it was ever perfected."); *see also* Deposition of Daniel Wheeler, dated August 5, 2021 ("Wheeler Dep. Tr.") at 232:10-19 (Q. "Who made that decision to not go forward with the section on secured interest?" A. "I think that was a combination of James [Alexander] and Dan Schatt." Q. "Did you make a recommendation as to whether they should perfect security interests or not?" A. "I told them they should press on and, you know, do it right. But it was their business call to stop the presses at that point."); Podulka Dep. Tr. at 51:18-20 (Q. "Are you aware of any efforts that Cred made to perfect security interests pursuant to this agreement? A. "No.").

[51] *See* 2021 Schatt Dep. Tr. at 254:23-255:1 (Q. "And Uphold was sending out marketing material from early 2019, until late 2020. Right?" A. "That's right.").

207.    At all relevant times, Uphold knew Cred's business model and the risks involved due to Schatt's significant and conflicting roles and involvement with both companies.

208.    Uphold nonetheless substantially assisted Schatt's and Hua's breaches of fiduciary duties by disseminating false marketing materials concerning CredEarn and CredBorrow.

### A.    Marketing Materials Omitted the MoKredit Relationship and Claimed Cred Only Lent to Reputable Parties

209.    Uphold also knew about Cred's relationship with MoKredit, including about Hua's conflicting leadership roles with Cred and MoKredit.

210.    Indeed, Hua and Thieriot met several times.  Thieriot went to Shanghai during the summer of 2018 to meet with Hua, and Hua also visited the Uphold offices in San Francisco.  Hua testified that he met Thieriot and the Uphold team multiple times:

> Q.    Did you have any interactions with anyone from Uphold?
> A.    No interactions, no.  I was – I visited the office a couple of times while I was in San Francisco.
> Q.    Oh, you visited the office.  Who did you meet with?
> A.    JP.
> Q.    JP Thieriot?
> A.    Yeah.  And there is the head of, I think its head of marketing or head of – oh, I think COO, the chief, COO [McLoughlin], a guy called [McLoughlin]…
> Q.    And when you met with Uphold, you told them that you owned moKredit; right?
> A.    Yes.
> Q.    And when you met with Uphold, did Uphold ask you any questions about moKredit?
> A.    Uphold, no.
> Q.    Okay.  Did you meet with Uphold once or did you meet with them on multiple occasions?
> A.    You mean the Uphold team?
> Q.    Yeah.
> A.    Multiple.[52]

---

[52] Deposition of Lu Hua, dated July 28, 2021 ("Hua Dep. Tr.") at 226:8-227:11.

211.    Schatt testified that Uphold knew about MoKredit's involvement and understood

the relationship between MoKredit and CredEarn:

Q.    How many times did you and Lu Hua meet with JP Thieriot?

A.    Us together, let's see, he came to moKredit, to the Shanghai office once.  So he was in China.

Q.    You say "he," you mean JP Thieriot came to moKredit?

A.    That's right.

Q.    So Uphold was aware of Cred's relationship with moKredit.  Correct?

A.    Yes.

Q.    And did Uphold ask Lu Hua any questions about moKredit?

A.    Yes.  And, in fact, JP was in the moKredit office saw the facilities, as well.

Q.    Okay.  Did you ever have any board meetings where moKredit was discussed?

A.    No, I don't believe we did.  No.

Q.    Did you ever speak to anyone else at Uphold about moKredit?

A.    Yeah, I believe – I believe we probably would have spoken with the COO and possibly their general counsel.

Q.    Uphold understood that in connection with the CredEarn program, that Cred would be relending those loans to moKredit.  Right?

A.    Right.

Q.    Okay.  And Uphold understood that moKredit was then relending it to video gamers. Right?

A.    Correct.

Q.    And did Uphold ever ask you or Lu Hua to provide audited financial statements from moKredit?

A.    I don't believe so.  No.

Q.    Did Uphold ever ask you or Lu Hua to provide a loan tape from moKredit?

A.    I don't believe so.  No.

Q.    Did Uphold ever ask you or Lu Hua to provide information about its customers it was lending its money to?

A.    Yeah, I believe it – I believe those questions were asked when JP was in China, in Shanghai at the moKredit offices.[53]

212.    Schatt also testified that Uphold knew about Cred's hedging risks:

Q.    Did you ever discuss with JP Thieriot, or anyone else at Uphold, the fact that Cred was lending stablecoin to moKredit as opposed to Bitcoin?

A.    Yes.

Q.    Did you ever discuss with JP Thieriot, or anyone else at Uphold, that Cred would have to employ this hedging strategy in order to protect it against the rise in price of Bitcoin?

A.    Yes.

---

[53] 2021 Schatt Dep. Tr. at 243:15-246:1.

Q.   So JP Thieriot and others at Uphold were fully aware of Cred's business model?

A.   Yes.[54]

213.   Although Uphold was aware of Cred's business model's reliance on MoKredit loans and the risks involved, Uphold substantially assisted Schatt's and Hua's breaches of fiduciary duties by disseminating retail customer marketing that did not disclose MoKredit.

214.   Except for disclosing MoKredit's involvement with Cred to a select few high net-worth investors, most of the marketing materials and communications surrounding CredEarn did not disclose the existence of MoKredit in the business model at all.

215.   For example, the initial joint press release for CredEarn on Business Wire failed to mention MoKredit.[55]

216.   Other communications directly from Uphold falsely represented that Cred made the CredEarn loans to ██████████████████████████████████ ████ :

---

[54] *Id.* at 247:6-18.

[55] *See* Business Wire, *A Better Way to Earn Interest on Digital Assets*, https://financialpost.com/pmn/press-releases-pmn/business-wire-news-releases-pmn/a-better-way-to-earn-interest-on-digital-assets.



[56]

217.    Cred did not make loans to "reputable third-party companies."

218.    Cred primarily made loans to MoKredit, despite the risks involved, and MoKredit repeatedly failed to make principal payments owed to Cred.

219.    Uphold also sent email blasts and other marketing materials to thousands of customers containing this similar claim that Cred lent to "reputable companies."[57]

220.    Schatt testified that Uphold did not mention MoKredit in its CredEarn marketing materials:

Q.    You are aware that in the marketing material issued by Uphold, there was no mention of moKredit.  Right?
A.    Yes, that's, right.[58]

**B.    Uphold Issued False Statements Indicating that CredEarn Was Secured and Insured**

221.    Cred executives, including Schatt, Hua, and Wheeler had fiduciary duties to exercise good business judgment in operating CredEarn, and ensuring the product was secure.

---

[56] Ex. T (March 29, 2019 Email from McLoughlin).

[57] Exs. U (March 29, 2019 email marketing), V (Uphold marketing deck).

[58] 2021 Schatt Dep. Tr. at 255:13–16.

222.    Wheeler had a fiduciary duty to ensure that the loans provided to MoKredit were secured by Cred perfecting its security interests in the Collateral.

223.    Wheeler breached this fiduciary duty by not perfecting Cred's security interest in the MoKredit Collateral.

224.    Schatt and Hua had a fiduciary duty to insure that CredEarn loans were insured and could be repaid to customers.

225.    Schatt and Hua breached their fiduciary duties by not insuring CredEarn loans.

226.    Uphold knew that CredEarn loans were not secured or insured.

227.    Uphold substantially assisted Schatt's, Hua's, and Wheeler's breaches of fiduciary duties by disseminating false marketing materials claiming CredEarn was secured and insured.

228.    Uphold disseminated marketing materials that falsely stated "CredEarn allows holders of digital assets to earn interest in a variety of assets…. Cred achieves this objective by making **_secured and/or guaranteed loans_** and investing in **_short-term debt instruments_**."[59]

229.    These materials included a "one-pager" about CredEarn.  Uphold requested that these materials be sent to Uphold so that they could be included in a pitch to potential investors.[60]

230.    Uphold and Cred also released joint statements on mainstream media stating that Cred provided "secured loans." ██████████████████████████████ :



---

[59] Exs. W (CredEarn "one-pager") (emphasis added), X (February 4, 2019 email from Thieriot).

[60] Ex. X (February 4, 2019 email from Thieriot).

[61] Ex. Y (January 2019 email chain between Uphold team and Schatt) (emphasis added).

231.    These statements were false and misleading because Cred made no "secured loans."

232.    Cred's loans to MoKredit were not secured because Cred did not perfect its security interest in the Collateral.

233.    Despite Uphold's representations, MoKredit did not have an "excellent track record."

234.    In fact, MoKredit repeatedly failed to make principal payments to Cred.

235.    Other marketing materials falsely claimed that CredEarn was insured.

236.    CredEarn loans were not insured.

237.    CredBorrow collateral was not insured.

238.    Cred's loans to MoKredit were not insured.

239.    The cryptocurrency Cred held on behalf of its customers were not insured.

240.    Uphold knew that insurance was a particular concern for investors and customers.

241.    ████████████████████████████████████████████████
████████████████████████████.[62]

242.    Uphold produced this collection to the Trust, ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████:

    a.    ████████████████████████████████████████
████████████████████████████████████████
████████████.

    b.    ████████████████████████████████████████
████████████████

---

[62] Ex. Z (████████████████████████).

c. 

d.

e. [63]

243.     Customers expressed confusion regarding Uphold's representations that CredEarn

was "insured" on social media outlets and online message boards, with one user stating:

> The other thing that is often touted, which is that CredEarn is insured, is something
> that you should scrutinize.  When I investigated it a couple of months back, I didn't
> come away with a strong sense that they truly had what I would consider an
> insurance policy, more an assurance by the management at that point.  The situation
> may be different now.[64]

244.     Schatt was aware that insurance was a concern for customers.

245.     Scatt also had a fiduciary duty to Cred to ensure that CredEarn loans were protected.

246.     Rather than properly insuring CredEarn loans to mitigate Cred's risk, Schatt created

and disseminated misleading advertising stating that Cred had insurance.

---

[63] *Id.*

[64] *See* Ex. UUU (XRP Chat, *LBA Discussion*, https://www.xrpchat.com/topic/31706-lba-discussion/).

247.    On June 1, 2019, Schatt sent an email to Cred's and Uphold's marketing teams discussing a "comprehensive insurance post … to give customers an even higher level of comfort about Cred."[65]

248.    Uphold's marketing contact forwarded the details in this email to Thieriot and McLoughlin for approval, which Thieriot approved on June 3, 2019.[66]

249.    That day, a joint press release between Uphold and Cred falsely stated that Cred was a licensed lender with "comprehensive insurance."[67]

250.    Following this press release, both Cred and Uphold approved of and disseminated other marketing materials that also falsely asserted that Cred had "comprehensive insurance and security policies to protect your digital assets and your data,"[68] had secured Lockton as the "insurance provider," and touted that Cred had the "most comprehensive insurance policy in the crypto-lending industry."[69]

251.    All of these statements concerning Cred's insurance were false.

252.    Cred maintained a small amount of basic business insurance, such as a directors and officer's liability policy, a cybersecurity policy, and a property casualty policy.

253.    The CredEarn and CredBorrow programs were not insured.

254.    None of the customer cryptocurrency that was pledged to Cred was insured.

---

[65] Ex. AA (June 1, 2019 email from Schatt and response from Thieriot).

[66] *Id.*

[67] *Id.*; *see also* Business Wire, *Earn Up to 10% Interest on USD and Euro on Uphold*, available at: https://www.businesswire.com/news/home/20190603005557/en/Earn-up-to-10-Interest-on-USD-and-Euro-on-Uphold.

[68] Ex. BB (July 14, 2020 email marketing).

[69] Ex. CC (September 3, 2019 email marketing).

255.     The insurance policies Cred did carry were subject to certain exclusions related to cryptocurrency, further limiting their utility.

256.     Wheeler believed that even the insurance policies that Cred did have had "no value" to Cred:



257.     In May 2020, Wheeler raised concerns regarding false representations about insurance.

258.     On May 15, 2020, Wheeler sent an email to Cred employee Michael Zhang stating the following:

> We need to delete the entire bullet point about 'insured custody of users crypto' because no such insurance exists.  ***We also need to delete the bullet point about 'Cred has one of the most comprehensive insurance' because it could mislead someone into thinking that their crypto is insured when it is not.***[71]

259.     In a subsequent email on May 15, 2020 to Marketing Director Meghan Gardler, Wheeler stated, "I am uncomfortable with continued references to Cred's insurance in our website or any of our marketing materials as our insurance has proven to be of no value to us and in no

---

[70] Wheeler Dep. Tr. at 180:5-22.

[71] Ex. DD (May 15, 2020 email from Wheeler) (emphasis added).

way insures our users' crypto against loss … I am strongly inclined to remove any and all references to Cred's insurance coverage."[72]

260.    Cred's marketing team pushed back.  On May 15, 2020, Gardler responded to Wheeler as follows:  "[i]t would be a big deal to remove our already scant references to insurance in our marketing and on our website.  All of our competitors in the crypto space and in the fintech space reference insurance in one way or another and it would be noticeable if we remove ours without explanation."[73]

261.    Wheeler later testified that the insurance language was a "whack-a-mole that didn't stay whacked" and that despite his efforts to stop insurance representations from being included in marketing materials, "it had a way of sort of creeping back in."[74]

262.    Wheeler also raised concerns that Uphold prepared separate advertisements and marketing materials for Cred's products without Cred's knowledge, or approval through Cred's Compliance Team.

263.    Wheeler raised these concerns about Uphold's marketing in an email to compliance consultants on December 9, 2019:

> Cred's marketing department … has apparently allowed Uphold, our most important partner by far, to prepare and use advertising for Cred's products.  This advertising creates serious confusion as to the nature of the product and does not comply with our policy.  It is important that you exercise oversight over partner advertising of Cred products.…  No partner should be advertising Cred in a way that violates our marketing policy.[75]

---

[72] *Id.*

[73] *Id.*

[74] Wheeler Dep. Tr. p. 171:14-172:2.

[75] Ex. EE (December 9, 2019 email from Wheeler).

264.    Wheeler attempted to establish guidelines to address Uphold's free-range marketing of Cred products.  Specifically, Wheeler sent an email to the compliance team and Gardler on September 19, 2019 stating:

> I will work with [Compliance] to come up with guidelines … for the marketing department that will hopefully provide guidance to you and help you decide exactly which communications need compliance review.  In looking at these examples, we should start with the principle that any marketing communication that promotes "CredEarn" needs compliance review before it is sent … we need to document that statements of fact (for example, that all loans are "fully collateralized" or that Cred has $300 million in funding) are supported by verified facts … given the volume of marketing occurring, please move the guideline development to our top priority[.][76]

265.    Cred's compliance department attempted to institute a policy pursuant to which the marketing teams for Cred and Uphold were required to "[s]ubmit all marketing content to [Compliance] for Pre-approval."

266.    The policy stated that "[a]s long as it is approved by Cred Compliance, it is okay for Uphold to employ the use of" email marketing and "[o]ther communications tools to send marketing materials to Uphold users alerting them to the availability of the CredEarn products."[77]

267.    Despite these raised concerns, Uphold continued to substantially assist Schatt's misleading claims and disseminate false marketing materials to drive customers to CredEarn.

268.    Schatt violated his fiduciary duties to Cred by disseminating false marketing materials concerning insurance which drove CredEarn debt to Cred in excess of what Cred could reasonably service.

---

[76] Ex. FF (September 9, 2019 email from Wheeler).

[77] Ex. GG (draft marketing approval policy).

269.   Uphold substantially assisted Schatt in his violation of his fiduciary duties to Cred by promoting false marketing materials concerning CredEarn insurance to drive additional CredEarn debt to Cred that Cred could not reasonably service.

### C.   Uphold Made Knowing False Claims That CredEarn Was Fully Hedged

270.   In addition to regular email blasts to all customers, Uphold sent newsletters to customers called "Uphold Insights," in which Uphold stated that ████████████████████ ███████████████████████████████████████[78]

271.   This statement was false because the principal was not "fully hedged."

272.   Cred and the Trading Firm executed an extremely risky hedging strategy that left Cred at risk of losing tens of millions of dollars' worth of customer cryptocurrency due to normal fluctuations in prices.

273.   Far from being "fully hedged," Cred's highly leveraged trading strategy left Cred exposed to having its cryptocurrency positions depleted entirely due to price drops of approximately 15-20%.

274.   As executives of Cred, Schatt, Hua, and Alexander had fiduciary duties to act prudently in the operation of Cred's business, and refrain from bet–the–company positions when such strategies could lose tens of millions of dollars due to normal fluctuations in prices.

275.   Schatt, Hua, and Alexander oversaw overly risky trading strategies and failed to conduct proper due diligence on new investments

276.   In allowing Cred to enter into these risky hedging positions, Schatt and Alexander breached their duties of care to Cred through their mismanagement of Cred, with no formal diligence or oversight policies or procedures regarding investment decisions.

---

[78] Ex. HH (Uphold Insights newsletter) (emphasis added).

277.     Uphold substantially assisted these breaches of fiduciary duties by falsely marketing the Cred's positions were "fully hedged."

278.     Uphold knew about Cred's hedging strategy and the risks involved.  But in an email to Uphold board member and former CEO Adrian Steckel ("Steckel")  regarding the potential that a customer would have natural doubts about Cred's ability to offer its advertised returns without substantial risk, Thieriot stated that the "principal is all hedged out:"[79]

> On Feb 1, 2019, at 10:50 AM, JuanPablo Thieriot <jp.thieriot@uphold.com> wrote:
>
> I hear you, but Lu Hua and James would obviously be happy to speak/meet with him - and they're pretty impressive. The principal is all hedged out. It's the certainty of high interest that requires the explanation... And from a 'security' perspective - there's zero security risk when your BTC is in such a contract.

279.     Thieriot directed Schatt to develop a presentation regarding Cred's "hedging mechanism" and how it mitigated consumer risk:

> Dan,
>
> You're going to need to create a diagrammatic showing your flows. I'd recommend highlighting that while there is some market risk, one is actually stepping entirely out of "security" risk via the hedging mechanism. I might also add some Mo9 collateral to substantiate the market risk behind the % return. Consider Salinas the most financially sophisticated individual you've ever met.
>
> [80]

280.     Schatt provided materials to Thieriot to attract high net worth investors, including

███████████████████████████████████████████████████████████

████████████████████████████████ [81]

281.     But CredEarn was not "fully hedged."

---

[79] Ex. II (February 1, 2019 email from Thieriot).

[80] *Id.*

[81] Ex. JJ (CredEarn BTC Yield Term Sheet) (emphasis added).

282.     A 15-20% price drop of BTC, ETH and other cryptocurrencies would cause Cred's highly leveraged trading positions to be liquidated entirely.

283.     If those trading positions were liquidated, Cred would no longer have any "hedge" against price increases of BTC, ETH, or other cryptocurrencies.

284.     Predictably, in March of 2020, Cred's trading positions were depleted entirely leaving Cred without any hedge positions.

285.     As described by Inamullah, Cred's trading strategy left Cred vulnerable to routine fluctuations in the price of cryptocurrency:

> Q.     And are there other transactions at Cred that has lost money that may have contributed to this overall position for Cred?
>
> A.     Yes.  So I guess the MoKredit transactions along with [the Trading Firm] as sort of the consultant on how we should apply our hedges really contributed to, I think, the largest discrepancy between assets and liabilities. And what I mean by that is, you know, the original strategy at Cred was to take in assets despite what type of asset it is—Bitcoin, ETH, whatever it may be—sell a piece of it for cash, and then lend that cash to MoKredit.
>
> When there was a cryptocurrency associated with that strategy, we also needed to hedge the upside risk associated with our liability.  And so I believe we had hired [the Trading Firm] as a consultant to help us with our hedging platform.  I wasn't involved then, but I'm assuming that was their primary responsibility along with providing advice with our investment committee.
>
> So what ended up happening is we had roughly 800 Bitcoins on margin that was distributed amongst different exchanges…  And what ultimately happened is because prices fell really quickly and we were overleveraged, those assets were wiped out, meaning they were liquidated by the exchanges.[82]

---

[82]  Deposition of Daniyal Inamullah, dated December 8, 2020 ("Inamullah Dep. Tr.") at 104:21-105:20.

286.    Inamullah also testified that Cred's positions were leveraged by six to seven times their value, with a high risk of full liquidation:

Q.      Okay.  So I understand there was [the Trading Firm] that was providing some advice and also acting as a counterparty, and there was some various other cryptocurrency hedge funds that were discussed.  But these decisions, the decisions where someone at Cred went on BitMEX or OKEx and got a five-or six time – five or six time Perpetual Swap – that decision was made by who?

A.      The investment committee to go – lever long.

Q.      Okay.  And you voted in favor of that position?

A.      Yes.

Q.      Okay.  You testified previously that you thought that those hedges were a bad idea, right?

A.      At the time where we were trading, it was between 6 to 7x, like I mentioned, which was significantly over-levered.  At the time, I thought it was a smart decision because Bitcoin had bottomed out around 5,000, so I thought it was okay to go up to like three to four times leveraged.  So, yeah, I thought that was a fine decision.  And then in the liquidity analysis for ongoing operations after this trade had ended, you know, I recommended we should at least decrease our leverage ratio down to 3x max.  It was like 3.3  I don't remember the exact number.

Q.      Okay.  So let me just understand it.

A.      Yeah.

Q.      When trade happened, you thought it was a good idea?

A.      When the 300 Bitcoin trade happened, you know, at the bottom of the market, yes, I thought it was a good idea.

Q.      Okay.  What about the 800 Bitcoin transaction that was used to hedge 5,500 Bitcoin?

A.      I thought we were over-levered, and that we were levered somewhere between 6 and 7x.  And that translates into, if crypto collapses, 15 percent to 20 percent, you get fully liquidated.  And we were probably sitting somewhere at the top of the market with an ongoing pandemic.  I didn't think those trades were as smart.  And as a result of that, we actually set stop losses somewhere around 7,000 per coin.  And with the idea that we expected a dramatic collapse in prices.[83]

287.    The March of 2020 liquidations occurred when Cred was already insolvent and suffering liquidity challenges.

---

[83] *Id.* at 192:4-193:22.

288.    The March 2020 liquidations occurred due to the "hedging" strategy executed by Cred and the Trading Firm.  This hedging strategy the Trading Firm created for Cred consisted of a combination of options, repurchases, futures contracts, and "perpetual swaps" (or "perps", a type of highly leveraged trade), among other things, that the Trading Firm would execute on Cred's behalf in order to (purportedly) protect Cred against an increase in the price of cryptocurrency. It achieved the opposite result.

289.    After the price of BTC dropped in March of 2020, this caused Cred's trading positions to become liquidated.  In an email to Cred from March 12, 2020, which accompanied one of the Daily Risk Reports, the Trading Firm advised, "You now have a short position equal to $27,483,181.  For every $100 move in BTC, you will make or lose around $400,000."[84]

290.    The Trading Firm's Risk Reports indicate losses of 4,181 BTC, 259 ETH, and 16,217,464 Ripple ("XRP") of exposure between March 11 and March 12, 2020—worth tens of millions of dollars at the time and over a hundred million dollars today.[85]

291.    Despite Uphold's statements that Cred's positions were "fully hedged," Cred's positions were never fully hedged because a 15-20% drop in the price of BTC and other cryptocurrencies would eliminate the hedges completely.

292.    Schatt and Alexander breached their fiduciary duties to Cred by not reasonably hedging the BTC and other cryptocurrency price risk due to the arrangement with MoKredit.

293.    Schatt and Alexander breached their fiduciary duties to Cred by falsely promoting that CredEarn was "fully hedged" in order to drive more CredEarn debt to Cred that Cred could not reasonably service.

---

[84] Ex. KK (March 12, 2020 email from Trading Firm).

[85] Ex. LL (Trading Firm Risk Reports from March 11, 2020 and March 12, 2020).

294.    Uphold knowingly substantially assisted Schatt and Alexander's breaches of their fiduciary duties to Cred by promoting false marketing materials indicating that CredEarn was "fully hedged" to drive more CredEarn debt to Cred than Cred could reasonably service.

**D.    Uphold Disseminated False and Misleading Marketing Materials Despite Senior Uphold Employees' Stated Concerns**

295.    Several Uphold senior executives and directors knew the CredEarn marketing materials were false and raised concerns.

296.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ [86]

297.    Steckel also expressed concerns about Cred's business model on numerous occasions. ████████████████████████████████████

████████████████████████████████████████████

████



---

[86] Ex. MM (September 30, 2020 email chain between Hansen, O'Connell, and Thieriot).



298.     Thieriot forwarded the email to Schatt and Alexander ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[88]

299.     Although Uphold kept the involvement of MoKredit a secret to retail customers, Uphold did share MoKredit's involvement with a select few high-value investors.

300.     ███████████████████████████████████████████████. An email chain further demonstrates that Thieriot knew or should have known of the high levels of risk and customer's concerns associated with Cred's business practices:



[87] Ex. NN (February 2019 email chain with Thieriot, Steckel, and potential investor) (emphasis added).

[88] Ex. OO (February 2019 email chain between Thieriot, Schatt, and Alexander).

51

████████████████████████████████████

301.     Thieriot attempted to persuade this individual to invest in CredEarn by describing MoKredit's purported ability to take advantage of China's "judicial blacklist" (the "Blacklist"), which Theriot describes as an inability to renew licenses and passports, as a reason to feel secure in transferring cryptocurrency to Cred.

302.     This Blacklist fallacy involved Cred and Uphold telling existing and prospective clients that, in China, MoKredit could deter customers from defaulting on their loans by threatening to "blacklist" them if they defaulted.

303.     Supposedly, the Blacklist would severely restrict the lifestyle of defaulted creditors, including preventing the defaulting individuals from traveling or otherwise paying for things beyond their minimum basic needs.

304.     In reality, the Blacklist process required petitioning a court and was too burdensome to use to enforce small loans.

305.     In fact, MoKredit never actually put any of its borrowers on any Blacklist.

306.     Schatt, Podulka, Wheeler, and Alexander each admitted that they did not know whether MoKredit actually placed any borrowers on the Blacklist.[90]

---

[89] Ex. PP (May 4, 2020 email from Steckel) (emphasis added).

[90] *See, e.g.,* 2021 Schatt Dep. Tr. at  94:7-10 (Q:  "You never looked closely at what the judicial blacklist process entailed?"  A.  "That's correct.); *see also* Wheeler Dep. Tr. at 202:10-13 (Q. "Are you aware that not a single moKredit customer was ever placed on the judicial blacklist?"  A. "No.").

307.    Schatt, Podulka, Wheeler, and Alexander also each admitted that no diligence was performed to determine whether MoKredit actually utilized this so-called Blacklist.[91]

308.    Hua effectively admitted that MoKredit never actually placed anyone on the "judicial blacklist":

> Q.    What's the Judicial blacklist?
> A.    That one, that's more like a marketing stuff.[92]

309.    Hua further testified that MoKredit only used the Blacklist process in a tiny percentage of MoKredit customer defaults:

> Q.    Okay.  So how many borrowers – let's say in 2019, how many borrowers did moKredit have?
> A.    I think the borrowers we have is like 300,000 to 400,000, something like that.
> Q.    Okay.  And out of those 300,000 to 400,000, approximately how many defaulted?
> A.    This is where we have to like distinguish this.  There is a timeframe before the pandemic and after the pandemic.  So before the pandemic it's actually the default rate is actually normally is around 5 percent, but after the pandemic, this skyrocket like to 60 to 70 percent, I will say that.
> Q.    Okay.  So in 2019 or 2020, how many lenders, how many borrowers had defaulted on their loans to moKredit did moKredit take through this judicial blacklist process?
> A.    That's a small percentage.  It's really a small percentage.
> Q.    Would you say it's under 3?
> A.    Yeah.  I would say that, uh-huh.[93]

310.    Thieriot knew of Cred's dealings with MoKredit, but nonetheless sought to attract investors by making misrepresentations regarding Cred's relationship with MoKredit.

---

[91] *See, e.g.,* Wheeler Dep. Tr. at 201:21-202:1 (Q. "Do you know if anybody from Cred asked anyone from moKredit to see the people that were put on the blacklist?"  A. "No, I don't – not aware of anybody who did.").

[92] Hua Dep. Tr. at 113:23-113:24.

[93] *Id.* at 120:10-121:5.

311.   Yet, despite these repeated concerns—including as expressed by Uphold senior executives and directors—Uphold continued to market CredEarn to its customers and collect its 2% commission.

### III.   Uphold Earned Risk Free Commissions from the CredEarn Program

312.   At the beginning of 2019, Uphold was driving nearly all of Cred's customers to Cred, including by using the false marketing materials described above.

313.   Schatt recognized in an internal Cred email that Cred "[was] 100% dependent on Uphold."[94]

314.   By March 25, 2019, Uphold's team identified ███████████████████████ ████████████████████████████████████████████"

315.   Uphold also identified that the remaining ████████████████████████ ███████████████████[96]

316.   New customers were extremely valuable to Uphold.  New customers to Uphold meant years' worth of significant transaction fees.

317.   Uphold driving customers to Cred was crucial to Cred's early success.  CredEarn also generated material profit to Uphold.

318.   Schatt's early forecasts of CredEarn's performance indicated that CredEarn would be lucrative.

---

[94] Ex. QQ (March 15, 2019 email from Schatt).

[95] Ex. RR (March 25, 2019 email from Uphold team to McLoughlin).

[96] *Id.*

319.    ███████████████████████████████████████████

███████████████████████████████████████████

█████ [97]

320.    Uphold retained complete control over CredEarn, bore no risk, and stood to reap a 100% profit.

321.    Schatt's email indicated that Uphold would have ████ profits of the below figures:

- ████████████
- 
- 
-  [98]

322.    One month later, on March 25, 2019, the revenue forecasts increased dramatically based on new data from the CredEarn program. ████████████████████

████████████████████████

- ████████████
- 
- 
-  [99]

323.    Schatt believed a more aggressive case could be made for Uphold's profit, stating in a March 25, 2019 email to Viroja ████████████████████████

████████████████████████████████████

████████████████████████████████ [100]



---

[97] Ex. SS (February 25, 2019 email from Schatt).

[98] *Id.*

[99] Ex. TT (March 25, 2019 email from Viroja).

[100] *Id.* (emphasis added).

324. As correctly noted by Schatt, new customers were coming to Uphold because they were interested in CredEarn was "new money" to Uphold.

325. Uphold stood to generate substantial transaction fees from those new customers in addition to the 2% commissions paid by Cred.

326. Schatt believed the annual profit for Uphold based on data at the time could be double than what Viroja's forecast projected.

327. Cred could profit only if it earned more interest from MoKredit than Cred owed customers (many times upwards of 9-12%), including Uphold's 2% commission.

328. Whether Cred actually profited—or whether Cred could even pay back its loans to customers—did not matter to Uphold. Uphold still charged its commission and stood to make its 100% profit regardless of how Cred performed.

329. Uphold sought to take full advantage of its profitable position. As Thieriot explained to Schatt, "the 'credit and yield' products I'm interested in developing are 100% tied to Cred."[101]

330. Uphold's CFO, Hansen, recognized that █████████████████████████████████████████████████[102]

331. Uphold successfully attracted new customers by offering the opportunity to earn yield with CredEarn.

332. Yield earning programs linked to cryptocurrency exchanges is more commonplace now. But in 2019 and 2020, CredEarn gave Uphold a competitive advantage over many cryptocurrency exchanges.

---

[101] Ex. UU (November 22, 2019 email from Thieriot).

[102] Ex. VV (November 28, 2019 email from Hansen).

333.    New Uphold customers were extremely valuable as Uphold charges significant transaction fees for all cryptocurrency transactions on the Uphold Platform.

334.    While the exact number is unknown at this time, Uphold likely earned millions of dollars in transaction fees from new customers who joined Uphold because of the CredEarn program.

335.    Uphold also promoted CredEarn to prospective equity investors in Uphold.

336.    For example, in 2018, McLoughlin stated:



337.    Later in March of 2019, McLoughlin used projections of revenue from CredEarn to attract potential investors, stating ████████████████████████████████████
███████████████████████████████[104]

338.    Uphold was also dependent on Cred for steady income due to Uphold's own cash flow problems.  In fact, Uphold needed a bridge loan from Cred in 2019.  Schatt testified:

Q.    What was this concept was Cred going to lend money to Uphold?
A.    Can you – I believe that's the case. They were looking for a loan.
Q.    At this time on March 16, 2019, you were a director of Uphold and Cred. Right?
A.    Right.
Q.    And Karen Wong, that was the former CFO?
A.    That's right.
Q.    Karen Wong is saying that well, we would be earning less by lending to Uphold than we would by lending to moKredit.  Right?
A.    Correct.
Q.    And you are sale telling Karen Wong we should lend money to Uphold anyway?

[103] Ex. WW (September 26, 2018 email from McLoughlin).

[104] Ex. XX (March 25, 2019 email from McLoughlin).

A.      We should.   Yeah.   To – yeah, we should take other factors into consideration too, the overall partnership.

Q.      Okay.  So at all the board meetings  you had with Uphold, you ever never once discussed  this potential loan to Uphold?

A.      I don't believe it came to the board level no, no, we never discussed this.

Q.      What about not the board meeting, did  you ever discuss with Uphold at all the potential for this loan?

A.      Oh, yes, because it was I think it was originally proposed by Uphold, I believe.

Q.      When you say "proposed," this was  proposed to you.  Right?

A.      Correct.

Q.      And who at Uphold would have proposed this to you?

A.      It would have been JP Thieriot, their CEO.[105]

339.    The loan was a $5 million line of credit that Cred provided to Uphold in April of 2019 (the "Uphold LOC").[106]

340.    Discussions regarding the potential loan began in March 2019.   Cred's former CFO, Karen Wong ("Wong"), was asked to provide an analysis on the potential loan.

341.    On March 15, 2019, Wong analyzed the Uphold LOC and indicated that it was a bad deal for Cred that it should not execute.

342.    Wong reasoned that compared to the terms of existing loans between Cred and MoKredit, Cred would "be foregoing $130k in revenue for the 6 month term by lending $4.6m to Uphold vs. mokredit" even if the Uphold loan include a waiver of fees and costs.[107]

343.    Wong went on to state to Schatt, "I propose we get better terms from Uphold," including increasing the interest rate from 14% to 20% "in order to breakeven . . . . Given our cash situation . . . I think this is a fair ask."[108]

---

[105] 2021 Schatt Dep. Tr. 241:21-243:8.

[106] Ex. YY (May 1, 2019 Loan and Security Agreement).

[107] Ex. QQ (March 15, 2019 email from Schatt).

[108] *Id.*

344.    Only three hours earlier, Wong emailed Schatt outlining Cred's cash needs through April 2019, which reflected a shortfall of $430,000.

345.    Schatt rejected Wong's recommendation that Cred forego the Uphold LOC or get better terms from Uphold.  In clear violation of Schatt's duty of loyalty to Cred, Schatt rejected Wong's recommendations in favor of being "good partners" to Uphold – Schatt was an Uphold director at the time:

> [W]e do need to be good partners to Uphold to help them raise their Series D and there are some optics of lending at more than 14%.  We are 100% dependent on Uphold for our revenue at this time, and that's another important reason to help them.  I think we'll quickly find another $5 million that we can use with Lu's generous 36% in the future, so I wouldn't look at this as a "revenue loss" as much as an opportunity cost that will give us continued business leverage over Uphold for the next 6 months.[109]

346.    Cred and Uphold agreed that Cred would provide the Uphold LOC, and Cred began providing assets to Uphold before any formal writing commemorated the exact terms and conditions of the Uphold LOC.

347.    ███████████████████████████████████████████████
████████████████████████████████████.[110]

348.    The proposed loan was originally intended to be a direct loan from Cred to Uphold.[111]  However, Cred executives decided to provide the loans through the Trading Firm.

---

[109] *Id.*

[110] Ex. ZZ (April 25, 2019 Uphold line of credit term sheet).

[111] *Id.*

349.   The Trading Firm lent assets to Uphold through a Master Sale and Repurchase Agreement (the "Repo Agreement"), that the Trading Firm entered into with Uphold.  Pursuant to the Repo Agreement, Uphold was loaned cryptocurrency in tranches.[112]

350.   Cred guaranteed the loans that the Trading Firm lent to Uphold under the Repo Agreement by lending the same amount of assets to the Trading Firm.  As part of this arrangement, Cred acknowledged that "[Trading Firm's] obligations hereunder, including [Trading Firm's] obligation to pay Management Fees when due and to re-deliver the Number of Tokens at maturity is expressly conditioned upon Purchaser receiving Management Fees and taking redelivery of the Number of Tokens from Uphold Inc, pursuant to a Swap and Tranche Agreement executed between [Trading Firm] and Uphold Inc on or about May 1, 2019."[113]

351.   To hedge against this liability, Alexander continued to push for some form of security or collateralization from Uphold on the loan.

352.   On April 30, 2019, Alexander sent Uphold a proposed Loan and Security Agreement, which ███████████████████████████████████████████████████ ████████████████████████████.[114]

353.   On May 1, 2019, Cred made a loan to Uphold through the Trading Firm.

354.   Each time Uphold drew down on the Repo Agreement, Cred was forced to draw down on Cred's own Master Sale and Repurchase Agreement with the Trading Firm to cover the loans to Uphold.

---

[112] Ex. AAA (Repo Agreement)

[113] Ex. VVV (May 1, 2019 Tranche Agreement between Cred and Trading Firm).

[114] Ex. YY (May 1, 2019 Loan and Security Agreement).

355.    After the first tranche under the Repo Agreement was lent to Uphold, Alexander continued to make proposals to Uphold to secure Cred's liabilities.

356.    On May 1, 2019, Alexander proposed an alternative option to the Loan and Security Agreement—a pledge agreement—stating: "I am trying to propose a solution without knowing much about your balance sheet or overall ability to provide a guarantee or collateral. So it would be helpful if you could propose a solution."[115]  It was critical that a solution be reached because Cred had already drawn down the assets to fill Uphold's loan.[116]  For that reason, Alexander asked Uphold to confirm that any guarantee or security be retroactive to May 1, 2019.[117]  Uphold did not agree and never entered into an agreement with Cred to secure Uphold's obligations under the Uphold LOC.

357.    Uphold continuously utilized and relied on the Uphold LOC, and informally arranged for additional tranches, extensions on repayments, and loan funds as needed.

358.    As of the date of this filing, Uphold has not repaid the entire balance under the Uphold LOC.

359.    The Uphold LOC was crucial to Uphold because Uphold was experiencing cash flow issues.

360.    Several communications from Uphold management demonstrate Uphold's desperate need for cash.

---

[115] Ex. BBB (May 1, 2019 email from Alexander).

[116] *Id.*

[117] *Id.*

361.    On August 25, 2019, Thieriot emailed the Uphold Board stating, ███████████
████████████████████████████████████████████████████ [118]

362.    Uphold's CFO Hansen emailed Uphold's outside counsel stating, ████████
████████████████████████████████████████████████████
██████████████████ [119]

363.    Finally, an email from Hansen to Thieriot expressed concern at the ongoing financial woes at Uphold, stating:



364.    Uphold had every reason to take advantage of the revenue it received from Cred because Uphold needed that revenue to overcome Uphold's own cash flow challenges.

365.    Uphold also believed that it could take advantage of such revenue risk free because the SOW allocated all of the CredEarn program risk to Cred.

## IV.    Uphold's and Cred's Co-Dependent and Intertwined Relationship Continued Through Cred's Financial Crisis and Collapse

366.    Since inception, Cred's liabilities exceeded its assets and its financial situation never meaningfully improved.

367.    Cred continued to take on more and more debt, suffering loss after loss in trading, hacks, and thefts.

---

[118] Ex. CCC (August 26, 2019 email from Thieriot).

[119] Ex. DDD (February 14, 2020 email from Hansen).

[120] Ex. EEE (June 2, 2021 email from Hansen) (emphasis added).

368.    Schatt and Hua had fiduciary duties to Cred to avoid incurring debts in excess of what Cred could reasonably service.

369.    However, with every new customer, Cred increased its debts.  Schatt and Hua continued to load new and unserviceable debt onto Cred by accepting new customers, in violation of their fiduciary duties to Cred.

370.    Uphold substantially assisted these breaches of fiduciary duties and continued to promote CredEarn and pursue its fees despite Uphold's knowledge of Cred's highly risky business plan and financial turmoil.

371.    Uphold did so because, again, it had off-loaded its risk onto Cred.  Irrespective of Cred's financial condition and customers' risk of loss, Cred LLC (and after May 2020 Cred Inc.) paid Uphold HQ, Inc. a 2% commission each time an Uphold customer enrolled in CredEarn.

372.    Because Uphold controlled CredEarn and the terms of the CredEarn offering under Section 2.2.1 of the SOW, only Uphold had the ability to mitigate Cred's financial troubles.

373.    Uphold exerted contractual and actual control over CredEarn and Cred.

374.    Uphold was in a position of trust and power over Cred.

375.    Uphold should have acted in the best interests of Cred and the CredEarn customers.

376.    CredEarn generated 100% profit for Uphold with no risk to Uphold.

377.    Accordingly, Uphold never allowed the CredEarn offering to change regardless of Cred's financial condition.

378.    The CredEarn business model was structured so that Cred plunged deeper into debt with each new CredEarn customer.

379.    Cred also funnelled over 90% of the cryptocurrency it received under the CredEarn program to MoKredit.

380.    As early as February 2019—just two months after Cred's inception and one month after the launch of the CredEarn Program—Cred executives expressed concerns about Cred's solvency.

381.    On February 27, 2019, Cred's then-CFO Wong wrote to Schatt, Hua, and Alexander via email concerning Cred's desperate need for cash through March 2019.[121] Wong explained that Cred could not satisfy its debts as they came due and needed at least "140k more by March 8 to cover the invoices due on week of March 11":

> We have $387k in invoices past due and immediately due.  To highlight the most pressing ones, this includes:
>
> $30k in BCLP invoices from 2018 that Dan wants paid immediately
>
> Our first instalment of $25k monthly on the $450 PwC invoice from 2018
>
> $74k for our D&O insurance premium which is due and MUST be paid immediately to avoid cancellation of the policy
>
> $57k in past due payments to Dentons and Paul Hastings from 2018
>
> $80k payments to our ongoing support teams at InnReg, [the Trading Firm], and India including past due portions
>
> $8k in past due payment for the ERP system (I've already worked out the best payment plan for this.  We are paying in 4 instalment [sic] vs. the vendor's preference of payment up front for the entire year.)
>
> ***We need $140k more by March 8 to cover the invoices due on week of March 11 including the March 15 Payroll which will be ~$120k*** …
>
> If you guys are wondering (as I did for a moment) whether this will leave a surplus of funds at Citi, it won't.  ***We have only $7k in the Citibank account today so if you sum up all of the above we would actually still be short ~10k.***  Plus the above doesn't include the additional $67k in March expenses that can be paid in the beginning of April or any projections for Dentons, Paul Hastings, or Atlassian services for Jan-Mar. …

---

[121] Ex. FFF (February 27, 2019 email from Wong).

Also, just a heads up that unless we do something drastically different or sufficient Alliance ICO proceeds come in by the week of March 25, we will unfortunately be having this conversation again for the $400k in projected expenses for April…[122]

382.    Despite these cash flow concerns, just two weeks after Wong sent this email, Uphold approached Cred for the Uphold LOC, which Cred agreed to provide and fund.

383.    Uphold had difficulties repaying the Uphold LOC. █████████████████
████████████████████████████████████████████████ [123]

384.    Schatt's willingness to extend the loan with no penalties, while Cred was hemorrhaging cash, breached his fiduciary duties of care and loyalty to Cred.

385.    On October 8, 2019, Alexander emailed Podulka and Wheeler, stating that monies owed by Cred to the Trading Firm needed to be paid "immediately."

386.    Alexander explained that the Trading Firm had been accommodating and making interest payments on "hedge swaps" on behalf of Cred but that the Trading Firm was "unwilling" to continue carrying the expense.[124]

387.    If the Trading Firm would no longer pay those expenses, then Cred was at risk of defaulting on those hedges.

388.    Alexander further explained that, absent significant reserves—which Alexander described as "still negative"—the Trading Firm was Cred's only source of liquidity for capital markets activities.

---

[122] *Id.* (emphasis added).

[123] Ex. GGG (September 23, 2019 email from Thieriot).

[124] Ex. HHH (October 8, 2019 email from Alexander).

389.    During this time period in early October 2019, ████████████████████

████████████████████████████████████████████████████████████████████████████

████.[125]

390.    Despite Cred's precarious financial situation, Cred continued to loan Uphold money while Uphold collected commissions on CredEarn enrollees.

391.    During this time, Schatt remained active on the Uphold Board attending a board meeting on October 25, 2019.

392.    Circumstances worsened for Cred in March 2020.

393.    Schatt testified that during the first quarter of 2020 Cred was in "desperate need of cash."[126]

394.    During the next few months of financial turmoil and uncertainty, Schatt continued to be an active board member for Uphold.

395.    ████████████████████████████████████████████████████████████████

████████████████████████████████████.[127]

396.    In early March 2020, there was a drop in the price of BTC, which caused a liquidation of Cred's highly leveraged hedging positions.

397.    In a single day on March 13, 2020, Cred lost more than $100,000,000 in cryptocurrency at today's prices.  Because Cred lacked the cash or cryptocurrency to re-establish its hedging positions, the March 13, 2020 trading losses also left Cred exposed to significantly more losses if BTC and other cryptocurrencies increased in value.

---

[125] Ex. III (October 1, 2019 email from Alexander).

[126] 2021 Schatt Dep. Tr. at 152:23–153:1.

[127] Ex. JJJ (Uphold Board meeting minutes).

398.    On March 13, 2020, the Trading Firm sent Cred the following email, which was referred to internally at Cred as the "Doomsday" email:

> James, please see today's risk report attached.  As discussed, despite our best efforts, as a result of the drastic move in the market overnight, all of your BTC futures positions were liquidated.  Some of your XRP futures were also liquidated. You still have ETH, BCH and LTC futures as well as some XRP/BTC futures. Please refer to the last two pages of your report for your positions … ***You now have a short position equal to \$27,483,181.  For every \$100 move in BTC, you will make or lose around \$400,000.***
>
> ***Additionally, we have requested that you post an additional \$3mm of collateral with us for the outstanding repos you have with us.  We need this case ASAP to meet margin calls with other counterparties***.[128]

399.    Schatt and Wheeler both testified that Cred had suffered cryptocurrency trading losses of millions of dollars' worth of cryptocurrency[129] and Schatt further testified that Cred "lost all of its hedging abilities."[130]

400.    In an attempt to reinstate its hedge position, Alexander wrote to Hua on March 12, 2020.  The subject of the email is "***Cash needs – urgent***."  Alexander wrote:  "We need to recall cash urgently to support our hedge positions.  ***Our immediate cash requirement is approximately \$10 million***."[131]

401.    In this email, Alexander attempted to recall \$10 million of the approximately \$38 million principal loan amount that Cred previously extended to MoKredit, which Cred was permitted to do under the Cred LSA.  MoKredit refused.

402.    On March 24, 2020, Hua proposed a repayment schedule for MoKredit as follows:

---

[128] Ex. KK (March 12, 2020 email from Trading Firm) (emphasis added).

[129] Wheeler Dep. Tr. at 257:1–7.

[130] 2021 Schatt Dep. Tr. at 148:13–14.

[131] Ex. KKK (March 12, 2020 email from Alexander) (emphasis added).

> April: Full payment of interest @ 20% [~$650,000] + $100,000 principal.
> May: Full payment of interest @ 20% [~$650,000] + $200,000 of principal.
> June: Full payment of interest @ 20% [~%650,000] + $4 million of principal.
> July: Full payment of interest @ 20% [~$650,000] + $4 million of principal.[132]

403.    Cred accepted this payment plan, and MoKredit made partial payments in April and

May. Yet no further payments followed.

404.    On April 5, 2020, Inamullah circulated a Liquidity Memo.[133]  The Liquidity Memo

reported the following:

> several financial hedging instruments of Cred LLC were liquidated given the falling
> market prices.   The resulting short position on BTC has a strike price of
> approximately $5,900 – about 800 BTC was lost in the arrangement . . . The
> simultaneous decline in global liquidity created additional balance sheet issues for
> Cred LLC.  Specifically, a principal recall of approximately $10 million from a
> lending partner (MoKredit) was delayed given liquidity issues in the Chinese
> Consumer loan portfolio.  As a result, it was not possible to reconstitute the
> appropriate hedging instruments at a more favorable market price.

405.    The Liquidity Memo also explained that the Trading Firm "issued a margin call for

outstanding swaps."[134]  Given the illiquidity of the loan portfolio, Cred was unable to acquire the

funds to provide additional contributions.  Cred negotiated a Loan Modification summary and

executed the agreement with [the Trading Firm]" for a specific "workout plan."[135]

406.    The Liquidity Memo outlined the sources of liquidity for Cred to include:

(i) approximately $350,000 in cash on the balance sheet; (ii) loans from the portfolio amounting

to approximately $2 million; (iii) revenue from generating net interest margin from the loan

---

[132] Ex. LLL (March 24, 2020 email from Hua).

[133] Ex. MMM (Liquidity Memo).

[134] *Id.*

[135] *Id.*

portfolio amounting to approximately $700,000 to $1 million; and (iv) additional contributions to CredEarn.

407.    The Liquidity Memo concluded: "***Based on the cash flow analysis, a potential cash liquidity issue is identified for May 2020 given the delay in receiving principal back from MoKredit and minimal working capital available on the balance sheet.***"[136]

408.    In reality, the Liquidity Memo grossly understated the amount of cryptocurrency trading losses Cred.

409.    Although the Liquidity Memo reflected a loss of approximately 800 BTC, the Trading Firm records indicate that Cred suffered significantly higher losses.  Schatt testified as follows:

> Q.    Was some of the information [in the Liquidity Memo] that was incorrect an understatement of the amount of Bitcoin that was lost in March of 2020?
> A.    No, not related to that. Related to the other numbers that are in there.
> Q.    ***You are aware that memo had a loss of 800 Bitcoin.  Right?***
> A.    ***Yes.***
> Q.    ***And we showed to you today that there was actually loss in excess of 4,000 Bitcoin. Right?***
> A.    ***Yes.***[137]

410.    The Cred executive team also knew that MoKredit's proposed repayment schedule was insufficient to satisfy its liquidity needs.  The Liquidity Memo recommended that Cred request an additional $3.3 million from MoKredit and an additional $1 million if the cryptocurrency prices continued to increase.

411.    The Liquidity Memo reflects cash flow concerns and a plan to buy immediately more cryptocurrency "hedges" if Cred was able to obtain funds from MoKredit:

---

[136] *Id.* (emphasis added).

[137] 2021 Schatt Dep. Tr. at 288:1–13 (emphasis added).

Immediately: use cash from MoKredit return of principal to acquire 2,003 units of BCH (estimated total cost is 500K) Acquire 8,074 ETH with cash from MoKredit to acquire hedges for 27,298 of ETH.  Also, use excess cash to repay initial 3,077 ETH (at today's market price this is a total of $2.0 million for the hedges and a total of $3.8 million for the entire payment)  Request an additional $3.3 million from MoKredit … Request additional capital from MoKredit, assuming conditions for their underlying portfolio improve.  ***While the situation in China seems to be improving, there is little insight to the short term liquidity with MoKredit due to (i) the Chinese government's relaxation of debt repayment terms and (ii) uncertainty to the amount of cash that will be available.***[138]

412.    The Liquidity Memo also acknowledged that Cred was completely exposed to the rise in the price of cryptocurrency as such a rise would significantly increase the value that Cred owed its CredEarn customers:

It's important to note the key risk in the recommended strategy is a significant increase in cryptocurrency prices.  With the strategy above, assuming a 75% increase in cryptocurrency prices by the end of 2020, an additional $1 million will be needed from MoKredit (in addition to the current repayment schedule) in order to reconstitute the hedging program absent significant acceleration in growth of the loan portfolio.  We believe an additional $1 million should also be requested as buffer for the hedges and to opportunistically take advantage of downward movements in prices.[139]

413.    On April 5, 2020, Schatt forwarded the Liquidity Memo to Hua.

414.    On April 25, 2020, Schatt followed up with Hua to ask if there were updates regarding MoKredit's repayment schedule because Cred was "looking for funds as soon as possible to rebuild the hedges."[140]   Hua responded that there was "no change to the payment schedule since [they] discussed last time."[141]

---

[138] Ex. MMM (Liquidity Memo) (emphasis added).

[139] *Id.*

[140] Ex. NNN (April 25, 2020 email from Schatt).

[141] *Id.*

415.    Schatt testified that he made Uphold aware of the financial situation at Cred. Indeed, Schatt testified and submitted an errata stating that ██████████████████ ██████████████████████████████████████████████████.[142]

█  ██████████████████████████████████[143]

416.    Despite having the sole authority to do so under the SOW,[144] Uphold did not amend the CredEarn offering.  As a result, Cred's financial position continued to spiral downward.

417.    During this time, Schatt remained active on the Uphold Board attending board meetings on April 21, 2020, and on April 30, 2020.

418.    Despite Cred's financial situation in April 2020, Schatt and Hua continued to breach their fiduciary duties by continuing to utilize and promote CredEarn and increase Cred's debt.

419.    Uphold continued to substantially assist these breaches by promoting CredEarn, and profited from the CredEarn program by taking commissions for each CredEarn enrollee.

420.    At the same time, Uphold continued to market CredEarn as a safe and secure investment.

421.    Inamullah testified that Cred would be shut down if Cred was unable to recover from MoKredit:

> Q.    And in your declaration, it states, Cred Capital recommended the course of action for wind-up operations as soon as possible [if] Cred was unable to bring equity capital or receive the liquidity back from moKred by June 30th, 2020.  Do you remember that?
> A.    Yeah . . .

---

[142] Ex. OOO (Errata of 2020 Schatt Dep. Tr.).

[143] 2020 Schatt Dep. Tr. at 251:7-9; Ex. OOO (Errata of 2020 Schatt Dep. Tr.).

[144] Ex. O (January 16, 2019 Statement of Work for CredEarn).

> Q.       ***So you thought Cred should be shut down if moKredit doesn't give liquidity back by June 30th, 2020; right?***
> A.       ***Yeah.***
> Q.       ***And moKredit didn't give liquidity back by June 30, 2020, right?***
> A.       ***No.***[145]

422.     To make matters worse, Alexander and others stole cryptocurrency from Cred.

423.     In late April 2020, Alexander improperly transferred 224.98993 BTC and 204,567 USDC.  Alexander directed the funds to be transferred to a cryptocurrency wallet belonging to a Cred consultant.  Alexander subsequently took control of the funds himself.

424.     Schatt testified that he informed Uphold of Alexander's theft and the resulting lawsuit.[146]  Uphold continued to market CredEarn as safe and secure.

425.     Alexander also introduced Cred executives to a fraudulent investment called "QuantCoin."  Cred transferred 800 BTC to QuantCoin.  Those 800 BTC were lost.

426.     Cred purportedly suffered multiple incidents in which Cred's account with a cryptocurrency exchange was hacked.  One hack resulted in losses of $1.3 million in cryptocurrency, which given today's prices, equates to USD values approximately 4-5 times that amount.

427.     During all of these hacks and losses, MoKredit remained in default on its obligations under the Cred LSA.

428.     In May of 2020, Hua communicated that MoKredit would not be able to repay the two $4 million principal payments to Cred for June and July—totalling $8 million, all of which Cred desperately needed to continue operating.

429.     In May 2020, Cred executives knew that Cred's financial condition remained dire.

---

[145] Inamullah Dep. Tr. at 222:5-20 (emphasis added).

[146] 2021 Schatt Dep. Tr. at 250:10-12.

430.     As Wheeler explained to one outside consultant:  "[t]his is where the solvency analysis stands.  ***The memo, which I will send when I put it in Word format, sets a minimum $4 million capital raise by June 30***."[147]  Cred did not raise or otherwise receive $4 million between May 2020 and June 30, 2020.

431.     That same month, Alexander wrote to Wheeler that "[b]ased on the recent solvency analysis ***I'm not sure Cred can continue as a going concern***."[148]

432.     Schatt kept Uphold abreast as to Cred's financial situation in May of 2020, and Uphold made no changes to the CredEarn program.

433.     Schatt remained active on the Uphold Board during this time, including attending a board meeting on May 15, 2020.

434.     Schatt and Hua also continued to operate CredEarn and incur more debt for Cred.

435.     Meanwhile, Uphold substantially assisted Schatt and Hua's breaches, continuing to market CredEarn and profit from the program by taking commissions for each CredEarn enrollee.

436.     In a memorandum titled Liquidity Analysis and Plan to Overcome Current Undercapitalization from Schatt dated June 1, 2020, he wrote:

> As of June 1, 2020, Cred's current liabilities exceeded its invested assets and current assets by approximately $19.5 million or 19% of the total principal balance of liabilities . . . ***Cred does not have the capacity to repay the full liabilities if assets were liquidated today*** . . .[149]

437.     On November 7, 2020 (the "Petition Date"), Cred commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

---

[147] Ex. PPP (May 28, 2020 email from Wheeler) (emphasis added).

[148] Ex. QQQ (May 26, 2020 email from Alexander) (emphasis added).

[149] Ex. RRR (June 1, 2020 Liquidity Analysis Memo from Schatt) (emphasis added).

V.   **After Cred's Collapse, Uphold Issues Misleading Press Releases in an Attempt to Distance Itself From Cred**

438.   On October 23, 2020, Uphold received an inquiry from a journalist at a cryptocurrency news site, CoinDesk, about a story concerning Cred "losing several million in client funds."

439.   As a result of an anticipated CoinDesk article, Uphold decided to distance itself from Cred and terminated its relationship on October 25, 2020.

440.   As part of this termination, Uphold issued a statement to its customers stating "Uphold has discontinued its relationship with third-party crypto lending provider Cred."[150]

441.   Cred and Uphold continued to work on certain public messaging regarding the relationship's end, but ultimately, Uphold tried to distance itself from Cred as much as Uphold could.

442.   After being contacted by a member of the media for comment about Cred, Uphold issued a series of false public statements disclaiming its knowledge of any wrongdoings or failures at Cred prior to October 23, 2020.  For example, Uphold stated:

> On October 23, Uphold became aware for the first time that there was a potential balance sheet shortfall at Cred that may affect the firm's ability to honour its financial obligations to customers.  On that day, it became apparent that Cred had covered the situation for months and had attempted to trade itself out of difficulties by attracting more customer deposits.[151]

443.   Uphold knew well before October 23, 2020, that Cred was in financial distress.

---

[150] Uphold, *Uphold has discontinued its relationship with third-party crypto lending provider Cred*, available at: https://support.uphold.com/hc/en-us/articles/360051081112-Uphold-has-discontinued-its-relationship-with-third-party-crypto-lending-provider-Cred-.

[151]  Uphold, *Cred Chapter 11 Bankruptcy Protection and how Uphold plans to help you*, available at: https://support.uphold.com/hc/en-us/articles/360052308611-Cred-Chapter-11-Bankruptcy-Protection-and-how-Uphold-plans-to-help-you.

444.    As discussed above, Schatt testified that he told Uphold about hedging losses, MoKredit's failure to pay under the LSA, and Alexander's theft long before October 23, 2020.[152]

445.    Uphold's announcement of Cred's Chapter 11 Cases stated Cred "is apparently unable to meet its customer obligations owing to a hole in its balance sheet, which we believe results from the alleged actions of a former executive of Cred."

446.    But Uphold knew about Alexander's theft by the time the lawsuit against Alexander was filed publicly by July 15, 2020, and knew about the potential balance sheet shortfall.

447.    On October 25, 2020, Schatt was removed from Uphold's Board.

448.    Schatt testified that this decision was mutual, after a discussion with Thieriot:

Q.    Did you resign from the board?
A.    I heard a – sorry. Was that the – was there more to the question?
Q.    No. I'm done. The first question is: Did you resign from the board?
A.    It was – after a conversation with the CEO, cofounder, and a board member, it was mutually agreed that there needed to be separation between Cred and Uphold, including my board position, yeah.

449.    Uphold's messaging also claimed that its financial position remained unchanged by the relationship's end, despite Uphold's previous dependence on Cred for cash flow:



450.    Uphold also wasted no time in trying to remove and destroy marketing materials promoting Cred.

---

[152] 2020 Schatt Dep. Tr. at 251:7-9; Ex. EEE (Errata of 2020 Schatt Dep. Tr.).

[153] Ex. SSS (October 2020 email chain between Uphold executives).

451.     On November 2, 2020, in a group text message between Uphold executives Thieriot, McLoughlin, and other executives Marinho and Ribeiro, Marinho ███████████ ████████████████████████ [154]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

452.     Despite Marinho's warning, McLoughlin responded to these text messages by directing the team to █████████████████████████████ [155]

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

453.     Less than one week after these messages were exchanged, Uphold attempted further damage control and communicated to customers its intention to sue Cred (which Uphold never did).

454.     After Cred's downfall, Uphold's senior management discussed the need to change its policies.  Specifically, McLoughlin wrote in an email that the ████████████████████ ████████████████████████████████████████████████ [156]

---

[154] Ex. A (text messages between Uphold executives).

[155] *Id.* at 167 (emphasis added).

[156] Ex. TTT (November 5, 2020 email from McLoughlin).

## VI.    CredEarn Customers React to Uphold's Coverup

455.    Upon receiving notice of the termination of Uphold and Cred's relationship, customers began to approach Uphold expressing outrage over being misled by Uphold.

456.    On October 26, 2020, one customer wrote to their Uphold Senior Account Executive: [157]



457.    The same customer later expressed frustration that ██████████████ ██████████. [158]



458.    This customer also detailed exactly how Uphold drove him to Cred:



---

[157] Ex. C (October 2020 email chain between customer and Uphold).

[158] *Id.* (emphasis added).



459.    Customers also took to social media to express their confusion and frustration with

Uphold and its promotion of Cred.  Some posts from customers include:

a.  ***Uphold is guilty as Cred***:  As a lot of people here, I'm very frustrated, all this situation with Cred seems like a nightmare and pitifully Uphold is guilty as Cred is, Uphold should have had better knowledge about its partner, demand real proves [sic] about his business and how it was managed.  I trusted on Cred because of Uphold but not one else.[160]

b.  **Uphold customers lost all money sent to their trusted partner Cred**: ***Uphold promoted and advertised Cred (they called it "UpholdEarn"), as a safe platform for customers to invest their cryptocurrency [sic] and earn a small interest***.  Suddenly, Uphold terminated their partnershit [sic] with Cred.  Shortly afterwards, Cred filed for bankrupcy [sic]…. Relevant fact: Cred's CEO was in Uphold's board of directors![161]

c.  [Uphold] went on a lame initial PR campaign to distance themselves from Cred, but when that was proven to be untenable with digital receipts they've gone radio-silent to their customers.[162]

---

[159] To sign up for CredEarn, Customers were directed to Cred from the Uphold Platform.  When a customer navigated to Cred's website from Uphold, Uphold provided a "disclaimer" to customers stating they were being taken to a third-party website.  The disclaimer also stated that "Uphold will not be a party or third-party beneficiary to any agreement you may have with CRED LLC[.]"  This "disclaimer" was misleading to customers, as Uphold substantially benefited from every CredEarn customer contract based on the collection of its fees.

[160] *See* Ex. B (Trustpilot reviews of Uphold, available at https://uk.trustpilot.com/review/uphold.com?search=Cred).

[161] *Id.*

[162] *Id.*

460.    Despite customers' frustration and concern, Uphold reaped the benefit of its commissions while Cred and CredEarn customers lost everything.

## VII.    Cred Suffered Substantial Losses And Incurred Significant Liabilities To CredEarn Customers

461.    The Trust reviewed records and data from Cred's Ledger (the "Cred Ledger") to estimate total losses, including the liabilities and obligations resulting from Cred's collapse.

462.    The Cred Ledger contains over 6,000 Cred users.

463.    The Cred Ledger contains each Uphold customer's investment balance in various forms of cryptocurrency that the customer loaned to Cred through CredEarn.

464.    The Cred Ledger indicates that CredEarn losses are approximately $783,946,276.[163]  Through ongoing claims reconciliation, interviews with former Cred employees, and an ongoing investigation of Cred's records, however, the actual losses appear to be significantly higher.

465.    Cred maintained contemporaneous records of the value of new and existing CredEarn customer accounts.

466.    This CredEarn recordkeeping included funds pledged from institutional investors from program inception through September 1, 2020 and retail investors from program inception through August 15, 2020.  The Cred Ledger also included whether those funds flowed through an Uphold customer.  For the months September and October 2020, the Trust estimated potential Uphold losses by applying the monthly averages of the CredEarn program values enrolled by the institutional and retail investors during the first eight months of 2020.  The value of new and

---

[163] This figure was determined using the market value of various forms of cryptocurrency enrolled in the CredEarn program, as of November 8, 2021, representing the highest intermediate value of cryptocurrency after Cred's collapse.

existing CredEarn customer accounts formed the basis of the 2% fee Uphold charged Cred for such referrals.

467.    A comprehensive analysis of these records utilizing the highest intermediate value of cryptocurrency losses reveals the full scope of the damages suffered through the CredEarn program.  The Trust estimates total CredEarn losses are approximately $783,946,276.

468.    Uphold's knowledge and substantial assistance of Schatt and Hua's breaches of fiduciary duties caused far more loss than what is accounted for in the Cred Ledger or other Cred files.

469.    Uphold's marketing and delivery of its customers to Cred allowed Cred to become a popular yield earning platform and expand its services.

470.    Uphold's marketing efforts assisted in establishing Cred's name in the space and resulted in non-Uphold customers enrolling with Cred.

471.    Uphold's efforts to drive customers to Cred greatly increased Cred's debts and obligations both internally through Uphold customer enrolment and externally.

472.    Uphold's misconduct was a major cause of these losses.  Schatt and Hua would never have achieved their goals of obtaining hundreds of millions of dollars of retail customer cryptocurrency and diverting it to MoKredit without Uphold's marketing engine and access to Uphold's thousands of customers.

473.    By aiding and abetting Schatt's, Podulka's, Wheeler's, Alexander's and Hua's breaches of fiduciary duties, Uphold is jointly and severally responsible for all of Cred's losses.

474.    Utilizing the highest intermediate value of cryptocurrency after the Petition Date, the total losses to Cred caused by Uphold is an amount to be proven at trial, but are no less than the equivalent of $783,946,276, plus interest, and costs.

475.    At all relevant times, Cred was insolvent and thus the Uphold Fees received in connection with CredEarn and CredBorrow were actual and constructive fraudulent transfers.

476.    The Uphold Fees also represent the amount that Uphold unjustly benefitted to the detriment of Cred and its customers.  The Uphold Fees are an amount to be proven at trial, but are no less than the equivalent of $1,402,929.

## CAUSES OF ACTION

### Count I
### Aiding and Abetting Breach of Fiduciary Duty – Duty of Care

477.    The Trust re-alleges the allegations set forth in the above paragraphs.

478.    Schatt, Hua, Podulka, Wheeler, and Alexander were executives and officers who owed the fiduciary duty of care to Cred.  Schatt and Hua also owed the fiduciary duty of care to Cred as Cred's directors.  Such duties included obligations to exercise good business judgment and to act prudently in the operation of Cred's business.

479.    Schatt, Hua, Podulka, Wheeler, and Alexander breached their duties of care to Cred through their mismanagement of Cred, with no formal diligence or oversight policies or procedures regarding investment decisions, accounting, and compliance.

480.    Schatt, Hua, Podulka, Wheeler, and Alexander breached their duty of care to Cred by seeking to obtain more CredEarn debt than Cred could reasonably service.

481.    Schatt and Hua breached their duties of care to Cred by using false marketing materials to obtain more CredEarn debt than Cred could reasonably service.

482.    Uphold knew or reasonably should have known and was provided notice that Schatt, Hua, Wheeler, Podulka, and Alexander acted in violation of their respective fiduciary duties.

483.     Uphold also substantially assisted each directors' breach of fiduciary duties by designing and controlling the CredEarn program and its terms.  Uphold maintained such control and refused to allow changes to the CredEarn offering even when Cred experience financial turmoil.  Uphold also continuously facilitated the CredEarn program despite poor investments, lack of recordkeeping, and Cred's deepening insolvency and distress.

484.     Uphold knew or reasonably should have known Cred's business model and that the marketing materials created by Schatt and Uphold were misleading to the public.

485.     Uphold knowingly, or with reckless indifference, participated in Schatt's, Hua's, Wheeler's, Podulka's, and Alexander's breaches of the fiduciary duty of care by approving and disseminated false marketing materials and communications to Uphold's customers to drive more CredEarn debt to Cred than Cred could reasonably service.

486.     Uphold knowingly, or with reckless indifference, approved and disseminated marketing materials that did not disclose the existence of MoKredit, and instead Uphold stated that Cred made loans to "reputable companies."

487.     Uphold knowingly, or with reckless indifference, and disseminated marketing materials that falsely claimed that CredEarn was "safe," "secured," "insured," and "fully hedged."

488.     As a result of Uphold's knowing participation in Schatt's, Hua's, Podulka's, Wheeler's, and Alexander's breaches of their fiduciary duty of care, Cred suffered damages in an amount to be determined at trial, but in no event less than $783,946,276, plus interest and costs.

### Count II
### Aiding and Abetting Breach of Fiduciary Duty – Duty of Loyalty

489.     The Trust re-alleges the allegations set forth in the above paragraphs.

490.     Schatt and Hua, as directors and executive officers of Cred owed fiduciary duties of loyalty to Cred.

491.    Schatt also owed fiduciary duties of care, loyalty, and good faith as a member of the Uphold Board.  The duties owed to Uphold often conflicted with the duties Schatt owed to Cred.

492.    Hua also owed fiduciary duties of care, loyalty, and good faith as the founder of MoKredit.  The duties that Hua owed to MoKredit often conflicted with the duties that Hua owed to Cred.

493.    Schatt and Hua breached their duties of loyalty and good faith by, among other things, creating and disseminating false marketing materials and making misrepresentations about the safety of Cred and CredEarn.

494.    Schatt breached his duty of loyalty and good faith because he was an Uphold director and entered into a business relationship between Cred and Uphold that disproportionately benefitted Uphold to the detriment of Cred.

495.    Hua breached his duty of loyalty and good faith because he was the founder of MoKredit and entered into a business relationship between Cred and MoKredit that disproportionately benefitted MoKredit to the detriment of Cred.

496.    Uphold knew or reasonably should have known that Schatt and Hua were acting in violation of their fiduciary duties.

497.    Uphold also knew or reasonably should have known Cred's business model and the marketing materials created by Schatt and Uphold were misleading to the public.

498.    Uphold substantially assisted Schatt's breach of fiduciary duties by using its position of power, and Schatt's conflicting interests, to negotiate terms of Cred and Uphold's arrangement that benefitted Uphold to Cred's detriment.

499.    Uphold substantially assisted Schatt's breach of fiduciary duties by designing the CredEarn program with Schatt to be such that every new customer plunged Cred into further debt, while providing Uphold with additional Uphold Fees.

500.    Uphold substantially assisted Schatt's breach of fiduciary duties by maintaining control over the CredEarn program even when Cred faced financial turmoil.

501.    Uphold substantially assisted Schatt's breach of fiduciary duties by continuing to use its position of power, and Schatt's conflicting interests, to negotiate terms of Cred and Uphold's arrangement that benefitted Uphold to Cred's detriment.

502.    Uphold knowingly, or with reckless indifference, participated in Schatt's and Hua's breaches of fiduciary duties by approving and disseminated misleading marketing materials and communications to Uphold's customers.

503.    Uphold knowingly, or with reckless indifference, created, approved, and disseminated marketing materials that did not disclose the existence of MoKredit and instead made false statements claiming that Cred made loans to "reputable companies."

504.    Uphold also knowingly, or with reckless indifference, approved and disseminated marketing materials that falsely claimed that CredEarn was "safe," "secured," "insured," and "fully hedged."

505.    As a result of Uphold's knowing participation in Schatt's and Hua's breaches of their fiduciary duty of loyalty, Cred has suffered damages in an amount to be determined at trial, but in no event less than $783,946,276, plus interest and costs.

**Count III**
**Unjust Enrichment**

506.    The Trust re-alleges the allegations set forth in the above paragraphs.

507.    Uphold was knowingly and unjustly enriched to the detriment of Cred.

508.     Uphold facilitated the CredEarn program and directed its customers to invest in that program.

509.     Uphold benefitted from the structure of the CredEarn program by maintaining complete control of the CredEarn offering while unreasonably assigning all risk to Cred.

510.     Uphold also benefitted from the structure of CredEarn as it received the Uphold Fees for every CredEarn customer it drove to Cred, despite how CredEarn actually performed.

511.     Uphold benefitted from CredEarn because, as Uphold executives admitted, CredEarn drove Uphold's walletholder growth.

512.     Uphold generated transaction fees from customers who joined Uphold through CredEarn, and collected the additional Uphold Fees directly from Cred.

513.     Moreover, new Uphold customers were extremely valuable as Uphold charges significant transaction fees for all cryptocurrency transactions on the Uphold Platform.

514.     While the exact number is unknown at this time, Uphold likely earned millions of dollars in transaction fees from new customers who joined Uphold because of the CredEarn program.

515.     Every CredEarn customer that Uphold drove to Cred provided Uphold a monetary fee and plunged Cred further into debt.

516.     The economic benefits derived by Uphold as a result of the Uphold Fees it generated through CredEarn, collected from Cred, and the fees it generated as a result of the investment accounts held by its customers, are a direct and proximate result of Uphold's deceptive marketing practices that in turn harmed Cred and customers.

517.     Uphold's collection of fees were not justified because Uphold obtained such fees by directing customers to CredEarn, causing Cred to plunge further into debt.

518.     It would be inequitable and unjust for Uphold to retain any portion of the profits, fees, or revenues resulting from Uphold's facilitation of the CredEarn program.

519.     Uphold should be required to provide restitution and to disgorge the Uphold Fees that it unjustly received from Cred, and proceeds derived from accounts of Uphold customers who joined Uphold in order to participated in the CredEarn program, in an amount to be determined at trial but in no event less than $1,402,929 for the Uphold Fees and proceeds derived from Uphold customers who joined Uphold to participate in CredEarn, plus interest and costs.

### Count IV
### Actual Fraudulent Transfer
### (11 U.S.C. § 548(a)(1)(A))

520.     The Trust repeats and re-alleges each of the allegations set forth in the above paragraphs.

521.     Cred LLC and Cred Inc.[164] executed Uphold Fee payments with the actual intent to hinder, delay, or defraud its creditors.

522.     Cred LLC and Cred Inc. had the actual intent to hinder, delay, or defraud its creditors demonstrated through the badges of fraud, including, but not limited to close relationship, consideration for conveyance, insolvency, and proximity of the transfer to Cred LLC's and Cred Inc.'s collapse.

523.     Uphold and Cred LLC and Cred Inc. were closely related since Cred's inception, as Schatt and Uphold launched Cred while Schatt was Cred's CEO and one of two Cred directors as well as an active Uphold Board member.

524.     Schatt remained an active Uphold Board member throughout Cred's existence.

---

[164] Cred LLC converted to Cred Inc. on May 13, 2020.  Transfers made prior to May 13, 2020 were executed by Cred LLC, while transfers made after May 13, 2020 were made by Cred Inc.

525. Cred LLC and Cred Inc. entered into the SOW with Uphold with intent to gain hundreds of millions of dollars' worth of assets through referrals and investors.

526. Cred LLC and Cred Inc. received no consideration for the transfers, as with every CredEarn customer received from Uphold, Cred LLC and Cred Inc. plunged further into debt.

527. On the dates Cred LLC and Cred Inc. paid Uphold's invoices, Cred LLC and Cred Inc. were insolvent and remained insolvent as a result of Uphold continuing to drive substantial business and collect fees, had unreasonably small capital, and incurred or intended to incur debts beyond its ability to pay as such debts matured.

528. Cred LLC and Cred Inc.'s payment of the Uphold Fees demonstrates close proximity to Cred's collapse. As the number of CredEarn customers increased, the Uphold Fees increased along with Cred's debt.

529. Uphold regularly invoiced Cred LLC and Cred Inc. for payment of the Uphold Fees despite how Cred actually performed. Thus, the more Uphold Fees generated, the closer Cred plummeted to bankruptcy.

530. The Trust is entitled to avoid the Uphold Fees transferred by Cred LLC and Cred Inc. pursuant to Bankruptcy Code § 548(a)(1)(A).

531. The Uphold Fees are an amount to be proven at trial, but are in no event less than the equivalent of $1,402,929.

532. Cred LLC and Cred Inc. transferred Uphold Fees to Uphold as part of the CredEarn program as detailed in the SOW. The transfer of Uphold Fees was a transfer of property of Cred LLC and Cred Inc. to and for the benefit of Uphold and is avoidable as a "transfer" within the meaning of Bankruptcy Code § 101(54).

533. Uphold collected the Uphold Fees within two years before the Petition Date.

534.     Accordingly, the Uphold Fees are avoidable as an actual fraudulent transfer pursuant to Bankruptcy Code § 548(a)(1)(A).

## Count V
## Actual Fraudulent Transfer
## (6 Del. C. §§ 1304(a)(1) and 11 U.S.C. § 544(b))

535.     The Trust repeats and re-alleges each of the allegations set forth in the above paragraphs.

536.     Cred LLC and Cred Inc. executed Uphold Fee payments with the actual intent to hinder, delay, or defraud its creditors.

537.     Cred LLC and Cred Inc. had actual intent to hinder, delay, or defraud its creditors demonstrated through the badges of fraud, including, but not limited to close relationship, consideration for conveyance, insolvency, and proximity of the transfer to Cred LLC's and Cred Inc.'s collapse.

538.     Uphold and Cred LLC and Cred Inc. were closely related since Cred's inception, as Schatt and Uphold launched Cred while Schatt was Cred's CEO and one of two Cred directors as well as an active Uphold Board member.

539.     Schatt remained an active Uphold Board member throughout Cred's existence.

540.     Cred LLC[165] entered into the SOW with Uphold with intent to gain hundreds of millions of dollars' worth of assets through referrals and investors.  Cred only gained debt.

541.     Cred LLC and Cred Inc. received no consideration for the transfers, as with every customer CredEarn received from Uphold, Cred plunged further into debt.

542.     On the dates Cred LLC and Cred Inc. paid Uphold's invoices, Cred was insolvent

---

[165] Cred LLC converted to Cred Inc. on May 13, 2020.  Transfers made prior to May 13, 2020 were executed by Cred LLC, while transfers made after May 13, 2020 were made by Cred Inc.

and remained insolvent as a result of Uphold continuing to drive substantial business and collect fees, had unreasonably small capital, and incurred or intended to incur debts beyond its ability to pay as such debts matured.

543.   Cred LLC's and Cred Inc.'s payment of the Uphold Fees demonstrates close proximity to Cred's collapse.  As the number of CredEarn customers increased, the Uphold Fees increased along with Cred's debt.

544.   Uphold regularly invoiced Cred LLC and Cred Inc. for payment of the Uphold Fees despite how Cred LLC and Cred Inc. actually performed.  Thus, the more Uphold Fees generated, the closer Cred LLC and Cred Inc. plummeted to bankruptcy.

545.   The Uphold Fees are an amount to be proven at trial, but are in no event less than the equivalent of $1,402,929.

546.   The Uphold Fees were transferred by Cred LLC and Cred Inc. to Uphold within four years of the Petition Date.

547.   At all times material hereto, Cred LLC and Cred Inc. had at least one general unsecured creditor holding an allowed claim who, but for Cred LLC's and Cred Inc.'s bankruptcy filings, would have standing to bring claims to avoid Uphold's fee payments, including, but not limited to, general unsecured creditors that filed proofs of claims in the Chapter 11 Cases.

548.   Accordingly, actual fraudulent transfers are avoidable pursuant to Bankruptcy Code § 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

549.   Accordingly, the Uphold Fees are avoidable as an actual fraudulent transfer pursuant to 6 Del. C. § 1304(a)(1) and Bankruptcy Code § 544(b).

## Count VI
### Constructive Fraudulent Transfers
### (11 U.S.C. § 548(a)(1)(B))

550.    The Trust re-alleges the allegations set forth in the above paragraphs.

551.    The Trust is entitled to avoid the Uphold Fees pursuant to Bankruptcy Code § 548(a)(1)(B).

552.    The Uphold Fees are an amount to be proven at trial, but are in no event less than the equivalent of $1,402,929.

553.    The Uphold Fees were transferred by Cred LLC and Cred Inc. to Uphold within two years before the Petition Date.

554.    Cred LLC and Cred Inc. received no value from paying the Uphold Fees, because with every customer Cred received from Uphold, Cred plunged further into debt.  Cred thus never had the ability to provide services to CredEarn customers.

555.    Cred LLC and Cred Inc. were insolvent as early as February 2019 and was unable to pay its debts as they became due.  At that time, Cred LLC and Cred Inc. immediately incurred $387,000 in past due invoices and needed an influx of cash.

556.    Cred LLC and Cred Inc.'s liquidity constraints worsened over time as a result of fraud, theft, hacks, and MoKredit's ongoing defaults.

557.    On the dates Cred LLC and Cred Inc. paid Uphold's invoices, Cred LLC and Cred Inc. were insolvent and remained insolvent as a result of Uphold continuing to drive substantial business and collect fees, had unreasonably small capital, and incurred or intended to incur debts beyond its ability to pay as such debts matured.

558.    Accordingly, the Uphold Fees are avoidable as a constructive fraudulent transfer pursuant to Bankruptcy Code § 548(a)(1)(B).

## Count VII
## Constructive Fraudulent Transfer
### (6 Del. C. §§ 1304(a)(2) and 1305(a)and 11 U.S.C. § 544(b))

559.    The Trust re-alleges the allegations set forth in the above paragraphs.

560.    The Uphold Fees are an amount to be proven at trial, but are in no event less than the equivalent of $1,402,929.

561.    The Uphold Fees are avoidable as "transfers" within the meaning of 6 Del. C. § 1301(12) and Bankruptcy Code § 101(54).

562.    The Uphold Fees were transferred by Cred LLC and Cred Inc. to Uphold within four years before the Petition Date.

563.    At all times material hereto, Cred LLC and Cred Inc. had at least one general unsecured creditor holding an allowed claim who, but for Cred LLC and Cred Inc.'s bankruptcy filings, would have standing to bring claims to avoid Uphold's fee payments, including, but not limited to, general unsecured creditors that filed proofs of claims in the Chapter 11 Cases.

564.    Cred LLC and Cred Inc. received no value from paying the Uphold Fees, because with every customer Cred LLC and Cred Inc. received from Uphold, Cred LLC and Cred Inc. plunged further into debt.  Cred LLC and Cred Inc. thus never had the ability to provide services to CredEarn customers.

565.    Cred LLC and Cred Inc. were insolvent as early as February 2019 and was unable to pay its debts as they became due.  At that time, Cred LLC and Cred Inc. immediately incurred $387,000 in past due invoices and other expenses and needed an influx of cash.

566.    Cred LLC and Cred Inc.'s liquidity constraints only worsened over time as a result of fraud, theft, hacks, and MoKredit's ongoing defaults.

567.    On the dates Cred LLC and Cred Inc. paid Uphold's invoices, Cred LLC and Cred Inc. were insolvent and remained insolvent as a result of Uphold continuing to drive substantial

business and collect fees, had unreasonably small capital, and incurred or intended to incur debts beyond its ability to pay as such debts matured.

568.     Accordingly, the Uphold Fees are avoidable as a constructive fraudulent transfer pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Bankruptcy Code § 544.

## Count VIII
## Breach of Uphold LOC

569.     The Trust re-alleges the allegations set forth in the above paragraphs.

570.     Pursuant to Cred's loan offer to Uphold, the parties entered into  the Uphold LOC, where Cred loaned funds to Uphold and Uphold agreed to repay the loan with interest.

571.     Cred and Uphold implemented the Uphold LOC and upheld all material portions thereof.

572.     Uphold continuously relied on the Uphold LOC.  Cred continuously performed under the Uphold LOC, and provided funds, extended repayments, and otherwise informally entered into new tranches as Uphold required.

573.     The Uphold LOC was enforceable and supported by valid consideration.

574.     As of the date of this filing, Uphold has not paid the entire balance of the Uphold LOC.

575.     As a result of Uphold's failure to repay the Uphold LOC, Cred has suffered actual monetary damages, in the amount of the unpaid balance of the Uphold LOC, plus interest and costs.

**PRAYER FOR RELIEF**

WHEREFORE, the Trust as Plaintiff requests that this Court grant the following relief against Defendants:

A.      On Counts I and II, enter judgment in favor of the Trust and against Uphold for actual and compensatory damages in an amount sufficient to compensate the Trust for the damages suffered as a consequence of Uphold's aiding and abetting the breaches of fiduciary duties of Schatt, Hua, Podulka, Wheeler, and Alexander, in an amount to be determined at trial, but not less than $783,946,276.

B.      On Count III, enter judgment in favor of the Trust and against Uphold for actual and compensatory damages in an amount sufficient to compensate the Trust for the damages suffered as a consequence of Uphold's unjust enrichment, including all fees Uphold generated and/or receive by facilitating the CredEarn program, in an amount to be determined at trial, but not less than $1,402,929, plus all transaction fees derived from Uphold customers who joined Uphold as a consequence of the CredEarn program.

D.      On Counts IV-VII, enter judgment in favor of the Trust and against Uphold, avoiding the Uphold Fees pursuant to Bankruptcy Code §§ 544(b) and 548 and 6 Del. C. §§ 1304(a)(1)-(2) and 1305(a) and directing Uphold to return the Uphold Fees to the Trust in an amount to be determined at trial, but not less than $1,402,929.

E.      On Count VIII, enter judgment in favor of the Trust and against Uphold for actual and compensatory damages in an amount sufficient to compensate the Trust for the damages suffered as a consequence of Uphold's breaches under the Uphold LOC, in an amount to be proven at trial but not less than the unpaid balance under the Uphold LOC.

F.      The award of statutory, exemplary, treble, and/or punitive damages and/or penalties to the Plaintiffs.

G.      Reasonable attorney's fees and costs of this action and pre-judgment interest under

the state consumer protection statutes.

H.      Such other relief as this Court may deem just and proper.


Dated: Wilmington, Delaware           **MCDERMOTT WILL & EMERY LLP**
       July 22, 2022

                                      /s/  *David R. Hurst*___
                                      David R. Hurst (I.D. No. 3743)
                                      1007 North Orange Street, 10th Floor
                                      Wilmington, DE 19801
                                      Telephone: (302) 485-3900
                                      Facsimile: (302) 351-8711

                                      – and –


                                      Darren Azman (admitted *pro hac vice*)
                                      Andrew B. Kratenstein (admitted *pro hac vice*)
                                      Joseph B. Evans (admitted *pro hac vice*)
                                      1 Vanderbilt Avenue
                                      New York, NY 10017
                                      Telephone: (212) 547-5400
                                      Facsimile: (212) 547-5444

                                      *Counsel to the Cred Inc. Liquidation Trust*