# Exhibit R

Exhibit 39

**To:**      Karen Wong[karen@mycred.io]
**Cc:**      Dan Schatt[dan@mycred.io]; Heidi Ng[Heidi@mycred.io]
**From:**    James Alexander
**Sent:**    Tue 2/12/2019 9:41:22 PM
**Subject:** Re: Cred E&O Follow up
CredEarn Sample Contract.docx
CredBorrow Sample Contract.docx
moKredit_Cred_Credit_Agreement.docx.pdf
CredEarn Process Overview - internal.pdf
image001.png
image002.jpg
image003.jpg

Hi Karen,

Here are requested documents.

Regarding hedging, we accomplish this through forward contracts. In other words, the commitment to buy or sell certain amounts of digital assets—notably BTC or XRP—at a future date. We enter into these forward contracts with exchanges, for example Bitmex for BTC. We hedge to avoid market risk (ie. Changes in price) because we are contractually obliged to re-deliver an equivalent amount of crypto assets as we received at the time we entered into CredEarn agreement with client.

@Heidi Ng are you comfortable sharing the attached Process Overview? Or maybe you have another doc. specifically focused on the hedging aspect?  @Karen Wong please don't send this internal document until we are sure its ready for distribution. I don't want to create more questions than answers.

James

**From:** Karen Wong <karen@mycred.io>
**Date:** Tuesday, February 12, 2019 at 1:16 PM
**To:** James Alexander <James.alexander@mycred.io>, Heidi Ng <Heidi@mycred.io>, Dan Schatt <dan@mycred.io>
**Subject:** FW: Cred E&O Follow up

Hi guys,

Could you please help with the below request from the insurance broker? This is required to obtain Errors & Omissions coverage which protects the company should there be a complaint / lawsuit from our customers. They're requesting response within a couple of days. I appreciate if you could turn around quickly or point me in the right direction.

--kw

**From:** "Coe, Lindsay" <L.Coe@lockton.com>
**Date:** Tuesday, February 12, 2019 at 11:10 AM
**To:** Karen Wong <karen@mycred.io>
**Cc:** "Koo, Jeff" <JKoo@lockton.com>, "Soliman, Vanessa" <VSoliman@lockton.com>, "Merlo, Blake" <BMerlo@lockton.com>, "Medak, Rachel" <RMedak@lockton.com>
**Subject:** Cred E&O Follow up

Hello Karen,

We have been working diligently to get CRED E&O quotes. The current D&O carrier is having a hard time getting comfortable with the CredEarn piece of the business. In order to get them more comfortable, they are requesting the below information. Could you get this to us in the next couple of days?

- CredEarn Sample Contract/Operating Agreement with Clients
- CredBorrow Sample Contract/Operating Agreement with Clients
- Cred's contract in place with MoKredit

• Additional information on the hedging policy in place for CredEarn (apologies, as I know this was addressed on the call, but any documentation available would be useful)

Let me know if you have any questions or concerns. Cheers!

Lindsay Coe
Senior Account Manager
Lockton Financial Services
Lockton Insurance Brokers, LLC
400 Capitol Mall, Suite 2600
Sacramento, CA 95814
Tel: 415.568.4036
Email: LCoe@lockton.com






## Enhanced Yield Agreement

When you sign this Agreement and fund your Enhanced Yield Account, you are agreeing to extend a loan of assets to CRED LLC. The purpose of the loan is to allow you to earn an enhanced yield on your Bitcoin, payable in Bitcoin, US dollars or other Stable Coin as specified in this Agreement. The loan from you to CRED LLC functions in some ways like a bank deposit account but CRED LLC is not a bank and the funds in your Enhanced Yield Account are not insured by the FDIC.

### How to contact us:

Email us at support@mycred.io

Call us at (213) 262-6000

### Important Terms of Your Enhanced Yield Account

| The Yield You Will Earn | |
| --- | --- |
| **Annual Rate** | 12% is the interest rate per annum (the "**Yield**") applicable to your Enhanced Yield Account on the day you fund that account. (the "**Funding Date**"). Interest is paid in Bitcoin on the last business day of every calendar quarter after Funding Date, or on the date on which your Enhanced Yield Account matures (the "**Closure Date**"). |
| | We may increase or decrease the Yield in our sole discretion 30 days after notifying you of the change (a "**Yield Change Notice**"). If you do not notify CRED of your decision to close your Enhanced Yield Account within 15 days of receiving a Yield Change Notice (a "**Closure Notice**"), then this Agreement will remain in effect and you cannot withdraw your funds until the Closure Date. If you deliver a Closure Notice within 15 days of after we send you a Yield Change Notice, then we will either not change your Yield or we will close your account and return your funds. We will do so within 45 days after CRED receives your Closure Notice, and during which time the previously agreed Annual Rate will apply to your Account. |
| **Initial Term of Your Enhanced Yield Account** | |

**NOT** FDIC-insured

| Initial Term | Your Enhanced Yield Account will mature as follows: |
|---|---|
| | [X]   on or about August 31, 2019 (calendar month end, 6 months after Funding Date) |
| | However, your Enhanced Yield Account will mature sooner if you timely deliver a Closure Notice as described above or in the Event of Default section below.  If you do not withdraw your funds within 15 days after the scheduled maturity date, we will either extend your account for another period equal to the original period or close your account and return your funds. |
| Loan Assets | You are lending Bitcoin to CRED.  Bitcoin should be transferred to Cred's BTC wallet at its paying agent ( "**Paying Agent Wallet**") using the following address. *Please send an initial small-value test transfer, and after confirmation of receipt transfer the balance:* |
| | 3MXVTPasaHSAP91wohZDy3UbFdcLqVGx3U |
| | Assets will be credited to your Enhanced Yield Account upon confirmation of receipt to the Paying Agent Wallet. |
| Commitment Amount | You agree to initially lend CRED [up to 1,250] Bitcoin, which must be fully funded to CRED's Paying Agent Wallet on the Funding Date.  Future Loan Assets are subject to a Tranche Agreement, found in Exhibit 1 of this Agreement. |
| Funding Date | Expected on [February 15, 2019].  The actual Funding Date will be the date CRED confirms receipt of the Loan Assets into Cred's BTC Paying Agent Wallet. |

## Additional Terms of Your Enhanced Yield Account

| Introduction | |
|---|---|
| About your Enhanced Yield Agreement | This document is referred to as the Enhanced Yield Agreement (the "**Agreement**") between you and CRED LLC with respect to your Enhanced Yield Account.  This Agreement documents a loan of assets from you to us, not a deposit relationship, although we refer to the relationship between you and us as an "account" or specifically as an "Enhanced Yield Account." |
| | When you fund your Enhanced Yield Account, you agree to the terms of this Agreement. |
| Changing the Agreement | We may change this Agreement in our discretion, subject to applicable law.  We may do this in response to the business, legal or competitive environment.  This written Agreement is a final expression of the agreement governing the Enhanced Yield Account.  The written Agreement may not be contradicted by any alleged oral agreement. |
| | Changes to some terms may require advance notice, and we will tell you in the |

2

CRED_EXAMINER_0000103Z

| | notice if you have the right to reject a change. |
|---|---|
| **Words we use in the Agreement** | "**We**", "**us**", "**our**" and "**CRED**" mean CRED LLC.<br><br>"**You**" and "**your**" mean the person who applied for and funded your Enhanced Yield Account. By funding your Enhanced Yield Account, you loan those funds to CRED subject to the terms and conditions of this Agreement.<br><br>"**Loan**" or "**Lend**" means the loan you extend to CRED by funding your Enhanced Yield Account. |

## Electronic Account

| | |
|---|---|
| **Your account is all electronic** | Your Enhanced Yield Account is all electronic. This means that you will not receive any paper notifications, statements or disclosures. You can request any statement or other notice in paper form within 180 days of the date of the notice. To receive a paper copy of any notice that has been previously provided to you electronically, please contact member support at support@mycred.io<br><br>Future notices will continue to be delivered electronically unless you specifically inform us that you wish to withdraw your consent to receive electronic documents. If you decide to withdraw your consent, the legal effectiveness, validity or enforceability of prior electronic notices will not be affected, we may decide to close your Enhanced Yield Account. |

## About using your credit line

| | |
|---|---|
| **Account credentials** | Keep your Enhanced Yield Account information safe and don't let anyone else access your Enhanced Yield Account. If your Enhanced Yield Account is being used without your permission, contact us right away.<br><br>You may not use your Enhanced Yield Account for illegal activities, or any transaction that is illegal in the state where you live or the state where you are making your transaction. |
| **The loan** | When you fund your Enhanced Yield Account, you are agreeing to lend to us all funds in the account. We agree to repay, with interest, all amounts we borrow from you, subject to provisions of this Agreement that allow us to deduct certain fees in some circumstances.<br><br>We calculate interest on a simple interest basis based on the number of days amounts are drawn and outstanding.<br><br>Our calculations as to the amounts we have borrowed and repaid, the amounts of accrued and paid interest, and all other calculations and determinations we make are binding on you and conclusive for all purposes unless you obtain a final, non-appealable judgment to the contrary.<br><br>Interest payments not received by you within three business days after due will accrue a late fee equal to 10% annualized, calculated daily<br><br>In the event CRED fails to pay any amounts due or to return any digital currency hereunder, CRED shall pay you upon demand all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs incurred by you in connection with the enforcement of its rights hereunder. |
| **Hard fork** | In the event of a hard fork in the relevant digital currency blockchain, lender shall provide email notification to borrower. There will be no immediate termination of loans due to hard fork.<br><br>Lender will receive the benefit of any incremental tokens generated as a result of a hard fork in the relevant digital currency protocol that results in a second token (the "New Token") being created. |

For purposes of this agreement, a hard fork will have been deemed to have occurred if any two of the following four conditions are met:

- Hash Power: the average hash power mining the New Token on the 30th day following the occurrence of the fork (calculated as a 30-day average on such date) is at least 5% of the hash power mining the relevant digital currency on the day preceding the hard fork (calculated as a 3-day average of the 3 days preceding the hard fork). The source for the relevant digital currency hash power will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- Market Capitalization. the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the hard fork (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the relevant digital currency (defined as the total value of the relevant digital currency) (calculated as a 30-day average on such date). The source for the relevant digital currency market capitalization will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the market capitalization of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- 24-Hour Trading Volume: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the hard fork (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the relevant digital currency (calculated as a 30-day average on such date). The source for the relevant digital currency 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the 24-hour trading volume of the New Token will be (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

- Wallet Compatibility: the New Token is supported by at least one wallet among Uphold, BitGo or Ledger wallets within 30 days of the hard fork.

If the hard fork meets the criteria above, borrower will have up to 60 days from the hard fork to pay lender. Borrower can reimburse lender for the value of the New Tokens with any combination of a one-time digital currency payment of the relevant digital currency reflecting the amount of the New Token due using the agreed upon spot rate at the moment of repayment, returning the loaned digital currency so that lender can split the tokens themselves, sending the New Tokens directly to lender, or a U.S. Dollar cash payment at the agreed upon spot rate of the New Token at the time of repayment.

| Periodic statements | Each month or quarter we may create a statement with that period's transactions on it. We may provide this statement to you electronically or you may need to log in to your account to see it. We may not provide a statement if there has been no |
|---|---|

4

| | |
|---|---|
| | activity in your Enhanced Yield Account or if it is not required by law. |

## Other important information

| | |
|---|---|
| **Changing your contact information** | You must notify us immediately if you change:<br><br>• the e-mail address to which we send notices, statements and other information;<br>• your phone number that you designate for communicating with us;<br>• your mailing address; or<br>• any linked bank account or wallet from which you send or receive funds.<br><br>If you have more than one account with us, you need to notify us separately for each account. We may update your contact information if we receive information that it has changed or is incorrect.<br><br>If you change your contact information and do not notify us, and we are unable to reach you or confirm delivery of information, or we are unable to process transfers between your Enhanced Yield Account and your bank account or wallet, we will assess (and collect via set off) a monthly fee of up to 1% of your account balance per month during such period that we are unable to make contact with you or process transfers. |
| **Event of default** | The following defaults shall constitute events of default hereunder and are hereinafter referred to as an "Event of Default" or "Events of Default":<br><br>(a) the failure of the Borrower to return any borrowed amount or pay any borrowing fees when due hereunder;<br>(b) a material default in the performance of any of the other agreements, conditions, provisions or stipulations contained in any of the loan documents;<br>(c) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower and shall not be dismissed within thirty (30) days of their initiation; or<br>(d) any representation or warranty made in any of the loan documents proves to be untrue in any material respect as of the date of making or deemed making thereof.<br><br>Upon the occurrence and during the continuation of any Event of Default, the lender may, at its option (a) declare the entire borrowed amount outstanding hereunder immediately due and payable, (b) terminate this agreement by delivery of a Closure Notice to Borrower, and (c) exercise all other rights and remedies available to the lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default the borrowed amount and the amount of any borrowing fee then outstanding hereunder shall automatically become and be immediately due and payable. |
| **Sending you notices** | Whenever possible, we will send you notices via email, text message, or through the mobile application, subject to applicable law. Any notice that we send to you in those ways is deemed to be given when sent.<br><br>We may also mail you notices through the U.S. mail, postage prepaid, and address them to you at the latest billing address on our records. Any notice that we send you this way is deemed to be given when deposited in the U.S. mail. |
| **We may contact you** | If we need to contact you to process a transfer or otherwise service your account, you authorize us (and our affiliates, agents and contractors) to contact you at any number you provide, from which you call us, or at which we believe we can reach you. We may contact you in any way, such as calling, text messaging, through the mobile application, or email. |

CRED_EXAMINER_00001035

| | We may monitor and record any calls between you and us |
|---|---|
| **Assigning the Agreement** | We may sell, transfer or assign this Agreement and your Enhanced Yield Account. We may do so at any time without notifying you. You may not sell, assign or transfer your Enhanced Yield Account or any of your rights, benefits, duties or obligations under this Agreement. |
| **Rights and remedies cumulative** | No delay or omission by the lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of the lender stated herein are cumulative and in addition to all other rights provided by law, in equity. |
| **Severability** | If at any time after the date of this Agreement, any of the provisions of this Agreement, with the exception of the mandatory arbitration provision below, which is governed by a separate severability provision, are held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality and unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provisions of this Agreement. |
| **Governing law** | All extensions of credit are made by us in the state of Utah. Utah law and federal law govern this Agreement and your Enhanced Yield Account. They govern without regard to internal principles of conflicts of law. |

| **Dispute resolution** | |
|---|---|
| **How to resolve a mistake** | If you think we made a mistake in how we have handled your account, email us at support@mycred.io, call our support line at (213) 262-6000 or write to us at:<br><br>CRED LLC<br>2121 S. El Camino Real, 5th floor<br>San Mateo, CA 94403<br><br>In your email or letter, please provide:<br><br>• your name and your telephone number or email address associated with your Enhanced Yield Account;<br>• the dollar amount of the suspected error; and<br>• a description of the error and why you believe it is a mistake.<br><br>You must contact us within 30 days after the error appeared on any statement, notice or other communication from us to you or will waive your objection.<br><br>Within 30 days of receiving your call, email, or letter, we will confirm that we received your call, email, or letter and we will notify you if we have already corrected the error. Within 90 days of receiving your call, email, or letter, if we have not already resolved the error, we will correct the error or explain to you why we believe the statement is correct. |
| **Mandatory arbitration** | PLEASE READ THIS ARBITRATION PROVISION CAREFULLY AS IT AFFECTS YOUR RIGHTS AND WILL IMPACT HOW LEGAL CLAIMS YOU BRING AGAINST CRED LLC OR THAT CRED LLC BRINGS AGAINST YOU ARE RESOLVED.<br><br>You and we agree that any claim or dispute at law or equity that has arisen or may arise between us will be resolved in accordance with the provisions set forth in this mandatory arbitration provision.<br><br>**Contact CRED First**<br><br>If you have a dispute regarding your Enhanced Yield Account, we encourage you to contact us first at support@mycred.io or (213) 262-6000 to try resolving your problem directly with us. |

6

## Agreement to Arbitrate

Except as explicitly provided in this Agreement, any dispute or claim arising out of or relating to this Agreement, or relating in any way to your Enhanced Yield Account, your loan, or the use of any of our products, websites, web applications, or mobile applications that cannot be resolved directly between you and us, including without limitation, any claims based in contract, statute, tort, fraud, misrepresentation or any other legal theory, shall be resolved by non-appearance based binding arbitration, rather than in court. You may also assert claims in small claims court, if your claims qualify and so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis. The Federal Arbitration Act and federal arbitration law apply to this Agreement. There is no judge or jury in arbitration and court review of an arbitration award is limited, but an arbitrator can award an individual the same damages and relief as a court and must apply and follow the terms of this Agreement as a court would. YOU UNDERSTAND THAT ABSENT THIS PROVISION, YOU WOULD HAVE THE RIGHT TO SUE IN COURT AND HAVE A JURY TRIAL.

Except as explicitly provided in elsewhere in this Agreement, all claims you or we bring must be resolved in accordance with this mandatory arbitration provision. Any claim filed or brought contrary to this mandatory arbitration provision shall be considered improperly filed.

## Arbitration Procedures

Either you or we can initiate arbitration through the alternative dispute resolution provider the American Arbitration Association (the "**AAA**") under its rules and procedures and, where appropriate, the then-current Supplementary Procedures for Consumer Related Disputes (the "**Consumer Rules**"), as modified by this mandatory arbitration provision. The AAA's rules and Consumer Rules are available at the AAA website www.adr.org.

The arbitration shall be conducted by telephone or electronic means and/or shall be solely based on written submissions, the specific manner of which shall be chosen by the party initiating the arbitration. The arbitration shall not involve any personal appearance by the parties or witnesses unless the arbitrator determines that an in-person hearing is necessary based on the request of one of the parties. The arbitrator will make a decision in writing, and shall provide a statement of reasons if requested by either party. The arbitrator will decide the substance of all claims in accordance with applicable law, including recognized principles of equity, and will honor all claims of privilege recognized by law. Any judgment on the award rendered by the arbitrator shall be final and may be entered in any court of competent jurisdiction.

## Costs of Arbitration

Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA rules and, where appropriate, limited by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, we will pay all arbitration fees and expenses.

## Prohibition of Class and Representative Actions and Non-Individualized Relief

YOU AND WE EACH AGREE THAT ANY DISPUTE RESOLUTION PROCEEDINGS WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A

CRED_EXAMINER_00001037

CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S) ANY RELIEF AWARDED CANNOT AFFECT OTHER CRED CUSTOMERS.

If for any reason a claim proceeds in court rather than in arbitration, we each waive any right to a jury trial and agree to proceed only on an individual basis and not in a class, consolidated, or representative action.

### Exceptions

You and we agree that the following disputes are not subject to the above provisions concerning informal negotiations and binding arbitration. (1) any case we file to collect assets you owe under this Agreement (however, if you respond to the collection lawsuit by claiming any wrongdoing, we may require you to arbitrate): (2) any disputes seeking to enforce or protect, or concerning the validity of, any of your or our intellectual property rights; and (3) any claim for injunctive relief.

We also both agree that you or we may bring suit in court to obtain interim or preliminary injunctive relief necessary to protect the rights or property of you or CRED and all of our partners, affiliates, shareholders, employees, and agents of any kind (together, our "**Affiliates**").

### Severability

With the exception of any of the provisions in the subsection above entitled "Prohibition of Class and Representative Actions and Non-Individualized Relief", if a court decides that any part of this mandatory arbitration provision is invalid or unenforceable, the other parts of this mandatory arbitration provision shall still apply. If a court decides that any of the provisions in the subsection entitled "Prohibition of Class and Representative Actions and Non-Individualized Relief" is invalid or unenforceable, then the entirety of this mandatory arbitration provision shall be null and void. The remainder of the Agreement will continue to apply.

### Opt-Out Procedure

Notwithstanding the above, you may choose to pursue your claim in court and not by arbitration if you opt out of this arbitration provision within 30 days from the date you accept this Agreement for the first time (the "**Opt Out Deadline**"). You may opt out of this mandatory arbitration provision by sending us a written notice that you opt out to the following address. CRED LLC, 2121 S. El Camino Real, 5th floor, San Mateo, CA 90043. Any opt-out received after the Opt Out Deadline (allowing three (3) additional days for mailing) will not be valid and you must pursue your claim in arbitration or small claims court. If you opt out of arbitration provisions, all other parts of this Agreement will continue to apply. Opting out of this mandatory arbitration provision has no effect on any previous, other, or future arbitration agreements that you may have with us.

### Future Amendments to this Arbitration Provision

Notwithstanding any provision in this Agreement to the contrary, you and we agree that if we make any amendment to this mandatory arbitration provision (other than an amendment to any notice address, telephone number, or website link provided herein) in the future, that amendment shall not apply to any claim that was filed in a legal proceeding against us prior to the effective date of the amendment. The amendment shall apply to all other disputes or claims governed by the arbitration provisions that have arisen or may arise between you and us. We will notify you of amendments to this mandatory arbitration provision by posting the amended terms on mycred.io at least 30 days before the effective date of the amendments and by providing notice through email. If you do not

8

agree to these amended terms, you may close your Enhanced Yield Account within the 30-day period and you will not be bound by the amended terms.

[Balance of page intentionally left blank]

9

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the Effective Date written below.  It is specifically agreed and understood that this Agreement is not binding upon the parties until the date it is actually signed by CRED.

Effective Date: [February 15, 2019]

Dan Schatt, President
For and on behalf of CRED LLC

[Lender]
For and on behalf of [entity – if any]

Borrower

Lender

--------------------------------------------------
Signature

--------------------------------------------------
Signature

--------------------------------------------------
Printed

--------------------------------------------------
Printed

Addresses for notices:

Addresses for notices:

Support@mycred.io
Cc: James Alexander
james.alexander@mycred.io

[email of Lender for notices]

43

**SAMPLE EXHIBIT 1 – *TO BE COMPLETED FOR SUBSEQUENT INVESTMENTS***

**TRANCHE AGREEMENT No. [2]**

Borrower and Lender hereby agree as follows:

1)      Each has elected to proceed with a new Tranche transaction involving additional Bitcoin loaned by You.

2)      Each agrees that the Enhanced Yield Agreement, effective on or about _____ is incorporated by reference into this Tranche Agreement and that the following terms are part of the Agreement:

| | |
|---|---|
| Loan Assets | [X]     Bitcoin |
| Commitment Amount | _____ Bitcoin |
| Interest Rate | _____% per annum for this Tranche, based on market conditions and Lender's adjustments to its normally-prevailing rates, which Lender modifies from time to time in its sole discretion. |
| Funding Date | _____<br><br>The actual Funding Date will be the date CRED confirms receipt of the Loan Assets into Cred's Paying Agent Wallet at the following address:<br><br>3MXVTPasaHSAP91wohZDy3UbFdcLqVGx3U |
| Initial Term | Your Enhanced Yield Account will mature as follows:<br><br>[X]     on [_____] (calendar month end, 6 months after Funding Date)<br><br>[__]     on _____ (days after the Funding Date)<br><br>However, your Enhanced Yield Account will mature sooner if you timely deliver a Closure Notice as described above.  If you do not withdraw your funds within 15 days after the scheduled maturity date, we will either extend your account for another period equal to the original period or close your account and return your funds. |
| Execution Date | _____, 20___ |

3)      This Tranche Agreement No. [__] documents a new Tranche and becomes a binding agreement on the Execution Date set forth above.

[Balance of page intentionally left blank.]

^1

Dan Schatt, President
For and on behalf of CRED LLC

Borrower

[Lender]

Lender

.................................................................
Signature

.................................................................
Printed

.................................................................
Signature

.................................................................
Printed

12

# MULTI-TRANCHE CREDIT AGREEMENT

This Multi-Tranche Credit Agreement (including the exhibits hereto, this "**Agreement**") is entered into by and between the undersigned individual or entity (the "**Borrower**") and CRED LLC having an address of 123 Mission Street, San Francisco, CA 94105 (the "**Lender**") as of the Effective Date specified on the signature page hereto.

# RECITALS

WHEREAS, the Borrower desires to borrow money from time to time in Tranches and secure these borrowings by pledging an agreed amount of Tokens in the form of Bitcoin, Ethereum, XRP and other agreed-upon types of cryptocurrency to Lender, and Lender desires to lend in Tranches to Borrower, subject to agreed-upon terms and conditions;

WHEREAS, Lender will release pledged Tokens on the Maturity Date for a Tranche, subject to agreed-upon terms and conditions; and

WHEREAS, the parties intend that the benefit of any and all appreciation and any and all risk of loss from any depreciation resulting from a change in the price of the Tokens from the Closing Date for a Tranche to the Maturity Date for that Tranche in the normal, non-default course of business will accrue to the Borrower and not to the Lender.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.     **DEFINITIONS.**  All The Terms Used In This Agreement Shall Have The Following Meanings:

1.1      "**Advance Rate**" means 50% of the Fair Market Price per the Closing Statement for XRP and 50% of the Fair Market Price per the Closing Statement for Ethereum unless otherwise specified in a Tranche Agreement.

1.2      **Balance Disbursement**" for a Tranche means the Tranche Loan Amount for that Tranche minus (less) the initial Disbursement, if any, and any origination fees, costs or expenses, if applicable and then due and as set forth in the Closing Statement for that Tranche, not satisfied in cash by the Borrower on the Closing Date.

1.3      "**Bitcoin**" means Bitcoin pledged or transferred as specified in this Agreement and any related Bitcoin resulting from a "soft" or "hard" fork in the Bitcoin blockchain, a revision or upgrade to the Bitcoin software code, reclassification, or other like change of Bitcoin.

1.4      "**Collateral**" is defined in the Pledge Agreement.

1.5      "**Contractual Currency**" means USD unless otherwise specified in a Tranche Agreement.

1.6      "**Closing Date**" means the date on which a Tranche is consummated, as evidenced by a completed and accepted Closing Statement.

1.7      "**Closing Statement**" means a document in substantially the form of Exhibit 2 hereto relating to a particular Tranche, which document will be binding and conclusive for all purposes unless Borrower provides a detailed written notification to Lender within 3 business days of the date of transmission of the Closing Statement and that notification demonstrates with accurate supporting evidence that an error was made in the Closing Statement.

1.8      "**Currency Exchange Price**" the parties agree to calculate the Token exchange price based on the applicable Bloomberg United States Dollar Spot XBT or XET Currency page.

1.9      "**Default**" means any event, act or condition which, with notice or lapse of time or both, would constitute an Event of Default.

1.10      "**Default Floor**" means, initially and with respect to a particular Tranche, 76% of the Fair Market Price for Ethereum per the Closing Statement and 75% of the Fair Market Price for XRP per the Closing Statement. Following the cure of a Valuation Event for a Tranche, Default Floor means that the Fair Market Price for pledged Collateral at that time is less than 60% of the then-outstanding balance of the Tranche Loan Amount plus any interest, fees and other amounts then due and payable with respect to that Tranche.

1.11      "**Default Notice**" is defined in Section 7.2.

1.12      "**Deficiency**" means with respect to a Valuation Event and a particular Tranche, the amount measured in USD by which the Default Floor for that Tranche exceeds the Fair Market Price for the Tokens pledged in that Tranche.

- 1 -

CRED_EXAMINER_00001043

1.13    "**Digital Wallet**" means a software program that stores public and private keys and interfaces with the Token blockchain in order to allow users to send and received Tokens.

1.14    "**Electronic Messaging System**" means an electronic system for communication capable of reproducing communication in hard copy form, including email.

1.15    "**Equivalent Tokens**" means with respect to a particular Tranche, Tokens equivalent (the same type, name, category and technical specifications) to the Tokens pledged by Borrower in that Tranche.

1.16    "**Ethereum**" means Ethereum pledged or transferred as specified in this Agreement and any related Ethereum resulting from a 'soft' or 'hard' fork in the Ethereum blockchain, a revision or upgrade to the Ethereum software code, reclassification, or other like change of Ethereum.

1.17    "**Event of Default**" is defined in Section 7.1.

1.18    "**Exchange Business Day**" means any day that is a trading day and a price is posted on the applicable Bloomberg United States Dollar Spot XBT or XET Currency page.

1.19    "**Fair Market Price**" means with respect to a Token, the average of the last USD sale price for that Token on 2 consecutive Exchange Business Days (although 3 consecutive Exchange Business Days is used in pricing a Tranche, as will be reflected in the *Initial Closing Statement* for that Tranche) quoted using the Bloomberg Generic Price as posted by Bloomberg on the applicable United States Dollar Spot XBT or XET Currency page.

1.20    "**Initial Disbursement**" means for a particular Tranche, the portion in USD of the Tranche Loan Amount for that Tranche specified in the Tranche Agreement.

1.21    "**Maturity Date**" means with respect to a particular Tranche, 2-year anniversary of the Closing Date for that Tranche unless otherwise agreed in the Tranche Agreement.

1.22    "**Pledge Agreement**" means the Pledge Agreement (Cryptocurrency) attached as *Exhibit 4*, entered into by Borrower and Lender and incorporated by reference herein.

1.23    '**Special Default Notice**' is defined in Section 8.3.

1.24    "**Tranche Loan Amount**" means with respect to a particular Tranche, the amount Lender agrees to lend based on the Tokens to be pledged by Borrower to secure that Tranche.   The Tranche Loan Amount is calculated as the product of (1) the per-Token Fair Market Price (calculated using the Verification Date as the first day of pricing) of the Tokens being pledged in that Tranche and (2) the number of Tokens being pledged.

1.25    "**Tranche Repayment Amount**" means with respect to a particular Tranche, the aggregate amount to be paid by Borrower to Lender on the Maturity Date to pay and satisfy all of Borrower's obligations, debts and liabilities with respect to that Tranche.

1.26    "**Tokens**" means the type of cryptocurrency specified in a Tranche Agreement which will be either Bitcoin, Ethereum or XRP.

1.27    "**Tranche**" means a particular loan transaction entered into pursuant to this Agreement and a particular Tranche Agreement and Closing Statement.

1.28    "**Tranche Agreement**" means an agreement in substantially the form of *Exhibit 1* hereto containing such terms and conditions as Borrower and Lender may agree upon in writing at the time to evidence a particular Tranche.

1.29    "**Transaction Documents**" means collectively, this Agreement, the Pledge Agreement, the Tranche Agreements, the Closing Statements, and any other agreements, documents, instruments, exhibits or financial statements delivered in connection with Tranches. All such documents must be contemporaneously executed and read and construed together in a manner so as to give meaning and effect to all their provisions.

1.30    "**USD**" means United States Dollars.

1.31    "**Valuation Event**" means with respect to a particular Tranche that the Fair Market Price of the Tokens pledged in that Tranche has fallen below the Default Floor.

1.32    "**Verification Date**" means the day after the Tokens are received in Lender's Digital Wallet prior to the Closing Date for a particular Tranche.

- 2 -

CRED_EXAMINER_00001044

2.    **TOKEN DELIVERY AND DISBURSEMENT ON TRANCHE CLOSING DATE**

    2.1    Tranche Loan Amount.

        (a)    Subject at all times to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to the Tranche Loan Amount for a particular Tranche as set forth in the applicable Tranche Agreement in the form of Exhibit 1 and Closing Statement in the form of Exhibit 2, both of which exhibits are incorporated herein by reference.   The Tranche Loan Amount must be funded in the Contractual Currency no later than the Closing Date

        (b)    In addition to the first Tranche Agreement which must be executed contemporaneously with this Agreement, Borrower and Lender may each elect to enter into additional Tranche Agreements for additional Tranche Loan Amounts secured by Tokens in the chosen type of Token for each Tranche Agreement. Lender will make its best efforts to complete additional Tranche Agreements contingent upon market conditions such as the price, trading volume, number of Tokens issued and outstanding and the number of Tokens in the float.   All Tranches and Tranche Agreements are subject to the terms and conditions of this Agreement, although the parties may agree in writing in each Tranche Agreement upon such additional or different terms and conditions as set forth in the Tranche Agreement.   Each Tranche transaction must be memorialized using the Tranche Agreement and Closing Statement forms attached hereto as Exhibit 1 and Exhibit 2.

        (c)    Lender has the discretion and right to elect to not proceed with any Tranche with the Borrower up until the expected Closing Date for that Tranche.   If Lender elects not to proceed with a Tranche, Lender will return the Tokens delivered by Borrower related to that Tranche within 5 business days.

    2.2    Origination Fee; Interest Calculation.

        (a)    Contemporaneous with the funding of the Tranche Loan Amount by Lender on the Closing Date for a particular Tranche, Borrower must pay an origination fee equal to that Tranche Loan Amount multiplied by the Origination Fee Percentage applicable to a Tranche Loan Amount of that amount, as specified below:

| Origination Fee Percentage | Tranche Loan Amount |
|---|---|
| 3.00% | All Tranche Loan Amounts, unless otherwise specified in a Tranche Agreement and agreed to in writing by Lender. |

Lender may deduct such origination fee from the Tranche Loan Amount.

        (b)    Each Tranche will accrue interest at the annual rate specified in the Tranche Agreement from and including the date of disbursement until and including the date repayment is received by Lender.   Interest will be computed on a 360-day year for the actual number of days elapsed and will be due and payable monthly or quarterly in arrears on the last day of each month or quarter, as specified in the Tranche Agreement.   However, during the continuance of an Event of Default hereunder, all outstanding amounts will accrue interest at an annual rate equal to 7% plus the annual rate otherwise applicable to that outstanding amount.

    2.3    Pledge Agreement; Security Interest; Lender Control of Tokens.

        (a)    Pledge Agreement.   Borrower acknowledges and agrees that Borrower is pledging Collateral to secure Borrower's obligations under this Agreement and by signing this Agreement, Borrower is also signing and agreeing to the Pledge Agreement (Cryptocurrency) provided to Borrower in connection with this Agreement.   Borrower acknowledges receipt of a copy of that Pledge Agreement (Cryptocurrency) and agrees that it is incorporated by reference herein.

        (b)    Lender control of Collateral.   Borrower acknowledges that the Lender has all rights, title, ownership and interest associated with the Tokens and the Collateral for a particular Tranche during the term of that Tranche Agreement.

    2.4    Payment Provisions.

- 3 -

CRED_EXAMINER_00001045

(a)    **Maturity.** With respect to each Tranche, the Borrower agrees to pay to Lender the Tranche Repayment Amount plus any other Borrower obligations due on the Maturity Date.

(b)    **Extensions and Refinancings.** With respect to each Tranche, the Maturity Date may be extended or the Tranche refinanced by Lender if Borrower requests an extension or refinancing at least 30 days in advance and Lender agrees in writing. A fee in the minimum amount of **1%** of the Tranche Repayment Amount is due and payable on (i) the original Maturity Date if Lender agrees to extend such Maturity Date or (ii) on the date of refinancing if Lender agrees to provide refinancing on terms acceptable to Lender at that time in its sole discretion.

(c)    **Late Fees.** If Lender has not received any payment when due hereunder from Borrower, including receipt of the Tranche Repayment Amount and all other obligations from Borrower then due in immediately available funds before the close of business (Pacific time) 3 Exchange Business Days after the Maturity Date, Borrower must pay to Lender a late charge equal to **5%** of the portion of the payment, including but not limited to the Tranche Repayment Amount, that is then due. Such late charge is in addition to and cumulative with all other obligations, rights, benefits and remedies available to Lender under the Agreement on account of any default by the Borrower.

(d)    **Prepayment.** There is no prepayment of the Tranche Repayment Amount permitted prior to the Maturity Date, other than as necessary to cure a Valuation Event. Borrower acknowledges that, if the Tranche Repayment Amount is paid or other prepayments are made for any reason prior to the Maturity Date other than to cure a Valuation Event, Lender will incur losses and damages.

(e)    **Automatic Electronic Payments.** If Borrower consented to automatic payment on Exhibit 2 and thereby authorized Lender to debit by ACH transfer the bank or credit union account (the "Account") at the financial institution (Borrower's "**Financial Institution**") specified on Exhibit 3 for the amount of each payment due on each due date, then Lender will do so. If there is more than one Borrower obligated to repay the Outstandings, then Borrower designates more than one Account for purposes of making electronic payments, then Borrower agrees that Lender will first attempt to debit the primary borrower's account up to two times and, if either of those debits is returned or rejected for any reason, then Lender may debit the other Accounts designated by the borrowers in any order and Lender may debit multiple Accounts for portions of the minimum payment then due. Borrower agrees that Lender will give Borrower prior notice of a payment /debit that varies in amount from the amount of the previous payment / debit or from the preauthorized amount only if the payment / debit varies by more than $2,500 from the amount of the previous payment or from the preauthorized amount. This authorization does not affect Borrower's obligation to pay when due all amounts payable hereunder, whether or not there are sufficient funds therefore in such accounts. The foregoing authorization is in addition to, and not in limitation of, any rights of setoff Lender may have. With regard to payments made by automatic withdrawal, Borrower may stop payment of automatic withdrawals or revoke Borrower's prior authorization for automatic withdrawals by notifying Borrower's Financial Institution at least 3 business days before the scheduled date of transfer. Borrower must notify Lender of the exercise of Borrower's right to stop a payment or revoke Borrower's authorization for automatic withdrawals at least 3 business days before the scheduled date of transfer.

(f)    **When Borrower's payment will be credited to Borrower's account.** Lender credits payments as of the date received, if the payment is: (1) (a) received by 12 p.m. Pacific time in the form, manner and at the place or address designated by Lender for payment; or (b) paid with a check drawn in U.S. dollars on a U.S. financial institution or a U.S. dollar money order; or (2) by means of a preauthorized ACH transfer. Payments by check received after 12 p.m. Pacific time at the address specified by Lender on any day including the payment due date, but that otherwise meet the above requirements for checks, will be credited as of the next day. Credit for payments not made by ACH transfer as specified above may be delayed up to five business days.

(g)    **Application of Payments.** Lender will apply all payments first to fees, expenses and other amounts (other than principal and interest) Borrower owes Lender, then to accrued interest and the balance to outstanding principal. However, if a Default occurs, Lender will apply payments to Borrower's obligations as Lender determines in Lender's sole discretion.

(h)    **Other payment terms.** Lender can accept late payments, partial payments, or payments with any restrictive writing without losing any of Lender's rights under this Agreement. This means that no payment, including those marked with paid in full or with any other restrictive words, will operate as an accord and satisfaction without the prior written approval of one of Lender's senior officers. Borrower may not use a postdated check to make a payment. If Borrower does postdate a payment check, Lender may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. Lender is not liable to Borrower for any loss or expense arising out of the action Lender elects to take.

-4-

CRED_EXAMINER_00001046

2.5    **Pre-Closing Deliveries.** With respect to each Tranche, Borrower must have delivered to Lender on or before the Closing Date for that Tranche:

    (a)    this Multi-Tranche Credit Agreement executed by Borrower;

    (b)    the Pledge Agreement;

    (c)    a Tranche Agreement completed and executed by Borrower; and

    (d)    the Tokens in the type and number specified in the Tranche Agreement. Delivery instructions for the wallet-to-wallet transfer of the Tokens to Lender, including Lender's Digital Wallet address for receiving the Tokens will be provided at the time of transfer of the Tokens.

2.6    **Legal Matters.** All matters and all documentation and other instruments in connection with each Tranche and all matters hereunder must be satisfactory in form and substance to Lender and its counsel, and counsel to Lender shall have received copies of all documents which it may reasonably request in connection with such transactions.

2.7    **Closing of each Tranche.** With respect to each Tranche:

    (a)    Borrower must deliver the Tokens to Lender's Digital Wallet address(es) as provided by Lender in an encrypted email. Borrower acknowledges that the process of sending the Tokens to Lender may be interrupted or subject to errors. Failure to properly use the Borrower's Digital Wallet software may result in errors and Lender not receiving the Tokens. Borrower should take great care to verify the accuracy of Lender's Digital Wallet address(es) before sending the Tokens. Borrower understands and assumes the risk that any Tokens sent to an incorrect Digital Wallet address may never be recovered.

    (b)    Promptly following receipt of the Tokens by Lender, but no later than 5 pm Eastern Standard Time on the Exchange Business Day of receipt, Lender will transfer any Initial Disbursement to the Borrower's account specified on Exhibit 3.

    (c)    The Closing Date must occur no later than 5 Exchange Business Days from the Verification Date, assuming the conditions to Lender's obligations set forth in Section 2.5 herein are satisfied. The Balance Disbursement must be paid on the Closing Date. Lender must provide the Closing Statement to Borrower prior to the Closing Date. The Balance Disbursement must be settled (paid) to the Borrower's account specified on Exhibit 3.

2.8    **Redelivery of the Tokens.** Within 5 business days of the Borrower's satisfaction of all obligations under this Agreement with respect to a Tranche, as confirmed by Lender, Borrower will specify a Digital Wallet address for redelivery of the Tokens and Lender will deliver Equivalent Tokens to such address in an amount equal to the Tokens originally delivered by Borrower at such time as Lender is reasonably capable of doing, consistent with Lender's rights to maintain possession of the Collateral beyond the time of repayment and satisfaction of the Outstandings, as set forth in the Pledge Agreement. It is Borrower's responsibility to ensure the Digital Wallet address provided to Lender is accurate and capable of receiving the return of the Tokens. Borrower understands and acknowledges that the loss of any requisite private key(s) associated with Borrower's Digital Wallet will result in loss of access to any Tokens returned to such address. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet or vault service Borrower uses, may be able to misappropriate Borrower's Tokens. Lender is not responsible for any such losses.

3.    **PAYMENT AND TRANSFER**

3.1    Unless otherwise agreed, all money paid hereunder must be in immediately available freely convertible funds of the relevant currency. All Tokens to be transferred hereunder must be (i) unrestricted and free trading and in suitable form for transfer and must be accompanied by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonable request, or (ii) transferred through the book entry system of Euroclear or Clearstream, or (iii) transferred through any other agreed similar electronic book entry system, or (iv) transferred by any other method mutually acceptable to Borrower and Lender.

3.2    Unless otherwise agreed, all money payable by one party to the other in respect of any transaction must be paid free and clear of, and without withholding or deduction for, any taxes or duties of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction of such taxes or duties is required by law. In that event, unless otherwise agreed, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such taxes or duties been required to be withheld or deducted.

- 5 -

CRED_EXAMINER_00001047

3.3    Notwithstanding the use of expressions such as "Tranche Repayment Amount" which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, all right, title and interest in and to Tokens and money transferred or paid under this Agreement shall pass to the transferee upon transfer or payment.

4.    **CONTRACTUAL CURRENCY**

4.1    All the payments must be made in the Contractual Currency. Notwithstanding the foregoing, the payee of any money may, at its option, accept tender thereof in any other currency, provided, however, that, to the extent permitted by applicable law, the obligation of the payer to pay such money will be discharged only to the extent of the amount of the Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency (after deduction of any premium and costs of exchange) for delivery within the customary delivery period for spot transactions in respect of the relevant currency.

4.2    If for any reason the amount of any payment received by a party falls short of the amount in the Contractual Currency due and payable, the party required to make the payment will, as a separate and independent obligation, immediately transfer such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall so as to assure full payment.

5.    **REPRESENTATIONS.** Borrower represents and warrants that:

5.1    **No Liens or Restrictions.** Borrower has the absolute right to assign, convey, transfer and deliver the Tokens to the transferee free and clear of any and all mortgages, pledges, security interests, liens or other encumbrances or charges of any kind or nature. The transferor is in sole possession of the private keys associated with the Tokens and has not previously sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Tokens or its beneficial interest therein.

5.2    **Consents.** This Agreement and all the other Transaction Documents executed by and to be executed by Borrower constitute valid and binding obligations of Borrower enforceable in accordance with its respective terms and are to be construed and interpreted as a whole, the same being part of an integrated transaction. No consent of any other person and no consent, license, approval, or authorization of any governmental authority is required in connection with the pledging by Borrower of Collateral hereunder and under the Pledge Agreement, the execution, delivery and performance of this Agreement, and any of the other Transaction Documents executed or to be executed in connection herewith.

5.3    **No Conflicts.** The execution and delivery by Borrower of this Agreement and any other Transaction Document executed and to be executed by Borrower, do not and will not (a) conflict with or violate any law or governmental order applicable to Borrower or (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any encumbrance on any Token (if applicable) pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Borrower is a party or by which Borrower or the Token (if applicable) are bound or affected or which would have an effect on the ability of Borrower to consummate the transactions contemplated by the Transaction Documents.

5.4    **No Default.** Borrower is not in default under any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Borrower is a party or by which the pledge of the Tokens (if applicable) are bond or affected or which would have an effect on the ability of Borrower to consummate the transactions contemplated by this Agreement.

5.5    **No Additional Liens.** The Borrower covenants that so long as a Tranche or any obligations to Lender remain outstanding and unpaid, the Borrower will not create, assume or suffer to exist any lien of any kind upon any of the Tokens Borrower transferred to Lender.

5.6    **Anti-Money Laundering Program.** Borrower represents and warrants that it will comply with anti-money laundering laws and regulations that apply to Borrower. At the request of Lender, Borrower must provide such written further assurances as Lender may reasonably request to confirm that Borrower maintains an anti-money laundering program if it is required to do so.

5.7    **OFAC.** Borrower hereby agrees and acknowledges that it will continue to comply with rules and regulations enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") that are applicable to Borrower. Borrower represents and warrants that neither it nor any person who controls Borrower bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time-to-time. Borrower hereby represents and warrants that none of the Tokens pledged to Lender hereunder came from a third party that violated, or otherwise would violate, the provisions of any rules, regulations, or laws administered by OFAC, or be subject to other restriction based on such relevant government lists as may be published from time-to-time.

- 6 -

CRED_EXAMINER_00001048

6.8    **Source and Use of Tokens.**  Borrower represents and warrants that (i) none of the Tokens pledged to Lender hereunder was sourced from a third party that is/was engaged in unlawful activities under state, federal or non-U.S. statutes (e.g., the Federal Controlled Substances Act) and (ii) any Tokens pledged to Lender hereunder has been lawfully obtained and has not been, is not, and will not be, used in any illegal activities   In addition, Borrower represents and warrants that neither it nor any person who controls Borrower resides in or who subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.  For purposes of this Agreement, a "Non-Cooperative Jurisdiction" means any country or territory that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.

6.9    **No Material Information.**  There is no material fact known to the Borrower regarding any Token pledged to Lender hereunder which materially adversely affects or is likely or is anticipated to materially adversely affect such Token.

5.10    **Business Purpose.**  Borrower represents and warrants that Borrower's purpose in incurring its debts, obligations and liabilities hereunder and entering into this Agreement is entirely for business or investment purposes and is not for personal, family, household or other consumer purposes.

6.    **RISK FACTORS.**  Borrower has carefully reviewed, acknowledged, understands and assumes the following risks, as well as all other risks associated with Tokens (including those not discussed herein), all of which could render the Tokens worthless or of little value:

6.1    **Liquidity.**  There is no guarantee or representation of liquidity and/or transferability of Tokens in the future.

6.2    **Security.**  Tokens may be subject to expropriation and/or theft, international or unintentional bugs or weaknesses that may negatively affect the Tokens or result in loss or ability to access the Tokens.

6.3    **Access to Private Keys.**  Loss of private key(s) associated with Borrower's Digital Wallet or vault will result in loss of Tokens.

6.4    **Uncertain Regulatory Framework.**  The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear and unsettled in many jurisdictions.  It is difficult to predict how or whether governmental authorities will regulate such technologies.  It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications.  Such changes could negatively impact the Tokens in various ways.

7.    **EVENTS OF DEFAULT**

7.1    **Events of Default.**  An "Event of Default" shall exist if any one or more of the following shall occur:

(a)    Failure by Borrower to make when due, any payment or delivery under this Agreement required to be made by it if such failure is not remedied on or before the 3rd Exchange Business Day after notice of such failure is sent to Borrower; or

(b)    if any representation or warranty made by Borrower in this Agreement or in any statement furnished at or in contemplation of the Closing Date or pursuant to this Agreement or any other Transaction Document shall prove to have been knowingly untrue or misleading in any material respect at the time made; or

(c)    Default by Borrower in the performance or observance of any covenant or agreement contained in this Agreement or default in any other Transaction Document which is not cured within a reasonable time; or

(d)    if the Tokens cease to trade or are otherwise halted for more than 3 Exchange Business Days by a regulatory agency or for any other reason; or

(e)    if Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or Borrower admits in writing its inability to pay its debts as they mature; or

(f)    if documents shall at any time after their execution and delivery for any reason cease to be in full force and effect or are declared null or void, or the validity or enforceability thereof is contested by Borrower or by any other person; or

-7-

CRED_EXAMINER_00001049

(g) If a Valuation Event occurs with respect to a Tranche and Borrower fails to cure such Valuation Event as set forth below.

    (i) If a Valuation Event occurs, Lender will provide written notice thereof to Borrower. Borrower has 3 business days following receipt of such written notice to cure the deficiency by delivering to Lender either USD or additional Tokens in an amount equal to the Deficiency as set forth in the Default Notice. Lender may demand that cure be effected only in USD.

    (ii) The cure of a Valuation Event will reduce, or buy down, the Default Floor to a new lower Default Floor for the Tokens and if effected in USD, will reduce the Tranche Repayment Amount dollar-for-dollar. If a cure is effected by delivering additional Tokens, then these Tokens must be delivered by Lender to Borrower at Maturity pursuant to Section 2.8 for that Tranche.

7.2 **Rights Upon An Uncured Event of Default.** If at any time an Event of Default has occurred and is continuing beyond any applicable cure period, the non-defaulting party shall issue a written notice to the defaulting party specifying the relevant Event of Default (a "**Default Notice**"). Lender will have all rights and remedies afforded by law and under the Transaction Documents. Matters set forth as fact in a Default Notice, including data and calculations, will be binding and conclusive unless Borrower provides a detailed written notification to Lender within 3 business days of the date of transmission of the Default Notice and that notification demonstrates with accurate supporting evidence that an error was made in the Default Notice.

## 8. NOTICES AND OTHER COMMUNICATIONS

8.1 Any notice or other communication to be given under this Agreement shall:

    (a) be in the English language, and except where expressly otherwise provided in this Agreement, shall be in writing;

    (b) may be given in any manner described in subsection 8.2 below;

    (c) must be sent to the party to whom it is to be given at the address or number, or in accordance with the electronic messaging details, set out herein.

8.2 Any such notice or other communications will be deemed effective:

    (a) if in writing and delivered in person or by courier, at the time when it is delivered;

    (b) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery is attempted;

    (c) if sent by electronic messaging system, at the time that electronic message is received except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted delivery or on a day which is not a day on which commercial banks are open for business in the place where that notice or other communication is to be given will be treated as given at the opening of business on the next following day which is such a day.

8.3 If ~

    (a) there occurs in relation to either party an event which gives rise to the service of a Default Notice; and

    (b) the non-defaulting party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsection 8.2 has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of those methods as are normally used by the non-defaulting party when communicating with the defaulting party), then the non-defaulting party may sign a written notice (a "**Special Default Notice**") which:

        (i) specifies the relevant event referred to by section which has occurred in relation to the defaulting party;

        (ii) states that the non-defaulting party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsections 8.2, has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of these methods as are normally used by the non-defaulting party when communicating with the defaulting party);

- 8 -

CRED_EXAMINER_00001080

       (iii)    specifies the date on which, and the time at which, the Special Default Notice is signed by the non-defaulting party; and

       (iv)    states that the event specified in accordance with subsection (i) above will be treated as an Event of Default with effect from the date and time as specified.

On the signature of a Special Default Notice the relevant event will be treated as effective from the date and time so specified as an Event of Default in relation to the defaulting party, and the Special Default Notice will be treated and accepted as an effective Default Notice. Any Special Default Notice should also be sent in a manner contemplated under Section 8.2.

8.4    All notices, requests or other communications to either of the parties by the other must be in writing, sent by overnight mail by a reputable commercial carrier, or by electronic mail and will be deemed duly given on the earlier of the date the same is received or when deposited in the mail, postage prepaid, to the address specified on the signature page hereto, as the same may be updated from time to time by following the notice requirements specified in this section.

## 9.    ENTIRE AGREEMENT AND SEVERABILITY

9.1    This Agreement supersedes any existing communications, term sheets, or agreements between the parties containing general terms and conditions for transactions. Each provision and agreement herein will be treated as separate from any other provision or agreement herein and will be enforceable notwithstanding the unenforceability of any such other provision or agreement.

9.2    Each party acknowledges that, and has entered into this Agreement and will enter into each Tranche hereunder in consideration of and in reliance upon the fact that such transactions constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each party agrees: (i) to perform all if its obligations in respect to the entire transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect to the entire transactions hereunder, and (ii) that payments, deliveries and other transfers made by either of them in respect of any transaction will be deemed to have been made in consideration of payments, deliveries and other transfers in respect to the entire transaction hereunder.

## 10    NON-ASSIGNABILITY

10.1    Neither party may assign, charge or otherwise deal with (including without limitation any dealing with any interest in or the creation of any interest in) its rights or obligations under this Agreement without the prior written consent of the other party. Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

## 11    GOVERNING LAW

11.1    This Agreement and all instruments delivered hereunder will be governed by and construed in accordance with the laws of the State of Utah, excluding them from any principles of conflicts of laws. Except to the extent either party exercises its right to demand arbitration pursuant to Section 12 of this Agreement, any legal action, claim or lawsuit commenced by one party against the other arising out of or in connection with this Agreement, and all instruments or agreements delivered hereunder must be brought exclusively in the courts in Salt Lake City, Utah, and such courts will have the exclusive jurisdiction and venue for any such legal action, claim or lawsuit.

## 12    ARBITRATION

12.1    **Arbitration of Claims, Disputes, or Controversies.** Any claim, dispute, or controversy ("Claim") arising from or relating to this Agreement or the relationships resulting from this Agreement, whenever and by whomever commenced, shall, upon delivery of a written notice demanding arbitration to the other party (including a written notice after the commencement of a lawsuit or a notice contained in court filings in any such lawsuit), be resolved by binding arbitration pursuant to the Federal Arbitration Act, 9 USC §§ 1 et seq., and the applicable rules of the American Arbitration Association ("AAA") or JAMS in effect at the time of the written notice demanding arbitration. The term **"Claim"** as used in this Agreement is to be given the broadest possible meaning, and includes but is not limited to claims, disputes, or controversies arising from or relating to soliciting, originating, closing, or enforcing the transaction that is the subject of the Agreement.

Borrower may select which of AAA or JAMS to use for purposes of administering an arbitration governed by this Agreement. The address, telephone number, and web site containing applicable rules for each of these arbitration administrators is as follows:

          AAA
          Corporate Headquarters

- 9 -

CRED_EXAMINER_00001081

1633 Broadway, 10th Floor
New York, NY 10019
212-716-5800
www.adr.org

JAMS
71 South Wacker Drive
Suite 3090
Chicago, IL 60606
312-655-0555
www.jamsadr.com

If Borrower fails to select an arbitration administrator within 30 days from the date it or Lender delivers notice demanding arbitration, Lender will choose one. Any arbitrator must be a commercial lawyer with more than 10 years of experience in a regionally recognized law firm or a retired Federal judge or judge who served as a regular member of a state court of intermediate or final appellate jurisdiction.

Arbitrations seeking monetary relief less than $100,000.00 in the aggregate will be held within the federal judicial district encompassing the city where Borrower resides or is located. Arbitrations seeking monetary relief of $100,000.00 or more in the aggregate will be held in Salt Lake City, Utah.

Each party shall pay one-half of any fees charged by the arbitration administrator for Claim(s) asserted by a party in the arbitration.

THIS AGREEMENT IS FULLY BINDING IN THE EVENT THAT A CLASS ACTION OR SIMILAR LAWSUIT IS FILED IN WHICH BORROWER WOULD BE A CLASS REPRESENTATIVE OR MEMBER. BORROWER AND Lender AGREE THAT THERE WILL BE NO CLASS OR CONSOLIDATED ARBITRATION OF ANY CLAIM. FURTHERMORE, CLAIMS BROUGHT BY OR ON BEHALF OF OTHER BORROWERS MAY NOT BE CONSOLIDATED WITH OR ARBITRATED IN ANY ARBITRATION PROCEEDING THAT IS CONSIDERING BORROWER'S CLAIMS UNLESS SAID OTHER BORROWERS ARE PARTIES TO THE SAME AGREEMENT. SIMILARLY, BORROWER MAY NOT JOIN WITH OTHER BORROWERS TO BRING CLAIMS IN THE SAME ARBITRATION PROCEEDING UNLESS ALL OF SUCH OTHER BORROWERS ARE PARTY TO THE SAME TRANSACTION.

13      INDEMNITY AND LIMITATION OF LIABILITY

     13.1    Either party shall indemnify and hold the other party harmless against any and all claims, demands, proceedings, suits, actions, damages, liabilities, losses, expenses and costs (which shall include, but not limited to all costs of defense, investigation and accounting and legal fees) to which the other party may become subject as a result of the defaulting party's fraud, negligence, wilful misconduct or breach of any obligation under this Agreement.

     13.2    Neither party will be liable for any indirect, incidental or consequential loss or damages, including loss revenue or profits or losses arising from its normal course of business even if a party has been advised of the possibility of such damages.

     13.3    Each provision of this Section operates independently and survives the expiration or termination of this Agreement.

14      NO WAIVERS. No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and the failure or delay in the exercise of any remedy hereunder by any party shall not constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure here from will be effective unless and until such modification, waiver or consent is in writing and duly executed by both of the parties hereto. The failure or delay to give any notice herein will not constitute a waiver of any right to do so at a later date.

15      COUNTERPARTS; AMENDMENTS

     15.1    This Agreement may be executed in counterparts, each of which will be deemed an original.

     15.2    None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the parties.

16      SECTION HEADINGS

The section headings used in this Agreement are for convenience of reference only and are not to affect the construction of the Agreement nor are they to be taken into consideration in interpreting, this Agreement.

- 16 -

17    **SEVERABILITY.**  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances is determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

18    **CONFIDENTIALITY.**  This Agreement and any other related documents are to be kept confidential and are not to be reproduced in any manner whatsoever for persons other than the parties hereto.  Each party agrees not to circumvent the legitimate interests of the other party and to maintain this transaction in strict confidentiality.  Each party agrees to maintain the confidentiality of any trade secrets, techniques, and contracts and contacts of the other party. Borrower agrees not to engage in unauthorized communications (i.e. telephone calls, written inquiries, etc.) with Lender's banks, insurers, contracting parties and contacts.

19    **TRANSLATION OF AGREEMENT.**  If this Agreement is translated into a language other than English, such translation is intended to assist the Borrower in understanding the terms and conditions of this Agreement and is not intended, and shall not comprise, an enforceable Agreement.  To the extent that any conflict exists between a translation of this Agreement and the English language version of this Agreement, the English language version shall prevail and be conclusive.  All notices, communications or documents exchanged under this Agreement or delivered under it must be in the English language or accompanied by an English translation of it.

20.   **NO RELIANCE**

      20.1    Each party will be deemed to represent to the other party on the date on which it enters into this Agreement that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary)

              (a)    it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether the transaction contemplated by this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such advisors (including its tax, legal, accounting and regulatory advisors) as it has deemed necessary;

              (b)    it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the transaction contemplated by this Agreement, it being understood that information and explanations related to the terms and conditions of this Agreement shall not be considered investment advice or a recommendation to enter into this transaction contemplated by this Agreement;

              (c)    no communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of the transaction contemplated by this Agreement;

              (d)    it is capable of assessing the merits of and evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the transaction contemplated by this Agreement; and

              (e)    it is also capable of assuming, and assumes, the financial and other risks contemplated by this Agreement.

21    **CONSENTS.**

      21.1    **TCPA Consent.**  Borrower expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender and its successors, assigns, agents, attorneys and service providers (collectively, the "**Lender Parties**" and individually, a "**Lender Party**"), at any telephone numbers that Borrower have provided or may provide in the future (including any cellular telephone numbers).  Borrower's cellular or mobile telephone provider will charge Borrower according to the type of plan Borrower carries.  Borrower also agrees that any Lender Party may contact Borrower by email, using any email address Borrower has provided to Lender or that Borrower provides to Lender in the future.  Any Lender Party may listen to and/or record phone calls between Borrower and Lender Party representatives without notice to Borrower as permitted by applicable law.  For example, Lender and/or its vendors and service providers listen to and record calls for quality monitoring purposes.

      21.2    **Consent to Sharing Data with Vendors.**  Borrower consents to Lender sharing with its vendors and service providers all data Lender has related to Borrower, this Agreement and the transactions related hereto for the purpose of opening, supporting and servicing the transactions related to this Agreement.  Borrower agrees to provide accurate and complete information for those purposes.

      21.3    **Electronic Transactions.**  This Agreement is fully subject to Borrower's consent to electronic transactions and disclosures, which consent is or will be set forth in the terms of use for Lender's website and mobile app.  Borrower

- 55 -

CRED_EXAMINER_00001083

expressly agrees that this Agreement is a "transferable record" for all purposes under the Electronic Signatures in the Global and National Commerce Act and the Uniform Electronic Transactions Act.

**Utah Residents Only**:   As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

{Balance of page intentionally left blank.}

- 12 -

CRED_EXAMINER_00001054

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date written below. It is specifically agreed and understood that this Agreement is not binding upon the parties until the date it is actually signed by the Lender.

Effective Date: _____

"Lender";                                          "Borrower":

CRED LLC                                           Christopher xx

_____                    _____
Signature                                          Signature

_____                    _____
Printed                                            Printed

_____                    _____
Title                                              Title

Notice address:                                    Notice address.

Dan Schatt
CRED LLC
123 Mission Street
San Francisco, CA 94105
dan@mycred.io

CRED_EXAMINER_00001055

## EXHIBIT 1

## TRANCHE AGREEMENT No.

Borrower and Lender hereby agree as follows:

1)      Each has elected to proceed with a new Tranche transaction involving the pledge of additional Tokens by Borrower.

2)      Each agrees that the Agreement is incorporated by reference into this Tranche Agreement No.    and that the following terms are part of the Agreement:

| Advance Rate | ____% for this Tranche, based on market conditions and Lender's adjustments to its normally-prevailing advance rate of 50%, which Lender modifies from time to time in its sole discretion. | | |
|---|---|---|---|
| Tokens | [   ]   Bitcoin<br><br>[   ]   Ethereum<br><br>[   ]   XRP | | |
| Number of Tokens | _____ Tokens | | |
| Origination Fee | _____% ($_____ USD) | | |
| Confirmation of LBA holdings | Lender has confirmed that Borrower holds LBA with a Fair Market Price of at least 3% of the Tranche Loan Amount:<br><br>[   ]   YES<br><br>[   ]   NO | | |
| Interest Rate | ____% per annum for this Tranche, based on market conditions and Lender's adjustments to its normally-prevailing rates, which Lender modifies from time to time in its sole discretion: | | |
| | **Term** | **Discounted Rate** (based on LBA holdings) | **Standard Rate** |
| | 12 months | 11% | 14% |
| | 24 months | 10% | 13% |
| | 36 months | 9% | 12% |
| Principal Amortization | [   ]   Principal is not payable until the Maturity Date.<br><br>[   ]   Principal is amortized over a [_____ month] [_____ year] period and payable on the same day on which interest is payable. | | |
| Interest Payments | Interest is due and payable [   ] monthly [   ] quarterly and payable on the last business day of each month or quarter, as applicable. | | |
| Initial Disbursement | $_____ USD | | |
| Tranche No.    Maturity Date | _____, 20____ | | |
| Execution Date of Tranche Agreement No. | _____, 20____ | | |

- 16 -

CRED_EXAMINER_00001086

3) This Tranche Agreement No. ▓▓ documents a new Tranche and becomes a binding agreement on the Execution Date set forth above.

[Balance of page intentionally left blank.]

- 18 -

CRED_EXAMINER_00001087

"Lender":                                    "Borrower":

CRED LLC                                     ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

.....................................................   .....................................................
Signature                                    Signature

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Printed                                      Printed

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Title                                        Title

CRED_EXAMINER_00001058

**EXHIBIT 2**

**Closing Statement – Tranche Agreement No. [░]**

**[░░░░░░░░], 20[░]**

Re:     The Multi-Tranche Credit Agreement (the "**Agreement**") by and between CRED LLC ("Lender") and the Borrower referenced in the Agreement ("Lender")

To:     Borrower

From:   CRED LLC
        123 Mission Street San Francisco, CA 94105

This Closing Statement relates to Tranche Agreement No. [░]. Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement and in Tranche Agreement No. [░].

On the date of delivery set forth below, Borrower delivered and posted Tokens in the number and type specified below to Lender's Digital Wallet pursuant to the Agreement. The average of three specific sale prices for the Tokens is set forth below. Accordingly, the Tranche Loan Amount, Closing Date, Balance Disbursement, and dates and amounts of regular payments related to Tranche No. ___ are set forth below and/or attached hereto.

| | |
|---|---|
| Date of delivery and posting of the Tokens by Borrower to Lender's Digital Wallet | _____, 20___ |
| Number of Tokens delivered and posted to Lender's Digital Wallet: | ...................................... Tokens<br><br>[__]  Bitcoin<br>[__]  Ethereum<br>[__]  XRP<br><br>LBA Utility ................................. Tokens \|__\| purchased \|__\| delivered |
| Closing sales price of the Token on 3 consecutive Exchange Business Days beginning on the Verification Date of _____, 20___: | $_____  USD on _____, 20___<br>$_____  USD on _____, 20___<br>$_____  USD on _____, 20___ |
| Average of the three closing sales prices | $_____  USD |
| Closing Date for Tranche No. [░] | _____, 20___ |
| Tranche Loan Amount for Tranche No. [░] | $_____  USD |
| Balance Disbursement for Tranche No. [░] | $_____  USD |
| Origination Fee | $_____  USD |

The Balance Disbursement will be transmitted to Borrower's account on the Closing Date in accord with Section 2.7 of the Agreement and Exhibit 3.

CRED LLC appreciates your business and please do not hesitate to contact us at any time should you have any questions or concerns.

CRED_EXAMINER_00001089

[Attach amortization schedule and payment schedules]

- 18 -

CRED_EXAMINER_00001060

**EXHIBIT 3**

Borrower's bank account information:

| Bank/Institution Name | |
|---|---|
| SWIFT Code | |
| Account Number | |
| Routing Number | |
| Account Name | |

Borrower understands that Lender may assess and collect a per-payment fee of up to $15 per payment made by check or by methods other than electronic debit from Borrower's bank account.

Borrower consents to preauthorized (automatic) payment by Lender debiting Borrower's bank account above as set forth in Section 2.4(e) of the Agreement:

[ ]     YES

[ ]     NO

CRED_EXAMINER_00001061

EXHIBIT 4

# Pledge Agreement
## (Cryptocurrency)

This Pledge Agreement (this "Agreement") is entered into by and between the undersigned individual or entity ("Borrower") and CRED (US), LLC ("Lender") as of the date set forth above and upon execution of the Multi-Tranche Credit Agreement to which this Agreement is attached and incorporated into.

1.   **BUSINESS PURPOSE REPRESENTATION.** Borrower represents and warrants that Borrower's purpose in incurring the Obligations and entering into this Agreement is entirely for business or investment purposes and is not for personal, family, household or other consumer purposes.

2.   **GRANT OF SECURITY INTEREST** For valuable consideration, and in order to secure any and all Obligations and to induce Lender to enter into the Obligation Documents, Borrower grants to Lender a security interest in the Collateral and agrees that Lender has the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

3.   **BORROWER'S OBLIGATIONS.** The word "Obligations" means any and all existing and future indebtedness and liabilities of every kind, nature and character, direct or indirect, absolute or contingent, liquidated or unliquidated, voluntary or involuntary, of Borrower now or hereafter owes to Lender under this Agreement and the Obligation Documents, including, without limitation, advances pursuant to any line of credit and any other extension of credit or financial accommodation of any nature, whether recovery thereon may be or hereafter becomes unenforceable or an allowed or disallowed claim under any proceeding commenced with respect to Borrower under conservatorship, bankruptcy, receivership, insolvency, or similar law from time to time in effect, including interest that accrues after the commencement by or against Borrower of any proceeding thereunder, including costs and expenses for which Borrower is responsible hereunder and thereunder. All Collateral secures all Obligations notwithstanding that Lender may allocate or reference a portion of Collateral to a particular portion of Obligations. Lender's books and records showing the amount of the Obligations will be admissible in evidence in any action or proceeding, and in the absence of manifest error, will be binding upon Borrower.

4.   **PLEDGE OF COLLATERAL.**

4.1   The word "Collateral" as used in this Agreement means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence:

(a)   the cryptocurrency identified in the exhibits hereto and in related notices and confirmations to Borrower by Lender, whether that cryptocurrency is deemed to be commodities, currency, money, securities, securities entitlements or any other type or category of property or asset;

(b)   the securities and security entitlements identified in the exhibits hereto;

(c)   the digital wallet, deposit account(s), commodities account(s) and securities account(s) specified on the exhibits hereto (collectively, the "Collateral Account") and all funds, monies, securities, security entitlements and other financial assets and other property from time to time held therein or credited thereto, and any successor or replacement wallet or account.

(d)   all additions to and substitutions for any of the foregoing (including, without limitation, any securities, security entitlements, instruments or other property delivered or pledged hereunder) (such additions and substitutions, the "Additions and Substitutions");

(e)   all present and future renewals, replacements, income, cash and noncash proceeds, earnings, increases, and substitutions from or for the Collateral of every kind and nature, including without limitation all payments, interest, profits, distributions, benefits, rights, options, warrants, dividends, stock dividends, stock splits, stock rights, regulatory dividends, subscriptions, monies, claims for money due and to become due, proceeds of any insurance on the Collateral, shares of stock of different par value or no par value issued in substitution or exchange for shares included in the Collateral, and all other property Borrower is entitled to receive on account of such Collateral, including accounts, documents, instruments, chattel paper, and general intangibles whether now accrued or hereafter accruing (collectively, "Income and Proceeds"); and

(f)   all of Borrower's property related to the Collateral (however owned if owned by more than one person or entity), whether or not in Lender's possession or in the possession of a third party subject to Lender's control, whether existing now or later and whether tangible or intangible in character, including all records relating to any of the Collateral, in whatever form existing.

Lender's confirmations and other notices to Borrower regarding the number, type and timing of the transfer of Collateral to

-26-

CRED_EXAMINER_00001062

Lender's control or possession, and the details of the digital wallet or other account in which Lender or its designated agent or custodian holds the Collateral, are dispositive and controlling for all purposes, absent a definitive, non-appealable court ruling to the contrary.

4.2 Concurrently with the execution of this Agreement, Borrower must deliver to Lender the original of any certificate or instrument or other document representing or evidencing the Collateral to be held by Lender pursuant hereto, which document must be duly endorsed to the order of Lender where appropriate.

4.3 Unless and until an Event of Default occurs, all rights to vote, provide or withhold consent, receive notice or similar rights exercisable by Borrower with respect to the Collateral may be exercised under a revocable license hereby granted by Lender to Borrower.

5. **RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all of Borrower's accounts with Lender (whether checking, savings, securities or some other account) and against any indebtedness or obligations Lender may owe to Borrower. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Obligations against any and all such accounts.

6. **COLLATERAL MAINTENANCE.** Borrower agrees that it will at all times maintain in, and immediately upon demand furnish for deposit to, the Collateral Account, or otherwise provide to Lender in a manner satisfactory to Lender, such securities or other assets as Lender may require in light of outstanding Obligations and potential Obligations. Such margin requirements will be set from time to time by Lender in its discretion and in accordance with its risk policies and margin maintenance requirements then in existence.

7. **REPRESENTATIONS, WARRANTIES AND COVENANTS** Borrower represents and warrants to, and covenants with, Lender that:

7.1 **Ownership.** Borrower is the lawful owner of the Collateral free and clear of all encumbrances and claims of others (other than pursuant to this Agreement).

7.2 **Authority; Binding Effect.** Borrower has the full right, power and authority to enter into this Agreement and to grant possession, control and a first priority lien in and upon the Collateral in favor of Lender. This Agreement is binding upon Borrower as well as Borrower's estate, successors and assigns, and is legally enforceable in accordance with its terms. The foregoing representations and warranties, and all other representations and warranties contained in this Agreement are and will be continuing in nature and will remain in full force and effect until such time as this Agreement is terminated or cancelled as provided herein.

7.3 **No Further Assignment.** Borrower has not, and may not, sell, assign, transfer, encumber or otherwise dispose of any of Borrower's rights in the Collateral except as provided in this Agreement.

7.4 **Financing Statement.** Lender may, in its discretion, file a UCC financing statement and any other notice, registration or filing to perfect or evidence Lender's security interest in the Collateral.

8. **LENDER'S RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLLATERAL.** Borrower irrevocably consents to Lender taking possession of, controlling, placing a hold on the funds, securities and securities entitlements in the Collateral Account to ensure that only Lender is able to debit, setoff or otherwise make withdrawals from the Collateral Account while this Agreement is in effect. Borrower expressly consents to Lender transferring legal title to the Collateral to third parties under sale and repurchase agreements and to Lender pledging the Collateral to third parties under credit facilities and pledge arrangements while this Agreement is in effect. Borrower may not sell, trade, withdraw, substitute, transfer, encumber, dispose of, or otherwise direct the payment of any proceeds, interest, or amounts payable with respect to the Collateral without the prior written approval of Lender for so long as Borrower is subject to this Agreement. Thereafter Lender may deliver the Collateral to Borrower or to any other owner of the Collateral. Borrower expressly consents to Lender returning property or assets equivalent to the Collateral (instead of the Collateral itself) if and when Lender is obligated to return the Collateral to Borrower. Borrower further expressly agrees and acknowledges that Lender is not obligated to return the Collateral (or equivalent Collateral) for a period of up to three years from when Borrower first grants a security interest in the Collateral and transfers the Collateral to Lender's possession and control, regardless of whether Borrower repays all debt and obligations under the Obligations prior to the end of such 3-year period.

Lender has the following rights in addition to all other rights Lender may have by law or under this Agreement:

8.1 **Maintenance and Protection of Collateral.** Lender may, but is not obligated to, take such steps as it deems necessary or desirable to protect, maintain, insure, store, or care for the Collateral, including paying of any liens or claims against the Collateral.

8.2 **Income and Proceeds from the Collateral.** Lender may receive all Income and Proceeds directly from the issuers and add it to the Collateral. Borrower authorizes and directs the Issuers. If Lender decides to collect the Income and Proceeds, to pay and deliver to Lender all Income and Proceeds from the Collateral and to accept Lender's receipt for the payments. Borrower agrees to deliver to Lender immediately upon receipt, in the exact form received and without commingling with other property, all Income and Proceeds from the Collateral which may be received by, paid, or delivered to Borrower or for Borrower's account, whether as an addition to, in discharge of, in substitution of, or in exchange for any of the Collateral.

Pledge Agreement (Cryptocurrency)
12176303.3

Rev. 9/2018

CRED_EXAMINER_00001063

8.3     **Power of Attorney.** Borrower hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (1) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (2) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (3) effect transfer of title upon sale of all or part of the Collateral; (4) to settle or compromise any and all claims arising under the Collateral, and in the place and stead of Borrower, to execute and deliver its release and settlement for the claim; and (5) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Borrower, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Obligations, and the authority hereby conferred is and will be irrevocable and will remain in full force and effect until renounced by Lender. The foregoing appointments are irrevocable and coupled with an interest and will survive the dissolution, death, bankruptcy or reorganization of Borrower and may not be revoked without Lender's written consent. To the extent permitted by law, Borrower hereby ratifies all said attorney-in-fact may lawfully do by virtue hereof.

9.     **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Obligation Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Obligation Documents, or any other Obligations, Lender on Borrower's behalf may (but is not obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the highest rate of interest charged on any Obligations from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Obligations. This Agreement also will secure payment of these amounts. Such right will be in addition to all other rights and remedies to which Lender may be entitled upon Default.

10.     **LIMITATIONS ON OBLIGATIONS OF LENDER.** Lender will use reasonable care in the physical preservation and custody of the Collateral in Lender's possession, but will have no other duties with respect to the Collateral. In accordance with Section 9207 of the UCC as enacted in Utah, Lender will be deemed to have used reasonable care if it observes substantially the same standard of care with respect to the custody of the Collateral as it observes with respect to similar assets owned by Lender.

11.     **DEFAULT.** Each of the following constitutes an "Event of Default" under this Agreement:

        11.1     **Payment Default.** Borrower fails to make any payment when due under the Obligations.

        11.2     **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Obligation Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

        11.3     **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Obligation Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

        11.4     **Defective Collateralization.** This Agreement or any of the Obligation Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected first priority security interest or lien) at any time and for any reason.

        11.5     **Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any receivership, bankruptcy or insolvency laws by or against Borrower.

        11.6     **Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Obligations is impaired.

        11.7     **Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Agreement within the preceding 12 months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than 15 days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

12.     **RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies in addition to any other rights and remedies Lender may have under law.

        12.1     **Accelerate Obligations.** Declare all Obligations, including any prepayment penalty which Borrower may be required to pay, immediately due and payable, without notice of any kind to Borrower.

------

-22-

Pledge Agreement (Cryptocurrency)                                                                                   Rev. 9/2018
12176303.3

12.2    **Application of Account Proceeds.** Lender may apply all funds in the Collateral Account to the Obligations. If the Collateral Account is subject to an early withdrawal penalty, that penalty will be deducted from the Collateral Account before its application to the Obligations, whether the Collateral Account is with Lender or some other institution. Any excess funds remaining after application of the Collateral Account proceeds to the Obligations will be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral Account to the Obligations. Lender also has all of the rights of a secured party under the Utah Uniform Commercial Code, even if the Collateral Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party are nonetheless part of this Agreement.

12.3    **Sell Collateral.** Sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable, irrespective of the impact of any such sales on the market price of the Collateral. To the maximum extent permitted by applicable law, Lender may be the purchaser of any or all of the Collateral at any such sale and will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply all or any part of the Obligations as a credit on account of the purchase price of any Collateral payable at such sale. Each purchaser at any such sale will hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay, or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Borrower agrees that, to the extent notice of sale may be required by law, at least 10 calendar days' notice to Borrower of the time and place of any public sale or the time after which a private sale is to be made will constitute reasonable notification. Lender will not be obligated to make any sale of Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. To the maximum extent permitted by law, Borrower hereby waives any claims against Lender arising because the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree. After the disposal of any of the Collateral, Lender may deduct all reasonable legal and other expenses and attorney's fees for protecting its interests and enforcing its remedies under this Agreement and may apply the residue of the proceeds to, or hold as a reserve against, the Obligations in such manner as Lender in its sole discretion may determine, and will pay the balance, if any, to Borrower or otherwise, in accordance with applicable law. If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities and Exchange Commission (such as Regulation D or Rule 144) or the rules of state securities departments under state "Blue Sky" laws, or if Borrower or any other owner of the Collateral is an affiliate of the issuer of the securities, Borrower agrees that neither Borrower, nor any member of Borrower's family, nor any other person signing this Agreement will sell or dispose of any securities of such issuer without obtaining Lender's prior written consent.

12.4    **Application of Proceeds.** Apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to reimbursement of any expenses, including any costs for registration of securities, commissions incurred in connection with a sale, attorneys' fees and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral and to the payment of the Obligations of Borrower to Lender, with any excess funds to be paid to Borrower as the interests of Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Collateral to the Obligations.

12.5    **Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Obligation Documents, or by any other writing, will be cumulative and may be exercised singularly or concurrently.

12.6    **Default Interest.** If a particular Obligation does not provide for a rate of interest, then Borrower agrees that such Obligation will accrue interest while an Event of Default continues with respect to that Obligation at the rate of 10% per annum. If a particular Obligation provides only a regular interest rate but does not provide for a post-default rate of interest, then Borrower agrees that such Obligation will accrue interest while an Event of Default continues with respect to that Obligation at the rate of 7 percentage points per annum in addition to the regular interest rate.

13    **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

13.1    Modifications to this Agreement.

    (a)    Lender reserves the right to modify the fees and other terms and conditions of this Agreement (including those set forth in exhibits, schedules and attachments hereto) and related documents upon providing notice to Borrower, by email or by an online posting on Lender's website. Lender will, except as set forth in the following sentence, notify Borrower of the modification online, by email or by mail at the address shown on Lender's records on or prior to the effective date of any such modification. If Lender makes a modification but the modification cannot be disclosed before the effective date without jeopardizing the security of Lender's system in Lender's judgment, then Lender will provide Borrower with electronic or written notice within 30 days after the modification. Borrower will be deemed to have agreed to each such modification on the effective date thereof unless Borrower notifies Lender of its objection to the modification within 10 business days of the date of the notice of that modification.

-39-

CRED_EXAMINER_00001065

(b) If performance of Lender's obligations under the terms of this Agreement would violate any present or future statute, regulation or government policy to which Lender is subject, and which governs or affects the transactions or performance contemplated by this Agreement, then this Agreement will be deemed amended to the extent necessary to comply with such statute, regulation or policy, and Lender will incur no liability to Borrower as a result of such violation or amendment.

(c) If, prior to the date Lender provides Borrower a copy of or notice regarding this Agreement, Borrower and Lender were parties to a prior version of this Agreement, then this Agreement will replace such prior agreement on the earlier of: (i) on the date Borrower uses any services or provides any instructions provided for in this Agreement following receipt of a copy of or notice regarding this Agreement, which receipt will be deemed to have occurred 5 banking days after Lender sends a copy of this Agreement to Borrower's email address of record with Lender or posts this Agreement online or (ii) the effective date for this Agreement specified in such notice unless Borrower notifies Lender of its objection to the modification within 10 banking days of the date of that notice. Information in exhibits, schedules and other attachments to the prior version of this Agreement describing Borrower and Collateral will remain in effect and incorporated by reference into the applicable portion(s) of the exhibit(s) to this Agreement (unless Lender and Borrower enter into replacement exhibits, schedules, etc.) and the effective date of this Agreement will be the effective date specified in such notice.

(d) Other than the modifications described above in this Section 13.1, any modification to this Agreement must be in writing and executed by Borrower and Lender to have legal effect.

13.2 **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement and the Obligations. Costs and expenses include Lender's attorneys' fees, court costs and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.

13.3 **Governing Law; Venue.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Utah without regard to its conflicts of law provisions. This Agreement has been entered into by Borrower and accepted by Lender in the State of Utah. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the exclusive jurisdiction of the courts in Salt Lake City, State of Utah.

13.4 **No Waiver by Lender.** Lender will not be deemed to have waived any rights or granted any consent under this Agreement unless such waiver or consent is specifically given in writing and signed by Lender.

13.5 **Notices.** Any notice required to be given under this Agreement must be given in writing, and will be effective when actually delivered, when actually received by email or fax (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown on the signature page to this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address, including email address.

13.6 **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding will not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision will be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it will be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement will not affect the legality, validity or enforceability of any other provision of this Agreement.

13.7 **Successors and Assigns.** This Agreement will bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrower without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion. Lender will have the right without the consent of or notice to Borrower to sell, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder.

13.8 **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, will be deemed to be an original, and all of which, when taken together, will constitute but one and the same Agreement.

13.9 **Indemnification.** Borrower agrees to defend, indemnify and hold harmless Lender and its officers, employees, and affiliates against all losses or expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to transactions between Lender and Borrower under this Agreement (including without limitation all attorneys' fees and expenses and other costs incurred by Lender in enforcing this Agreement and realizing upon any Collateral), except for losses caused by Lender's gross negligence or willful misconduct.

-24-

CRED_EXAMINER_00001066

13.10    **Survival.** All covenants, representations and warranties made in this Agreement will continue in full force and effect so long as any Obligations remain outstanding.    The obligations of Borrower to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities described in Section 13.9 will survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.    This Agreement and the pledge, security interest and other rights granted to Lender hereunder will terminate when the Obligation Documents have terminated and all of the Obligations have been satisfied.

13.11    **Further Assurances.**   Borrower agrees that it must cooperate with Lender and must execute and deliver, or cause to be executed and delivered, to Lender all assignments, financing statements, instruments and other documents, and must take all further action, at the expense of Borrower, from time to time requested by Lender, in order to maintain a continuing, first-priority, perfected security interest in the Collateral in favor of Lender, and to enable Lender to exercise and enforce its rights and remedies hereunder with respect to the Collateral.

14    **DEFINITIONS.**   The following capitalized words and terms have the following meanings when used in this Agreement.  Words and terms not otherwise defined in this Agreement have the meanings attributed to such terms in the Uniform Commercial Code:

14.1    **Obligation Documents.**   The words "Obligation Documents" mean this Agreement and the documents described as "Obligation Documents" on the exhibits hereto, as those exhibits are modified from time to time, as well as all exhibits, schedules, promissory notes, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Obligations or incorporated into the Obligation Documents.

14.2    **Issuer.** The word "Issuer" means without limitation any and all persons obligated to pay money or to perform some other act under or with respect to the Collateral.

CRED_EXAMINER_00001067

## EXHIBIT 1 (to Pledge Agreement)

Obligation Documents:    The *Multi-Tranche Credit Agreement* between Borrower and Lender, as modified from time to time, together with this Agreement and other agreements entered into or delivered by Borrower as a condition to or as part of entering into the Multi-Tranche Credit Agreement, are collectively referred to as the "**Obligation Documents**." Borrower's Obligations arising thereunder and in connection therewith are referred to as "**Secured Obligations**".

Release of Collateral:    Lender will release to Borrower the Collateral allocated to secure Secured Obligations only upon the expiration or termination of the Obligation Documents giving rise to the Secured Obligations and payment in full of all Secured Obligations.

| Check as applicable: | Type of Collateral | Description of Collateral |
|---|---|---|
| [__] | Bitcoin (BTC) | All Bitcoin (BTC) transferred to or held in Lender's digital wallet or other account, or held by Lender's designated agent or custodian, from time to time in connection with the Obligation Documents, including all private and public keys related thereto and other related documents, data, property and assets, including without limitation any and all Bitcoin resulting from a "soft" or "hard" fork in the Bitcoin blockchain, a revision or upgrade to the Bitcoin software code, reclassification, or other like change. |
| [__] | Ethereum (ETH) | All Ethereum (ETH) transferred to or held in Lender's digital wallet or other account, or held by Lender's designated agent or custodian, from time to time in connection with the Obligation Documents, including all private and public keys related thereto and other related documents, data, property and assets, including without limitation any and all Ethereum resulting from a "soft" or "hard" fork in the Ethereum blockchain, a revision or upgrade to the Ethereum software code, reclassification, or other like change. |
| [__] | Ripple (XRP) | All Ripple (XRP) transferred to or held in Lender's digital wallet or other account, or held by Lender's designated agent or custodian, from time to time in connection with the Obligation Documents, including all private and public keys related thereto and other related documents, data, property and assets, including without limitation any and all XRP resulting from a "soft" or "hard" fork in the Ripple blockchain, a revision or upgrade to the Ripple software code, reclassification, or other like change. |
| [__] | Libra Credit (LBA) | All Libra Credit (LBA) transferred to or held in Lender's digital wallet or other account, or held by Lender's designated agent or custodian, as well as all LBA held or controlled by Borrower if Borrower's holdings of LBA was relied upon by Lender in pricing credit under the Multi-Tranche Credit Agreement, in each case from time to time in connection with the Obligation Documents, including all private and public keys related thereto and other related documents, data, property and assets, including without limitation any and all Libra Credit resulting from a "soft" or "hard" fork in the Libra Credit blockchain, a revision or upgrade to the Libra Credit software code, reclassification, or other like change. |

CRED_EXAMINER_00001068

DocuSign Envelope ID: 2B623618-79EE-4466-BF72-767CC6737DCB

# MULTI-TRANCHE CREDIT AGREEMENT

This Multi-Tranche Credit Agreement (including the exhibits hereto, this **"Agreement"**) is entered into by and between the undersigned individual or entity (the **"Borrower"**) and CYBER QUANTUM PTE. LTD. having an address of Ansort Road, Singapore 079903 (the **"Lender"**) as of the Effective Date specified on the signature page hereto.

## RECITALS

WHEREAS, the Borrower desires to borrow money in the form of Tokens from time to time in Tranches and secure those borrowings by form of guarantee to Lender, and Lender desires to lend in Tranches to Borrower, subject to agreed-upon terms and conditions;

WHEREAS, the parties intend that the benefit of any and all appreciation and any and all risk of loss from any depreciation resulting from a change in the price of the Tokens from the Closing Date for a Tranche to the Maturity Date for that Tranche in the normal, non-default course of business will accrue to the Borrower and not to the Lender.

NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.    **DEFINITIONS.**  All The Terms Used In This Agreement Shall Have The Following Meanings:

1.1    **"Contractual Currency"** means cryptocurrencies or fiat currencies as determined solely by the Lender and accepted by the Borrower through this Agreement or incorporated Tranche Agreement similar in form to Exhibit 1.  The Lender may also accept repayment of any outstanding obligations by Borrower in USD, at the sole discretion of the Lender.

1.2    **"Closing Date"** means the date on which a Tranche is consummated, as evidenced by a completed and accepted Closing Statement.

1.3    **"Closing Statement"** means a document in substantially the form of Exhibit 2 hereto relating to a particular Tranche, which document will be binding and conclusive for all purposes unless Borrower provides a detailed written notification to Lender within 3 business days of the date of transmission of the Closing Statement and that notification demonstrates with accurate supporting evidence that an error was made in the Closing Statement.

1.4    **"Default"** means any event, act or condition which, with notice or lapse of time or both, would constitute an Event of Default.

1.5    **"Default Notice"** is defined in Section 7.2.

1.6    **"Digital Wallet"** means a software program that stores public and private keys and interfaces with the Token blockchain in order to allow users to send and receive Tokens.

1.7    **"Electronic Messaging System"** means an electronic system for communication capable of reproducing communication in hard copy form, including email.

1.8    **"Equivalent Tokens"** means with respect to a particular Tranche, Tokens equivalent (the same type, name, category and technical specifications) to the Tokens pledged by Borrower in that Tranche.

1.9    **"Event of Default"** is defined in Section 7.1.

1.10    **"Exchange Business Day"** means any day that is a trading day and a price is posted on the applicable Token

1.11    **"Fair Market Price"** means with respect to a Token, the average of the last USD sale price for that Token as determined by the Lender

1.12    **"Maturity Date"** means with respect to a particular Tranche, 3-year anniversary of the Closing Date for that Tranche unless otherwise agreed in the Tranche Agreement.  Or as otherwise might be called at anytime by the Lender with 30 days notice to the Borrower.

1.13    **"Special Default Notice"** is defined in Section 8.3

1.14    **"Stable Coin"** means USDT or other US dollar-backed Token.

-- 3 --

CRED_EXAMINER_00001069

DocuSign Envelope ID: 2B5E361F-79EE-4406-BF72-767CC6737DCB

1.15 **"Tranche Loan Amount"** means with respect to a particular Tranche, the amount Lender agrees to lend. The Tranche Loan Amount is calculated as the product of (1) the per-Token Fair Market Price (calculated using the Verification Date as the first day of pricing) of the Tokens being pledged in that Tranche and (2) the number of Tokens.

1.16 **"Tranche Repayment Amount"** means with respect to a particular Tranche, the aggregate amount to be paid by Borrower to Lender on the Maturity Date to pay and satisfy all of Borrower's obligations, debts and liabilities with respect to that Tranche.

1.17 **"Tokens"** means the type of cryptocurrency specified in a Tranche Agreement, which will be either USDT or other Stable Coin.

1.18 **"Tranche"** means a particular loan transaction entered into pursuant to this Agreement and a particular Tranche Agreement and Closing Statement.

1.19 **"Tranche Agreement"** means an agreement in substantially the form of Exhibit 1 hereto containing such terms and conditions as Borrower and Lender may agree upon in writing at the time to evidence a particular Tranche.

1.20 **"Transaction Documents"** means collectively, this Agreement, the Pledge Agreement, the Tranche Agreements, the Closing Statements, and any other agreements, documents, instruments, exhibits or financial statements delivered in connection with Tranches. All such documents must be contemporaneously executed and read and construed together in a manner so as to give meaning and effect to all their provisions.

1.21 **"USD"** means United States Dollars.

2. **TOKEN DELIVERY AND DISBURSEMENT ON TRANCHE CLOSING DATE**

2.1 **Tranche Loan Amount.**

(a) Subject at all times to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to the Tranche Loan Amount for a particular Tranche as set forth in the applicable Tranche Agreement in the form of Exhibit 1 and Closing Statement in the form of Exhibit 2, both of which exhibits are incorporated herein by reference. The Tranche Loan Amount must be funded in the Contractual Currency no later than the Closing Date.

(b) In addition to the first Tranche Agreement which must be executed contemporaneously with this Agreement, Borrower and Lender may each elect to enter into additional Tranche Agreements for additional Tranche Loan Amounts in the chosen type of Token for each Tranche Agreement. Lender will make its best efforts to complete additional Tranche Agreements contingent upon market conditions such as the price, trading volume, number of Tokens issued and outstanding and the number of Tokens in the float. All Tranches and Tranche Agreements are subject to the terms and conditions of this Agreement, although the parties may agree in writing in each Tranche Agreement upon such additional or different terms and conditions as set forth in the Tranche Agreement. Each Tranche transaction must be memorialized using the Tranche Agreement and Closing Statement forms attached hereto as Exhibit 1 and Exhibit 2.

(c) Lender has the discretion and right to elect to not proceed with any Tranche with the Borrower up until the respective Closing Date for that Tranche. If Lender elects not to proceed with a Tranche, Lender will return the Tokens delivered by Borrower related to that Tranche within 5 business days.

2.2 **Origination Fee; Interest Calculation.**

(a) Contemporaneous with the funding of the Tranche Loan Amount by Lender on the Closing Date for a particular Tranche, Borrower must pay an origination fee equal to that Tranche Loan Amount multiplied by the Origination Fee Percentage applicable to a Tranche Loan Amount of that amount, as specified below:

| Origination Fee Percentage | Tranche Loan Amount |
|---|---|
| nil | All Tranche Loan Amounts, unless otherwise specified in a Tranche Agreement and agreed to in writing by Lender. |

Lender may deduct such origination fee from the Tranche Loan Amount.

CRED_EXAMINER_00001070

DocuSign Envelope ID: 2B623611-79EE-4406-BF72-767CC6737DCB

(b)   Each Tranche will accrue interest at the annual rate specified in the Tranche Agreement from and including the date of disbursement until and including the date repayment is received by Lender. Interest will be computed on a 360-day year for the actual number of days elapsed and will be due and payable monthly or quarterly in arrears on the last day of each month or quarter, as specified in the Tranche Agreement. However, during the continuance of an Event of Default hereunder, all outstanding amounts will accrue interest at an annual rate actual to 7% plus the annual rate otherwise applicable to that outstanding amount.

2.3   **Payment Provisions.**

(a)   **Maturity.** With respect to each Tranche, the Borrower agrees to pay to Lender the Tranche Repayment Amount plus any other Borrower obligations due on the Maturity Date.

(b)   **Extensions and Refinancings.** With respect to each Tranche, the Maturity Date may be extended or the Tranche refinanced by Lender if Borrower requests an extension or refinancing at least 30 days in advance and Lender agrees in writing. A fee in the minimum amount of 1% of the Tranche Repayment Amount is due and payable on (i) the original Maturity Date if Lender agrees to extend each Maturity Date or (ii) on the date of refinancing if Lender agrees to provide refinancing on terms acceptable to Lender at that time in its sole discretion.

(c)   **Late Fees.** If Lender has not received any payment when due hereunder from Borrower, including receipt of the Tranche Repayment Amount and all other obligations from Borrower then due in immediately available funds before the close of business (Pacific time) 3 Exchange Business Days after the Maturity Date, Borrower must pay to Lender a late charge equal to 6% of the portion of the payment, including but not limited to the Tranche Repayment Amount, that is then due. Such late charge is in addition to and cumulative with all other obligations, rights, benefits and remedies available to Lender under the Agreement on account of any default by the Borrower.

(d)   **Prepayment.** There is no prepayment of the Tranche Repayment Amount permitted prior to the Maturity Date, other than as necessary to cure a Valuation Event. Borrower acknowledges that, if the Tranche Repayment Amount is paid or other prepayments are made for any reason prior to the Maturity Date other than to cure a Valuation Event, Lender will incur losses and damages.

(e)   **When Borrower's payment will be credited to Borrower's account.** Lender credits payments as of the date received, if the payment is: (1) (a) received by 12 p.m. Pacific time in like form, manner and at the place or address designated by Lender for payment; or (b) paid with a check drawn in USD on a U.S. financial institution or a U.S. dollar money order, or (2) by means of a SWIFT transfer. Payments by check received after 12 p.m. Pacific time at the address specified by Lender on any day including the payment due date, but that otherwise meet the above requirements for checks, will be credited as of the next day. Credit for payments not made by SWIFT transfer as specified above may be delayed up to five business days.

(f)   **Application of Payments.** Lender will apply all payments first to fees, expenses and other amounts (other than principal and interest) Borrower owes Lender, then to accrued interest and the balance to outstanding principal. However, if a Default occurs, Lender will apply payments to Borrower's obligations as Lender determines in Lender's sole discretion.

(g)   **Callable.** At anytime, with at least 30 days prior notice, the Lender may require the Borrower to pay the Tranche Repayment Amount, which may be a portion or the entire amount of the Tranche at the sole discretion of the Lender.

(h)   **Other payment terms.** Lender can accept late payments, partial payments, or payments with any restrictive writing without losing any of Lender's rights under this Agreement. This means that no payment, including those marked with paid in full or with any other restrictive words, will operate as an accord and satisfaction without the prior written approval of one of Lender's senior officers. Borrower may not use a postdated check to make a payment. If Borrower does postdate a payment check, Lender may elect to honor it upon presentment or return it uncredited to the person that presented it, without in either case waiting for the date shown on the check. Lender is not liable to Borrower for any loss or expense arising out of the action Lender elects to take.

2.4   **Pre-Closing Deliveries.** With respect to each Tranche, Borrower must have delivered to Lender on or before the Closing Date for that Tranche:

(a)   this Multi-Tranche Credit Agreement executed by Borrower;

(b)   a Tranche Agreement completed and executed by Borrower; and

- 3 -

CRED_EXAMINER_00001071

DocuSign Envelope ID: 2B5E361F-79EE-4406-BF72-767CC6737DCB

(c)     Delivery instructions for the wallet-to-wallet transfer of Tokens to Borrower. Lender's Digital Wallet address for receiving Tokens will be provided at the time of transfer of the Tokens.

2.5     **Legal Matters**  All matters and all documentation and other instruments in connection with each Tranche and all matters hereunder must be satisfactory in form and substance to Lender and its counsel, and counsel to Lender shall have received copies of all documents which it may reasonably request in connection with such transactions.

2.6     **Closing of each Tranche**.  With respect to each Tranche:

(a)     Promptly following receipt of the Countersigned Tranche Agreement by Lender, but no later than 5 pm Eastern Standard Time on the third Exchange Business Day of receipt, Lender will transfer any Disbursement to the Borrower's account specified on Exhibit 3.

3.     **PAYMENT AND TRANSFER**

3.1     Unless otherwise agreed, all money paid hereunder must be in immediately available freely convertible funds of the relevant currency. All Tokens to be transferred hereunder must be (i) unrestricted and free trading and in suitable form for transfer and must be accompanied by duly executed instruments of transfer or assignment in blank (where required for transfer) and such other documentation as the transferee may reasonable request, or (ii) transferred through the book entry system of Euroclear or Clearstream, or (iii) transferred through any other agreed similar electronic book entry Tokens clearance system, or (iv) transferred by any other method mutually acceptable to Borrower and Lender.

3.2     Unless otherwise agreed, all money payable by one party to the other in respect of any transaction must be paid free and clear of, and without withholding or deduction for, any taxes or duties of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction of such taxes or duties is required by law. In that event, unless otherwise agreed, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such taxes or duties been required to be withheld or deducted.

3.3     Notwithstanding the use of expressions such as "Tranche Repayment Amount" which are used to reflect terminology used in the market for transactions of the kind provided for in this Agreement, all right, title and interest in and to Tokens and money transferred or paid under this Agreement shall pass to the transferee upon transfer or payment.

4.     **CONTRACTUAL CURRENCY**

4.1     All the payments must be made in the Contractual Currency. Notwithstanding the foregoing, the payee of any money may, at its action, accept tender thereof in any other currency, provided, however, that, to the extent permitted by applicable law, the obligation of the payer to pay such money will be discharged only to the extent of the amount of the Contractual Currency that such payee may, consistent with normal banking procedures, purchase with such other currency (after deduction of any premium and costs of exchange) for delivery within the customary delivery period for spot transactions in respect of the relevant currency.

4.2     If for any reason the amount of any payment received by a party falls short of the amount in the Contractual Currency due and payable, the party required to make the payment will, as a separate and independent obligation, immediately transfer such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall so as to assure full payment.

5.     **REPRESENTATIONS**.  Borrower represents and warrants that:

5.1     **No Liens or Restrictions**  Borrower has the absolute right to assign, convey, transfer and deliver the Tokens to the transferee free and clear of any and all mortgages, pledges, security interests, liens or other encumbrances or charges of any kind or nature. The transferor is in sole possession of the private keys associated with the Tokens and has not previously sold, conveyed, transferred, assigned, participated, pledged or otherwise encumbered the Tokens or its beneficial interest therein.

5.2     **Consents**.  This Agreement and all the other Transaction Documents executed by and to be executed by Borrower constitute valid and binding obligations of Borrower enforceable in accordance with its respective terms and are to be construed and interpreted as a whole, the issue being part of an integrated transaction. No consent of any other person and no consent, license, approval, or authorization of any governmental authority is required by Borrower for the execution, delivery and performance of this Agreement, and any of the other Transaction Documents executed or to be executed in connection herewith.

- 4 -

CRED_EXAMINER_00001072

DocuSign Envelope ID: 2B5B361F-79EE-4406-BF72-767CC6737DCB

5.3 **No Conflicts.** The execution and delivery by Borrower of this Agreement and any other Transaction Document executed and to be executed by Borrower, do not and will not (a) conflict with or violate any law or governmental order applicable to Borrower or (b) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any encumbrance on any Token (if applicable) pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Borrower is a party or by which Borrower or the Token (if applicable) are bound or affected or which would have an effect on the ability of Borrower to consummate the transactions contemplated by the Transaction Documents.

5.4 **No Default.** Borrower is not in default under any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which Borrower is a party or the Tokens (if applicable) are bond or affected or which would have an effect on the ability of Borrower to consummate the transactions contemplated by this Agreement.

5.5 **No Additional Liens.** The Borrower covenants that so long as a Tranche or any obligations to Lender remain outstanding and unpaid, the Borrower will not create, assume or suffer to exist any lien of any kind upon any of the Tokens Borrower transferred to Lender.

5.6 **Anti-Money Laundering Program** Borrower represents and warrants that it will comply with anti-money laundering laws and regulations that apply to Borrower. At the request of Lender, Borrower must provide such written further assurances as Lender may reasonably request to confirm that Borrower maintains an anti-money laundering program if it is required to do so.

5.7 **OFAC.** Borrower hereby agrees and acknowledges that it will continue to comply with rules and regulations enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") that are applicable to Borrower. Borrower represents and warrants that neither it nor any person who controls Borrower bears a name that appears on the List of Specially Designated Nationals and Blocked Persons maintained by OFAC from time-to-time. Borrower hereby represents and warrants that none of the Tokens hereunder came from a third party that violated, or otherwise would violate, the provisions of any rules, regulations, or laws administered by OFAC, or be subject to other restriction based on such relevant government lists as may be published from time-to-time.

5.8 **Source and Use of Tokens.** Borrower represents and warrants that (i) none of the Tokens hereunder was sourced from a third party that is/was engaged in unlawful activities under state, federal or non-U.S. statutes (e.g., the Federal Controlled Substances Act) and (ii) any Tokens hereunder has been lawfully obtained and has not been, is not, and will not be, used in any illegal activities. In addition, Borrower represents and warrants that neither it nor any person who controls Borrower resides in or who subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction. For purposes of this Agreement, a "**Non-Cooperative Jurisdiction**" means any country or territory that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the Financial Action Task Force on Money Laundering, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.

5.9 **No Material Information.** There is no material fact known to the Borrower regarding any Token hereunder which materially adversely affects or is likely or is anticipated to materially adversely affect such Token.

5.10 **Business Purpose.** Borrower represents and warrants that Borrower's purpose in incurring its debts, obligations and liabilities hereunder and entering into this Agreement is entirely for business or investment purposes and is not for personal, family, household or other consumer purposes.

6. **RISK FACTORS.** Borrower has carefully reviewed, acknowledged, understands and assumes the following risks, as well as all other risks associated with Tokens (including those not discussed herein), all of which could render the Tokens worthless or of little value:

6.1 **Liquidity.** There is no guarantee or representation of liquidity and/or transferability of Tokens in the future.

6.2 **Security.** Tokens may be subject to expropriation and/or theft, international or unintentional bugs or weaknesses that may negatively affect the Tokens or result in loss or ability to access the Tokens.

6.3 **Access to Private Keys.** Loss of private key(s) associated with Borrower's Digital Wallet or vault will result in loss of Tokens.

6.4 **Uncertain Regulatory Framework.** The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear and unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental

- 5 -

CRED_EXAMINER_00001073

DocuSign Envelope ID: 2B5B361F-79EE-4406-BF72-767CC0737DCB

authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications. Such changes could negatively impact the Tokens in various ways.

7.    **EVENTS OF DEFAULT**

7.1    **Events of Default.** An "Event of Default" shall exist if any one or more of the following shall occur.

    (a)    Failure by Borrower to make when due, any payment or delivery under this Agreement required to be made by it if such failure is not remedied on or before the 3rd Exchange Business Day after notice of such failure is sent to Borrower; or

    (b)    If any representation or warranty made by Borrower in this Agreement or in any statement furnished at or in contemplation of the Closing Date or pursuant to this Agreement or any other Transaction Document shall prove to have been knowingly untrue or misleading in any material respect at the time made; or

    (c)    Default by Borrower in the performance of or observance of any covenant or agreement contained in this Agreement or default in any other Transaction Document which is not cured within a reasonable time; or

    (d)    If the Tokens cease to trade or are otherwise halted for more than 3 Exchange Business Days by a regulatory agency or for any other reason; or

    (e)    If Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties, or Borrower admits in writing its inability to pay its debts as they mature; or

    (f)    If documents shall at any time after their execution and delivery for any reason cease to be in full force and effect or are declared null or void, or the validity or enforceability thereof is contested by Borrower or by any other person, or

7.2    **Rights Upon An Uncured Event of Default.** If at any time an Event of Default has occurred and is continuing beyond any applicable cure period, the non-defaulting party shall issue a written notice to the defaulting party specifying the relevant Event of Default (a "**Default Notice**"). Lender will have all rights and remedies afforded by law and under the Transaction Documents. Matters set forth as fact in a Default Notice, including data and calculations, will be binding and conclusive unless Borrower provides a detailed written notification to Lender within 3 business days of the date of transmission of the Default Notice and that notification demonstrates with accurate supporting evidence that an error was made in the Default Notice.

8.    **NOTICES AND OTHER COMMUNICATIONS**

8.1    Any notice or other communication to be given under this Agreement shall:

    (a)    be in the English language, and except where expressly otherwise provided in this Agreement, must be in writing,

    (b)    may be given in any manner described in subsection 8.2 below;

    (c)    must be sent to the party to whom it is to be given at the address or number, or in accordance with the electronic messaging details, set out herein.

8.2    Any such notice or other communications will be deemed effective.

    (a)    if in writing and delivered in person or by courier, at the time when it is delivered;

    (b)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when that mail is delivered or its delivery if attempted;

    (c)    if sent by electronic messaging system, at the time that electronic message is received except that any notice or communication which is received, or delivery of which is attempted, after close of business on the date of receipt or attempted delivery or on a day which is not a day on which commercial banks are

    - 6 -

CRED_EXAMINER_00001074

DocuSign Envelope ID: 2B62361F-79EE-4406-BF72-767CC8737DCB

open for business in the place where that notice or other communication is to be given will be treated as given at the opening of business on the next following day which is such a day.

8.3    If ...

(a)    there occurs in relation to either party an event which gives rise to the service of a Default Notice; and

(b)    the non-defaulting party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsection 8.2 has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of those methods as are normally used by the non-defaulting party when communicating with the defaulting party), then the non-defaulting party may sign a written notice (a "**Special Default Notice**") which:

    (i)    specifies the relevant event referred to by section which has occurred in relation to the defaulting party;

    (ii)    states that the non-defaulting party, having made all practicable efforts to do so, including having attempted to use at least two of the methods specified in subsections 8.2, has been unable to serve a Default Notice by one of the methods specified in those subsections (or such of those methods as are normally used by the non-defaulting party when communicating with the defaulting party);

    (iii)    specifies the date on which, and the time at which, the Special Default Notice is signed by the non-defaulting party; and

    (iv)    states that the event specified in accordance with subsection (i) above will be treated as an Event of Default with effect from the date and time as specified.

On the signature of a Special Default Notice the relevant event will be treated as effective from the date and time so specified as an Event of Default in relation to the defaulting party, and the Special Default Notice will be treated and accepted as an effective Default Notice. Any Special Default Notice should also be sent in a manner contemplated under Section 8.2.

8.4    All notices, requests or other communications to either of the parties by the other must be in writing, sent by overnight mail or by a reputable commercial carrier, or by electronic mail and will be deemed duly given on the earlier of the date the same is received or when deposited in the mail, postage prepaid, to the address specified on the signature page hereto, as the same may be updated from time to time by following the notice requirements specified in this section.

## 9.    ENTIRE AGREEMENT AND SEVERABILITY

9.1    This Agreement supersedes any existing communications, term sheets, or agreements between the parties containing general terms and conditions for transactions. Each provision and agreement herein will be treated as separate from any other provision or agreement herein and will be enforceable notwithstanding the unenforceability of any such other provision or agreement.

9.2    Each party acknowledges that, and has entered into this Agreement and will enter into each Tranche hereunder in consideration of and in reliance upon the fact that such transactions hereunder constitute a single business and contractual relationship and are made in consideration of each other. Accordingly, each party agrees: (i) to perform all if its obligations in respect to the entire transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect to the entire transactions hereunder  and (ii) that payments, deliveries and other transfers made by either of them in respect of any transaction will be deemed to have been made in consideration of payments, deliveries and other transfers in respect to the entire transaction hereunder

## 10.    NON-ASSIGNABILITY

10.1    Neither party may assign, charge or otherwise deal with (including without limitation any dealing with any interest in or the creation of any interest in) its rights or obligations under this Agreement without the prior written consent of the other party.  Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the parties and their respective successors and assigns.

## 11.    GOVERNING LAW

11.1    This Agreement and all instruments delivered hereunder will be governed by and construed in accordance with the laws of the State of Utah, excluding them from any principles of conflicts of laws   Except to the extent either

- 7 -

CRED_EXAMINER_00001075

DocuSign Envelope ID: 2B563361F-79EE-4406-BF72-767CC6737DCB

party exercises its right to demand arbitration pursuant to Section 12 of this Agreement, any legal action, claim or lawsuit commenced by one party against the other arising out of or in connection with this Agreement, and all instruments or agreements delivered hereunder must be brought exclusively in the courts in Salt Lake City, Utah, and such courts will have the exclusive jurisdiction and venue for any such legal action, claim or lawsuit.

12.   **ARBITRATION**

12.1   **Arbitration of Claims, Disputes, or Controversies.** Any claim, dispute, or controversy ("Claim") arising from or relating to this Agreement or the relationships resulting from this Agreement, whenever and by whomever commenced, shall, upon delivery of a written notice demanding arbitration to the other party (including a written notice after the commencement of a lawsuit or a notice contained in court filings in any such lawsuit), be resolved by binding arbitration pursuant to the Federal Arbitration Act, 9 USC §§ 1 et seq., and the applicable rules of the American Arbitration Association ("AAA") or JAMS in effect at the time of the written notice demanding arbitration. The term "**Claim**" as used in this Agreement is to be given the broadest possible meaning, and includes but is not limited to claims, disputes, or controversies arising from or relating to soliciting, originating, closing, or enforcing the transaction that is the subject of the Agreement.

Borrower may select which of AAA or JAMS to use for purposes of administering an arbitration governed by this Agreement. The address, telephone number, and web site containing applicable rules for each of these arbitration administrators is as follows:

> AAA
> Corporate Headquarters
> 1633 Broadway, 10th Floor
> New York, NY 10019
> 212-716-5800
> www.adr.org
>
> JAMS
> 71 South Wacker Drive
> Suite 3090
> Chicago, IL 60606
> 312-655-0555
> www.jamsadr.com

If Borrower fails to select an arbitration administrator within 30 days from the date it or Lender delivers notice demanding arbitration, Lender will choose one. Any arbitrator must be a commercial lawyer with more than 10 years of experience in a regionally recognized law firm or a retired Federal judge or judge who served as a regular member of a state court of intermediate or final appellate jurisdiction.

Arbitrations seeking monetary relief less than $100,000.00 in the aggregate will be held within the federal judicial district encompassing the city where Borrower resides or is located. Arbitrations seeking monetary relief of $100,000.00 or more in the aggregate will be held in Salt Lake City, Utah.

Each party shall pay one-half of any fees charged by the arbitration administrator for Claim(s) asserted by a party in the arbitration.

THIS AGREEMENT IS FULLY BINDING IN THE EVENT THAT A CLASS ACTION OR SIMILAR LAWSUIT IS FILED IN WHICH BORROWER WOULD BE A CLASS REPRESENTATIVE OR MEMBER. BORROWER AND Lender AGREE THAT THERE WILL BE NO CLASS OR CONSOLIDATED ARBITRATION OF ANY CLAIM. FURTHERMORE, CLAIMS BROUGHT BY OR ON BEHALF OF OTHER BORROWERS MAY NOT BE CONSOLIDATED WITH OR ARBITRATED IN ANY ARBITRATION PROCEEDING THAT IS CONSIDERING BORROWER'S CLAIMS UNLESS SAID OTHER BORROWERS ARE PARTIES TO THE SAME AGREEMENT. SIMILARLY, BORROWER MAY NOT JOIN WITH OTHER BORROWERS TO BRING CLAIMS IN THE SAME ARBITRATION PROCEEDING UNLESS ALL OF SUCH OTHER BORROWERS ARE PARTY TO THE SAME TRANSACTION.

13.   **INDEMNITY AND LIMITATION OF LIABILITY**

13.1   Either party shall indemnify and hold the other party harmless against any and all claims, demands, proceedings, suits, actions, damages, liabilities, losses, expenses and costs (which shall include, but not limited to all costs of defense, investigation and accounting and legal fees) to which the other party may become subject as a result of the defaulting party's fraud, negligence, willful misconduct or breach of any obligation under this Agreement.

13.2   Neither party will be liable for any indirect, incidental or consequential loss or damages, including loss revenue or profits or losses arising from its normal course of business, even if a party has been advised of the possibility of such damages.

- 8 -

CRED_EXAMINER_00001076

DocuSign Envelope ID: 2B5B361F-79EE-4406-BF72-767CC6737DCB

13.3    Each provision of this Section operates independently and survives the expiration or termination of this Agreement.

14.    **NO WAIVERS.**  No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and the failure or delay in the exercise of any remedy hereunder by any party shall not constitute a waiver of its right to exercise any other remedy hereunder.  No modification or waiver of any provision of this Agreement and no consent by any party to a departure here from will be effective unless and until such modification, waiver or consent is in writing and duly executed by both of the parties hereto.  The failure or delay to give any notice herein will not constitute a waiver of any right to do so at a later date.

15.    **COUNTERPARTS; AMENDMENTS**

15.1    This Agreement may be executed in counterparts, each of which will be deemed an original.

15.2    None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the parties.

16.    **SECTION HEADINGS**

The section headings used in this Agreement are for convenience of reference only and are not to affect the construction of this Agreement nor are they to be taken into consideration in interpreting, this Agreement.

17.    **SEVERABILITY.**  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances is determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

18.    **CONFIDENTIALITY.**  This Agreement and any other related documents are to be kept confidential and are not to be reproduced in any manner whatsoever for persons other than the parties hereto.  Each party agrees not to circumvent the legitimate interests of the other party and to maintain this transaction in strict confidentiality.  Each party agrees to maintain the confidentiality of any trade secrets, techniques, and contracts and contacts of the other party.  Borrower agrees not to engage in unauthorized communications (i.e. telephone calls, written inquiries, etc.) with Lender's banks, insurers, contracting parties and contacts.

19.    **TRANSLATION OF AGREEMENT.**  If this Agreement is translated into a language other than English, such translation is intended to assist the Borrower in understanding the terms and conditions of this Agreement and is not intended, and shall not comprise, an enforceable Agreement.  To the extent that any conflict exists between a translation of this Agreement and the English language version of this Agreement, the English language version shall prevail and be conclusive.  All notices, communications or documents exchanged under this Agreement or delivered under it must be in the English language or accompanied by an English translation of it.

20.    **NO RELIANCE**

20.1    Each party will be deemed to represent to the other party on the date on which it enters into this Agreement that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary):

(a)    it is acting for its own account, and it has made its own independent decisions to enter into this Agreement and as to whether the transaction contemplated by this Agreement is appropriate or proper for it based upon its own judgment and upon advice from such advisors (including its tax, legal, accounting and regulatory advisors) as it has deemed necessary;

(b)    it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the transaction contemplated by this Agreement, it being understood that information and explanations related to the terms and conditions of this Agreement shall not be considered investment advice or a recommendation to enter into this transaction contemplated by this Agreement;

(c)    no communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of the transaction contemplated by this Agreement;

(d)    it is capable of assessing the merits of and evaluating and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the transaction contemplated by this Agreement; and

- 9 -

CRED_EXAMINER_00001077

DocuSign Envelope ID: 2B62361F-79EE-4406-BF72-767CC8737DCB

(e)    it is also capable of assuming, and assumes, the financial and other risks contemplated by this Agreement.

21.    **CONSENTS.**

21.1    **TCPA Consent.** Borrower expressly consents to receiving calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender and its successors, assigns, agents, attorneys and service providers (collectively, the "**Lender Parties**" and individually, a "**Lender Party**"), at any telephone numbers that the Borrower have provided or may provide in the future (including any cellular telephone numbers). Borrower's cellular or mobile telephone provider will charge Borrower according to the type of plan Borrower carries. Borrower also agrees that any Lender Party may contact Borrower by email, using any email address Borrower has provided to Lender or that Borrower provides to Lender in the future. Any Lender Party may listen to and/or record phone calls between Borrower and Lender Party representatives without notice to Borrower as permitted by applicable law. For example, Lender and/or its vendors and service providers listen to and record calls for quality monitoring purposes.

21.2    **Consent to Sharing Data with Vendors.** Borrower consents to Lender sharing with its vendors and service providers all data Lender has related to Borrower, this Agreement and the transactions related hereto for the purpose of opening, supporting and servicing the transactions related to this Agreement. Borrower agrees to provide accurate and complete information for those purposes.

21.3    **Electronic Transactions.** This Agreement is fully subject to Borrower's consent to electronic transactions and disclosures, which consent is or will be set forth in the terms of use for Lender's website and mobile app. Borrower expressly agrees that this Agreement is a "transferable record" for all purposes under the Electronic Signatures in the Global and National Commerce Act and the Uniform Electronic Transactions Act.

---

**Utah Residents Only:** As required by Utah law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

---

[Balance of page intentionally left blank.]

Rev. 6/2018

CRED_EXAMINER_00001078

DocuSign Envelope ID: 2B52361F-79EE-4406-BF72-767CC6737DCB

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date written below. It is specifically agreed and understood that this Agreement is not binding upon the parties until the date it is actually signed by the Lender.

Effective Date: ..............................................

"Lender":                                      "Borrower":

CYBER QUANTUM PTE. LTD.                         MoKredit Inc.

DocuSigned by:

/-Walsh

_____                        _____
Signature                                       Signature

                                                Liu Hua

_____                        _____
Printed                                         Printed

                                                CEO

_____                        _____
Title                                           Title

Notice address:                                 Notice address:

Dan Schatt                                      Liu Hua

CYBER QUANTUM PTE. LTD.                          MoKredit Inc.
attn: Cred LLC, 2121 S. El Camino Real, 5th floor   618 East Yanan Road
San Mateo, CA 94403                              F17 Shanghai 200001
dan@credited.io                                  liu@credited.io

CRED_EXAMINER_00001079

DocuSign Envelope ID: 2650361F-79EE-4466-BF72-767CC6737DCB

## EXHIBIT 1

## TRANCHE AGREEMENT No. 1

Borrower and Lender hereby agree as follows:

1)  Each has elected to proceed with a new Tranche transaction involving the pledge of additional Tokens by Borrower.

2)  Each agrees that the Agreement is incorporated by reference into this Tranche Agreement and that the following terms are part of the Agreement:

| | |
|---|---|
| Contractual Currency | [X]  USDT Tokens<br><br>[_]  .................. |
| Tranche Loan Amount | .................. Tokens |
| Origination Fee | 0% |
| Interest Rate | 30% per annum for this Tranche, based on market conditions and Lender's adjustments to its currently-prevailing rates, which Lender modifies from time to time in its sole discretion. At anytime, with at least 30 days prior notice, the Lender may require the Borrower to pay the Tranche Repayment Amount. |
| | **Term** / **Rate**<br>12 months / 30% |
| Principal Amortization | [X]  Principal is not payable until the Maturity Date.<br><br>[_]  Principal is amortized over a [____ month(s)] [____ year(s)] period and payable on the same day on which interest is payable. |
| Interest Payments | Interest is due and payable [__] monthly [X] quarterly and payable on the last business day of each month or quarter, as applicable. |
| Digital Wallet Address | 13z7SB1AaH5Nz8U2cHrX2gJgJAkgjE3T0TC3 |
| Tranche Maturity Date | [Date] |
| Execution Date of Tranche Agreement | [Date] |

3)  This Tranche Agreement documents a new Tranche and becomes a binding agreement on the Execution Date set forth above.

[Balance of page intentionally left blank.]

Multi-Tranche Credit Agreement
12176303.4

Rev. 9/2018

CRED_EXAMINER_00001080

DocuSign Envelope ID: 2B50361F-79EE-4466-BF72-767CC6737DCB

"Lender":

CYBER QUANTUM PTE. LTD.

_____
Signature

_____
Printed

_____
Title

"Borrower":

moKredit inc

_____
Signature

_____
Printed

_____
Title

CRED_EXAMINER_00001081

DocuSign Envelope ID: 2B62361F-79EE-4406-BF72-767CC6737DCB

**EXHIBIT 2**

**Closing Statement – Tranche Agreement No. 1**

[Date]

Re:   The Multi-Tranche Credit Agreement (the "**Agreement**") by and between CYBER QUANTUM PTE. LTD. ("Lender") and the Borrower referenced in the Agreement ("**Lender**")

To:   Borrower

From:   CYBER QUANTUM PTE. LTD.
         Attn: Cred LLC, 2121 S. El Camino Real, 5th floor
         San Mateo, CA 94403

This Closing Statement relates to Tranche Agreement No. 1. Capitalized terms used but not defined herein have the meanings given to such terms in the Agreement and in Tranche Agreement.

On the date of delivery set forth below, Lender delivered and posted Tokens in the number and type specified below to Borrower's Digital Wallet pursuant to the Agreement. The average of specific sale prices for the Tokens is set forth below. Accordingly, the Tranche Loan Amount, Closing Date, and dates and amounts of regular payments related to Tranche No. 1 are set forth below and/or attached hereto.

| | |
|---|---|
| Date of delivery and posting of the Tokens to Borrower | [Date] |
| Number of Tokens delivered: | _____ Tokens<br><br>[X]   USDT |
| Average of the closing sales prices | $_____ USD |
| Closing Date for Tranche No. 1 | [Date] |
| Tranche Loan Amount | _____ USDT |

CYBER QUANTUM PTE. LTD. appreciates your business and please do not hesitate to contact us at any time should you have any questions or concerns

-14-

CRED_EXAMINER_00001082

DocuSign Envelope ID: 2B583361F-79EE-4406-BF72-767CC6737DCB

**EXHIBIT 3**

Borrower's bank account information;

| Bank/Institution Name | |
|---|---|
| Currency | USD |
| SWIFT Code | |
| Account Number | |
| Routing Number | |
| Account Name | |

Borrower's Digital Wallet address:

| Wallet Address | 1GrZG61AdHVn8UZoflXZgJgAkajRaTo1C3 |
|---|---|
| Type of Token | Omnibus account |
| Owner | PBG |

Pledge Agreement (Cryptocurrency)
12176303.4

Rev. 9/2018

CRED_EXAMINER_00001083

# CredEarn Process and Asset Flow



CRED_EXAMINER_00001084



CRED_EXAMINER_00001085