## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CRED INC., *et al.*, | ) | Case No. 20-12836 (JTD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |
| CRED INC. LIQUIDATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. 22-50398 (JTD) |
| | ) | |
| UPHOLD HQ INC., UPHOLD INC., | ) | |
| and UPHOLD LTD., | ) | |
| | ) | |
| Defendants. | ) | **Re: D.I.  5, 6** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Cred Inc. Liquidating Trust (the "**Trust**") commenced this adversary proceeding

against defendants Uphold HQ Inc., Uphold Inc., and Uphold Ltd. (together "**Uphold**" or

"**Defendants**"), in which it seeks to hold Defendants liable for the loss of hundreds of millions of

dollars' worth of cryptocurrency invested in the Debtors' cryptocurrency lending platform.[1]

Defendants have moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure

12(b)(6), 8(a), and 9(b), made applicable to this proceeding by Federal Rule of Bankruptcy

Procedure 7012.[2]  The Motion was fully briefed and oral argument was held on January 11,

2023.[3]  For the reasons set forth below, the Motion is granted.

---

[1] Adv. D.I. 1 (Redacted Complaint), Adv. D.I. 3 (Sealed Complaint).  The Debtors include Cred Inc., Cred (US) LLC, Cred Capital, Inc., Cred Merchant Solutions LLC, and Cred (Puerto Rico) (collectively "**Debtors**" or "**Cred**").

[2] Adv. D.I. 5, Motion to Dismiss Adversary Proceeding (the "**Motion**").

[3] Adv. D.I. 6, Memorandum of Law in Support of Defendants' Motion to Dismiss ("**Opening Brief**"), Adv. D.I. 18, Sealed Memorandum of Law of Cred Inc. Liquidation Trust in Opposition to Defendants'

## LEGAL STANDARD

A motion made pursuant to Rule 12(b)(6) challenges the sufficiency of the factual allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In *Ashcroft v. Iqbal*, the Supreme court identified two "working principles" underlying its earlier decision in *Twombly*. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679 (citation omitted). "In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Applying these principles to the Complaint before me has been a daunting task. To quote then Vice Chancellor Strine, "the complaint achieves a level of obscurity and incomprehensibility that is truly remarkable." *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 182 (Del. Ch. 2006). The first step in the analysis, separating the conclusions from well-pled facts, took much greater effort than is typically required because despite the Complaint's considerable length, it is comprised of very few facts. Many of the

Motion to Dismiss ("**Opposition Brief**"), Adv. D.I. Sealed Reply in Further Support of Defendants' Motion to Dismiss ("**Reply Brief**").

allegations constitute legal conclusions, but "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678-79 (citations omitted).  Here, however, many of the purportedly "factual" allegations in the Complaint are also entirely conclusory, meaning that even though they are framed as facts they lack foundational support.  *Nozawa v. Operating Eng'rs Local Union No. 3*, 418 P.3d 1187, 1195 (2018) ([W]hen an assertion [ ] expresses an inference without setting forth the underlying facts on which the conclusion is based or states a conclusion that is not reasonably drawn from the underlying facts, the assertion is considered conclusory. . . .").  Such "naked assertions" are not entitled to the presumption of truth. See *Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."); *Coppedge v. US Bank Nat'l Ass'n*, Civil Action No. 12-cv-00051-GMS, 2014 U.S. Dist. LEXIS 103740, at *4 (D. Del. July 25, 2014) ("'The Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context,' however, so conclusory factual statements may be struck from consideration.") (quoting *Iqbal*, 556 U.S. at 686).

Once I disregard the Complaint's conclusory allegations (both legal and factual), the second step in the analysis is to examine the facts that remain by "assum[ing] their veracity and then determin[ing] whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "[C]ourts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *ADA v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 567).  "Where

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679.  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Here, both my experience and common sense lead me to conclude that the Trust does not state any claim for relief against Uphold that is plausible.  Even assuming the truth of all the properly pled factual allegations, those that support the conclusion that Uphold acted unlawfully are sparse and the Trust assigns far greater significance to them than is reasonable. Put simply, the claims alleged are at best only possible, not plausible, and the sheer possibility of liability is not enough.  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (internal quotations omitted).  Accordingly, and for the reasons detailed below, the Motion to Dismiss is granted.

## FACTUAL BACKGROUND

The following facts are taken from the Complaint and are accepted as true for purposes of this Opinion:

### A.  The Parties

Debtor Cred was a cryptocurrency yield-earning platform.  Yield-earning platforms borrow cryptocurrency from their customers with a promise to pay them back later with interest, essentially providing their customers unsecured notes.[4]  The company seeks to earn a greater

---

[4] Complaint ¶39.  The term "cryptocurrency" refers to a digital asset on a blockchain.  Cryptocurrencies may also be referred to as "virtual currencies," "digital assets," "coins," and "tokens."  *Id.* at ¶32.  Bitcoin and Ethereum are types of cryptocurrencies, though there are thousands of others.  A "blockchain" is an open-sourced string of code which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All cryptocurrencies exist on a blockchain, and

yield on the loaned cryptocurrency than it owes the customer, usually through re-lending or cryptocurrency trading strategies.[5]  Yield-earning platforms are generally risky due to their promises of high returns (often in excess of 8-12%), the volatility of cryptocurrency prices, and a lack of a clearly applicable regulatory scheme.[6]

Defendant Uphold is a multi-asset cryptocurrency exchange, on which users can buy and sell cryptocurrencies, fiat currencies, equities, and precious metals.[7]  Uphold provides retail customers with a digital money platform (the "**Uphold Platform**") for transacting and storing cryptocurrency and markets itself as easy to use for new cryptocurrency investors.[8]  Uphold was founded in 2013 by its former CEO and current Vice Chairman, Juan Pablo Thieriot "(**Thieriot**").[9]

In February of 2018, Uphold engaged Daniel Schatt ("**Schatt**") to provide advisory services.[10]  Shortly thereafter, in April of 2018, Schatt was appointed as a director on the board of Uphold, Ltd.[11]

In May of 2018, Schatt, along with Lu Hua ("**Hua**") organized Cred.[12] At all relevant times, Schatt was Cred's CEO and a director on its board.[13]  Hua was the second of Cred's two

---

transactions recorded on the blockchain are publicly available, except when a private blockchain is used. *Id.* ¶ 33 n.11.
[5] *Id.* ¶ 59.
[6] *Id.* ¶¶ 40, 122.
[7] *Id.* ¶ 41.
[8] *Id.* ¶ 42.
[9] *Id.* ¶ 18.
[10] Complaint ¶ 19.
[11] *Id.* ¶ 43-44.
[12] *Id.* ¶49.  Specifically, they formed an entity called Libra Credit (US) LLC, which was later renamed Cred LLC. A subsidiary called Cred (US) LLC was later formed, with Cred LLC as its sole member. Cred LLC later converted to Cred Inc.
[13] *Id.* ¶ 53.

directors and was also the founder of a Chinese micro-lending platform called MoKredit ("**MoKredit**").[14]

### B.  Joint Venture Discussions

In June of 2018, Schatt introduced Thieriot to Hua, and the next month Uphold and Schatt began discussing a joint venture to create a yield earning program.[15]  Initially, Uphold planned to release the program directly, under the name "Uphold Earn," and early marketing about the program made little to no mention of Cred.[16]  Between late December 2018 and mid-January 2019, it was decided that the program would be run entirely through Cred and it was rebranded as "CredEarn."[17]

On or around January 16, 2019, Cred and Uphold entered into a Statement of Work (the "**SOW**") related to the CredEarn program.[18]  Pursuant to the SOW, Uphold would integrate CredEarn on its website and mobile application and, in exchange, Cred would pay Uphold a commission in the form of a service fee (the "**Uphold Fees**") for sending its customers to Cred.[19] The Uphold Fees that Cred was required to pay under the SOW were in addition to the interest it owed to CredEarn customers and were paid to Uphold regardless of whether Cred made a profit from the loan.[20]  The SOW provided that "all risk of loss of principal loan by [Cred] from [Uphold's customers] shall be borne by [Cred]."[21]

---

[14] There are several MoKredit entities encompassed within this definition (see Complaint n.10), but their individual identities are not relevant to this Motion.
[15] *Id.* ¶ 57
[16]  Complaint ¶ 71-77.
[17] *Id.* ¶ 87.
[18] Complaint ¶ 94, Ex. O.
[19] *Id.* ¶¶ 96-98 and Ex.O.  The SOW provided that the Uphold Fees would equal "the greater of (a) 2% of total credit extended by customers funding CredEarn accounts via Uphold [P]latform, or (b) the historical yield percentage on the assets committed to CredEarn accounts via Uphold [P]latform."
[20] *Id.* ¶ 99.
[21] *Id.* ¶ 120 and Ex. O, Section 2.2.2.

CredEarn was fully integrated on Uphold's website so that "with a 'push [of] a button [you could] sign the terms and conditions and participate in the program as an Uphold customer.'"[22]  Customers needed to join Uphold before having access to CredEarn.[23]

To participate in the CredEarn program, customers entered into "CredEarn Agreements" with Cred.[24]  CredEarn Agreements would typically expire in six to twelve months, at which time Cred would be required to return the cryptocurrency to the CredEarn customer unless the customer re-enrolled in a new CredEarn Agreement.

The CredEarn Agreements provided that Cred would pay customers 8-12% interest. Each CredEarn Agreement specified the type of cryptocurrency that Cred was obligated to repay to the customer.[25]  Customers could loan a variety of cryptocurrencies to Cred.

To facilitate CredEarn, Uphold held the digital wallets of both Cred and CredEarn customers for the majority of Cred's existence.[26]  Because Uphold held Cred and CredEarn customers' wallets, Uphold dictated the types of cryptocurrencies used in CredEarn by Uphold customers.[27]  Uphold comingled the cryptocurrency it received from its customers.  Cred's cryptocurrency held at Uphold was comingled with the cryptocurrency of other Uphold customers, including CredEarn customers.[28]

To make a loan with the CredEarn program, customers would execute a transfer of cryptocurrency from their individual Uphold wallets to Cred-owned wallets, which were also hosted by Uphold.[29]  While the transfers appeared to involve shifting cryptocurrency from one

---

[22] *Id.* ¶ 140 (alterations in original).
[23] *Id.* ¶ 143.
[24] Complaint, Ex R.
[25] *Id.* ¶ 183.
[26]  Complaint ¶ 111.
[27] *Id.* ¶ 112.
[28] *Id.* ¶¶113, 114
[29] *Id.* ¶¶ 149-50.

Uphold wallet to another Uphold wallet, because the Uphold wallets were comingled, the transactions were primarily just recorded in internal recordkeeping at Uphold.[30]  Additionally, the majority of transactions between Cred and CredEarn customers were not recorded on any public blockchain.  Accordingly, Cred relied entirely on Uphold's internal recordkeeping to determine which cryptocurrency was owned by Cred, which was owned by CredEarn customers, and which was owned by other Uphold customers.[31]

### C.  CredEarn Launches

On January 23, 2019, CredEarn launched and within 24 hours had signed its 1,000th customer.[32]  Early forecasts of CredEarn's performance indicated that the program would be lucrative for Uphold, with profits growing from at least $161,000 in the first year to as much as $2.8 million annually by 2022.[33]

By March of 2019, Uphold's statistics regarding CredEarn reflected that there was a total of 691 CredEarn Customers, 645 of which were pre-existing Uphold users and 46 of whom joined Uphold just to participate in CredEarn.[34]  New customers were valuable to Uphold as Uphold charges significant transaction fees for all cryptocurrency transactions on the Uphold platform.[35]

All CredEarn's initial customers were driven to CredEarn by Uphold.[36]  Since only a very small percentage of customers discovered the CredEarn website independently from

---

[30] *Id.* ¶ 150-51.
[31] *Id.*  ¶¶115-17.
[32] *Id.* ¶ 137.
[33] Complaint ¶ 321.
[34] *Id.*, Ex. RR.
[35] *Id.* ¶ 333.
[36] *Id.* ¶ 138.

Uphold, Cred and Uphold primarily targeted customers through jointly created advertisements disseminated by Uphold.[37]

### D.  Marketing

Uphold distributed marketing material with respect to CredEarn from early 2019 until late 2020.[38]  The CredEarn marketing materials included several representations about the security of investments made with Cred, including that:

- Cred lent to "reputable third-party companies" with an "excellent track record"[39]

- Cred "ensures the principal is fully hedged"[40]

- "CredEarn allows holders of digital assets to earn interest in a variety of assets. . . . Cred achieves this objective by making secured and/or guaranteed loans and investing in short-term debt instruments."[41]

- Cred has "comprehensive insurance and security policies to protect your digital assets and your data."[42]

As investors would later learn, many (if not most) of the representations made in CredEarn's marketing materials were false.  None of the loans made through the CredEarn program were insured.[43]  None of the loans involved in the program (either loans to Cred or loans from Cred to MoKredit) were secured.[44]  And Cred's positions were far from "fully hedged."

---

[37] *Id.* ¶¶ 102, 140-41.
[38] *Id.* ¶ 206.
[39] *Id.* ¶ 270.
[40] *Id.* ¶ 270.
[41] Complaint, Ex. W.
[42] *Id.*, Ex. BB.
[43] *Id.* ¶¶ 224-25.
[44] *Id.* ¶ 222-23.

### E.  Cred's Risky Business Plan

In order to generate enough yield to satisfy the promised 8-12% return to CredEarn customers and Uphold's commission, Cred took "huge risks."[45]

The vast majority (90%) of the cryptocurrency Cred received from CredEarn customers was lent to MoKredit, who would then loan the funds to its customers, who were primarily video gamers.[46]  Cred and MoKredit's relationship was governed by a series of agreements, several of which were not executed until long after Cred had loaned MoKredit tens of millions of dollars of customer cryptocurrency.[47]  Although the MoKredit Agreements granted Cred security interests in MoKredit's accounts, inventory, equipment, instruments and securities, Cred never perfected them.[48]  Additionally, when MoKredit failed to repay principal on its loans as required by the MoKredit Agreements, Cred would simply allow MoKredit to roll the principal owed to the next tranche.  Accordingly, "the money, when a tranche would close, wouldn't necessarily result in a flow of cash to Cred.  It could be reenrolled in another program or tranche."[49]

Further, MoKredit would only accept loans of fiat currency or "stable" cryptocurrency, which is cryptocurrency whose value is pegged to a stable asset such as the U.S. Dollar or gold ("**Stablecoins**").  Stablecoins are less volatile than other types of cryptocurrency.[50]  Because Cred and MoKredit only transacted with each other in Stablecoin, but Cred owed its customers

---

[45] *Id.* ¶ 158.
[46] *Id.* ¶ 159, 168.  MoKredit's customers were primarily video gamers located in China who would borrow small sums at high interest rates, often exceeding 35%.
[47] *Id.* ¶¶ 171-177.  For ease of reference, I will refer to the agreements between MoKredit and Cred collectively as simply the "**MoKredit Agreements**."
[48] *Id.* ¶ 200-01.
[49] Complaint ¶ 198-99.
[50] *Id.* ¶¶ 35, 182.

Bitcoin ("**BTC**") and other cryptocurrencies, Cred bore the risk of loss if BTC or other cryptocurrencies increased in value during the life of the CredEarn loan.[51]

In an effort to mitigate this risk, Cred hired an unlicensed and unregistered trading firm (the "**Trading Firm**") to enter into options, futures, and perpetual swaps for Cred in order to hedge against an increase in the price of cryptocurrency.[52]  The Trading Firm enabled Cred to make risky trades that were otherwise unavailable to U.S. persons and entities.[53]  "Cred's highly leveraged trading strategy left Cred exposed to having its cryptocurrency positions depleted entirely" due to normal price fluctuations.[54]

### F.  Cred's Decline

Throughout 2019 and 2020, as Cred continued to take on debt, it suffered loss after loss in trading, hacks, and thefts, which were ultimately more than it could recover from.[55]

As early as February 2019, Cred executives expressed concerns about Cred's solvency. On February 27, 2019, Cred's then-CFO Karen Wong wrote to Schatt, Hua, and Cred's Chief Capital Officer, James Alexander ("**Alexander**") concerning Cred's desperate need for cash through March 2019, explaining that Cred could not satisfy its debts as they came due and needed at least "140k more by March 8 to cover the invoices due on week of March 11."[56]

On October 8, 2019, Alexander emailed other Cred executives stating that monies owed by Cred to the Trading Firm needed to be paid "immediately."  Alexander explained that the Trading Firm had been accommodating and making interest payments on hedge swaps on Cred's

---

[51] *Id.* ¶ 185.
[52] *Id.* ¶ 192.
[53] *Id.* ¶¶ 23-24, 190.
[54] *Id.* ¶ 272-73.
[55] *Id.* ¶ 367.
[56] Complaint ¶ 381.

behalf but that it was unwilling to continue carrying the expense.  If the Trading Firm would no longer pay those expenses, then Cred was at risk of defaulting on those hedges.[57]

Circumstances worsened for Cred in March 2020.  In early March, there was a drop in the price of BTC, which caused a liquidation of Cred's highly leveraged hedging positions.  In a single day, on March 13, 2020, Cred lost more than $100 million in cryptocurrency at today's prices.  Because Cred lacked the cash or cryptocurrency to re-establish its hedging positions, this massive trading loss left Cred exposed to significantly more losses if BTC and other cryptocurrencies increased in value.[58]

On March 12, 2020, the Trading Firm notified Cred that all of its BTC futures positions and some of its XRP futures were liquidated as a result of a drastic move in the market overnight.  That same day, in an effort to find the funds needed to reinstate its hedge position, Cred requested $10 million in cash from MoKredit as a recall of some of the approximately $38 million principal loan amount that Cred previously extended to MoKredit.  MoKredit refused.[59] It later agreed to a repayment schedule but did not follow through on all of the payments.

On April 5, 2020, Cred's Vice President of Capital Markets, Daniel Inamullah ("**Inamullah**") circulated a memo (the "**Liquidity Memo**") internally.  The Liquidity Memo outlined the status of Cred's liquidity and concluded that 'based on cash flow analysis, a potential cash liquidity issue is identified for May 2020. . . .".[60]  The Liquidity Memo, however, grossly understated Cred's cryptocurrency trading losses.

---

[57] *Id.* ¶ 386
[58] *Id.* ¶ 397.
[59] *Id.* ¶ 400-01.
[60] Complaint ¶ 407.

To make matters worse, Alexander and others stole cryptocurrency from Cred.  In late April 2020, Alexander improperly transferred cryptocurrency to himself.[61]  Around the same time, Alexander introduced Cred executives to a fraudulent investment called QuantCoin, through which Cred lost additional cryptocurrency.[62]  Cred also suffered multiple incidents in which Cred's account with a cryptocurrency exchange was hacked, resulting in further losses.

In May of 2020, Hua communicated that MoKredit would not be able to repay the two $4 million principal payments due to Cred for June and July, which Cred desperately needed to continue operating.[63]

By June of 2020, Cred executives were questioning whether Cred could continue as a going concern.[64]

On October 23, 2020, Uphold received an inquiry from a journalist at a cryptocurrency news site, CoinDesk, about a story concerning Cred "losing several million dollars in client funds."[65]

On October 25, 2020, Uphold terminated its relationship with Cred and Schatt.[66] Following the termination, Uphold issued statements to its customers about the separation, including statements disclaiming its knowledge of any wrongdoings or failures at Cred prior to October 23, 2020.  For example, Uphold stated:

> On October 23, Uphold became aware for the first time that there was a potential balance sheet shortfall at Cred that may affect the firm's ability to honour its financial obligations to customers.  On that day, it became apparent that Cred had covered the situation for months and had attempted to trade itself out of difficulties by attracting more customer deposits.[67]

---

[61] *Id.* ¶ 423.
[62] *Id.* ¶¶ 422-425.
[63] *Id.* ¶ 428.
[64] *Id.* ¶ 431.
[65] *Id.* ¶ 438.
[66] *Id.* ¶ 447.
[67] Complaint ¶ 442.

Uphold also informed its customers that its financial position would remain unchanged by the relationship's end, stating:

> Uphold's relationship with Cred was based on permitting our customers to sign up for Cred programs and link their Uphold accounts to Cred. This relationship provided Uphold with some modest quarterly revenue but not a material amount. The termination of our relationship with Cred will not impact our balance sheet and we foresee little to no impact on our business.[68]

Uphold's senior management then discussed the need to change its policies. Simon McLoughlin, Uphold's President and Chief Operating Officer wrote that the "[f]eeling is we need to change policy – and be seen to change policy – to better control such high risks after Cred."[69]

### G. Cred's Losses

On November 7, 2020 (the "**Petition Date**"), Cred commenced the Chapter 11 cases by filing voluntarily petitions for relief under chapter 11 of the Bankruptcy Code.

Once the Trust was established, it reviewed records and data from Cred's Ledger (the "**Cred Ledger**") to estimate total losses, including the liabilities and obligations resulting from Cred's collapse.[70] The Cred Ledger indicates that CredEarn losses are approximately $783,946,276.[71]

### JURISDICTION

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. § 1409(a).

---

[68] *Id.* ¶ 449.
[69] *Id.* ¶ 454.
[70] *Id.* ¶ 461.
[71] *Id.* ¶ 464.

**DISCUSSION**

Before addressing the sufficiency of each of the Complaint's individual causes of action, the Trust's inclusion of more than 450 pages of exhibits with its Complaint makes it necessary to examine the guidelines for consideration of documents outside a complaint.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). However, the Third Circuit recognizes an exception to this rule and instructed that in deciding a motion to dismiss under Rule 12(b)(6) "courts may consider 'document[s] *integral to or explicitly relied* upon in the complaint, or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pinkney v. Meadville*, No. 21-1051, 2022 U.S. App. LEXIS 13824, at *4-5 (3d Cir. May 23, 2022) (internal quotations and citations omitted). "Courts may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case." *Id.* "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint -- lack of notice to the plaintiff -- is dissipated 'where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (quoting *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993)).

In keeping with this guidance, I have considered the documents attached to the Complaint in evaluating its sufficiency. While Uphold, in connection with its response, submitted additional documents for my review,[72] I did not find it necessary to consider them. Accordingly, I made no decision regarding whether doing so would be appropriate under the standards articulated above.

---

[72] D.I. 7 (Request for Judicial Notice); D.I. 8 (Declaration of Douglas W. Green).

## I.  Count I  - Aiding and Abetting Breach of the Duty of Care

To state a claim for aiding and abetting breach of fiduciary duty under Delaware law, the Trust must establish: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.  *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Nos. 11-10776 (MFW), 13-51215 (MFW), 2014 Bankr. LEXIS 1362, at *18 (Bankr. D. Del. Apr. 2, 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks omitted)).  "As with standard fiduciary duty claims, any general allegations are subject to the general pleading requirements of Rule 8(a) while any fraudulent allegations are subject to the heightened pleading requirements of Rule 9(a)." *Guiliano v. Ferdinand (In re Liquid Holdings Grp., Inc.)*, Nos. 16-10202 (KG), 17-50662 (KG), 2018 Bankr. LEXIS 1665, at *42 (Bankr. D. Del. June 6, 2018).[73]

### A.      The Alleged Breaches of Fiduciary Duty

This case is somewhat unusual in that there are claims asserted for aiding and abetting breaches of fiduciary duty, but no claims asserted for the breaches themselves.[74]  Nevertheless, in considering a claim for aiding and abetting a breach of fiduciary duty I must first determine whether an underlying breach of fiduciary duty has been properly alleged.

The alleged breach underlying Count I is a breach of the duty of care.  "The duty of care is the duty to act on an informed basis." *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (Bankr. D. Del. 2011) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). "The fiduciary duty of due care requires that directors of a Delaware corporation both:

---

[73] While the Trust disputes the applicability of Rule 9(b) to these claims, I need not resolve this issue, as I find they fail under the more lenient Rule 8(a).

[74] The directors and officers who are alleged to have breached their fiduciary duties to Cred have entered into settlements with the Trust.

16

(1) use that amount of care which ordinarily careful and prudent men would use in similar circumstances; and (2) consider all material information reasonably available." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 568 (Bankr D Del. 2008) (citing *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. Ct. Aug. 2005) (internal quotations omitted)).

To state a claim for breach of the duty of care a plaintiff must allege the defendant acted with gross negligence. *Miller v. Bradley (In re W.J. Bradley Mortg. Capital, LLC)*, 598 B.R. 150, 157 (Bankr. D. Del. 2019) ("A breach of the duty of care requires proving gross negligence."). Gross negligence "generally requires that officers, directors, and managers fail to inform themselves fully and in a deliberate manner." *Buchwald Cap. Advisors LLC v. Schoen (In re OPP Liquidating Co.)*, Nos. 19-10729 (MFW), 21-50431 (MFW), 2022 Bankr. LEXIS 651, at *19 (Bankr. D. Del. Mar. 14, 2022). Accordingly, in order to establish gross negligence, a plaintiff must plead that the defendant was recklessly uninformed or acted outside the bounds of reason." *Liquidation Tr. of Sols. Liquidation LLC v. Stienes (In re Sols. Liquidation LLC)*, 608 B.R. 384, 404 (Bankr. D. Del. 2019) (internal citations and quotations omitted).

The Trust alleges the following with regard to the breach of the duty of care:

479.   Schatt, Hua, Podulka, Wheeler, and Alexander breached their duties of care to Cred through their mismanagement of Cred, with no formal diligence or oversight policies or procedures regarding investment decisions, accounting, and compliance.

480.   Schatt, Hua, Podulka, Wheeler, and Alexander breached their duty of care to Cred by seeking to obtain more CredEarn debt than Cred could reasonably service.

481.   Schatt and Hua breached their duties of care to Cred by using false marketing materials to obtain more CredEarn debt than Cred could reasonably service. [75]

---

[75] Complaint ¶¶ 479-81.

Focusing on the latter two allegations, Uphold argues that the Trust has not stated a claim for breach of the duty of care, but has instead asserted an improper deepening insolvency claim.

To the extent the Trust intends by these allegations, and its reference within this Count to Cred's "deepening insolvency," to claim that the breach of fiduciary duty was allowing the company to incur additional debt, its claim must fail. "Delaware law requires that a plaintiff plead facts supporting an inference that officers and directors . . .committed a cognizable breach of duty. Simply alleging that a corporation was insolvent and took on further debt to continue operating is not enough to plead a claim for breach of fiduciary duty[.]" *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 541 (Bankr. D. Del. 2009).   As the Court in *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.* explained:

> If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, but that also involves the incurrence of additional debt, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action.

906 A.2d 168, 205 (Del. Ch. 2006).  In other words, "[i]f a plaintiff cannot state a claim that the directors of an insolvent corporation acted disloyally or without due care in implementing a business strategy, it may not cure that deficiency simply by alleging that the corporation became more insolvent as a result of the failed strategy." *Id.*

However, considering the allegations of the Complaint in their entirety, Count I can be read to assert a claim for breach of the duty of care arising not from the single act of incurring debt through CredEarn, but rather from a systemic failure of management to act within the bounds of reason in running the company.  Taking on more debt than could be serviced is one example of this, as is the use of false marketing materials to induce investments.  Other examples

are found throughout the Complaint, including the failure to conduct due diligence with respect to MoKredit, the failure to ensure that Cred's investments with MoKredit were secured or made pursuant to properly executed contracts, the failure to obtain appropriate insurance, and the company's reliance on an unregistered trading firm to hedge investments, to name a few.  Taken together, these allegations are sufficient to state a claim for breach of the duty of care.

### B.   Knowing Participation in the Breach

The "knowing participation" element of an aiding and abetting claim "requires a showing that defendant both (1) participated in the breach; and (2) knew at the time that the conduct assisted constituted a breach of fiduciary duty." *In re NewStarcom Holdings, Inc.*, 547 B.R. 106, 119 (Bankr. D. Del. 2019).  "To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper." *Id*. (internal quotations omitted).  Because the Trust fails to adequately plead either participation or knowledge sufficient to state a claim, I will address them separately.

### 1.   Uphold's Knowledge

An aiding and abetting claim must be supported by proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties.' *Carlton Invs. ex rel. TLC Beatrice Int'l Holdings v. TLC Beatrice Int'l Holdings*, Civil Action No. 13950, 1995 Del. Ch. LEXIS 140, at *49 n.11 (Del. Ch. Nov. 21, 1995).  *See also Malpiede v. Townson,* 780 A.2d 1075, 1097 (Del. 2001) (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].").  The presence of suspicious circumstances alone is not enough. *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, 573 F. App'x 154, 163 (3d Cir. 2014) ("[T]he Trust attempts to

substantiate its assertion of knowledge by insinuating that Preferred Bank must have known of the fraud in the context of the purportedly suspicious circumstances. We are not persuaded. The existence of such circumstances, coupled with bald assertions of knowledge, was insufficient to survive Preferred Bank's motion to dismiss.").

Uphold argues that the Complaint does not allege any facts that would support the conclusion that Uphold knew that the Cred fiduciaries were breaching their duties or knew that its conduct would be assisting such a breach.  Specifically, it argues that the Complaint contains nothing but conclusory allegations regarding Uphold's purported knowledge about Cred's mismanagement, its liquidity issues, or that the information contained in the marketing materials for CredEarn was false.

The Trust responds that Uphold ignores the plethora of allegations in the Complaint that show that Uphold knew of Cred's unreasonably risky business model, its calamitous financial condition, and of the falsity of the marketing materials and that these things together establish that Uphold either knew or should have known that the Cred executives were breaching their fiduciary duties by entering into the CredEarn transaction.  I disagree.

The Complaint includes an abundance of allegations regarding all the ways that Cred was being mismanaged but is devoid of allegations that show that both: 1) Uphold knew of the problems at Cred; and 2) knowledge of the problems would have necessarily led Uphold to conclude that the Cred executives were breaching their fiduciary duties.

For example, while the Trust argues that "Schatt testified that he personally informed Uphold of [Cred's] dire financial situation,"[76] the allegations in the Complaint do not support such a broad conclusion.  The entirety of the allegations regarding what Schatt told Uphold are as follows:

---

[76] Opposition Br. at 14-15.

"Schatt kept Uphold abreast as to Cred's financial situation in May of 2020[.]"[77]

"Schatt testified that he informed Uphold of Alexander's theft and the resulting Lawsuit[78]

"Schatt testified that he made Uphold aware of the financial situation at Cred. Indeed, Schatt testified and submitted an errata stating that he kept Uphold informed of the financial losses Cred experienced, including the significant trading losses explained below.

> Q.   Did you ever tell Uphold about any hedging losses that Cred experienced?

> A.   I believe I did.[79]

At best, these tentative and vague assertions establish only that Uphold was told something regarding Cred experiencing trading losses and an executive's theft in the Spring of 2020, more than a year after CredEarn launched. They do nothing to establish that Uphold knew of a breach of fiduciary duty. There is nothing in these allegations to suggest that Uphold was informed of the full scale of the situation at Cred. It is just as reasonable to conclude from these allegations that Schatt told Uphold that the hedging losses and theft were not cause for concern as it is to conclude that he told Uphold that Cred was on the precipice of bankruptcy.

But importantly, even if Uphold did know of the dire situation at Cred, it is not a breach of fiduciary duty for executives to try to right a sinking ship. The Trust's assumption that directors of a company with dire finances are breaching their fiduciary duties simply by entering into business transactions that might result in additional debt is, as discussed above, wrong as a matter of law. *Quadrant Structured Prods. Co., LTD. v. Vertin*, 115 A.3d 535, 547 (Del. Ch. 2015) ("Directors cannot be held liable for continuing to operate an insolvent entity in the good

---

[77] Complaint ¶ 432.
[78] *Id.* ¶ 424.
[79] *Id.* ¶ 415. Notably, this was Schatt's amended answer to the question, as noted in the deposition's errata sheet. His original answer to the question was "No." *Id.* ¶ 415, Ex. OOO.

faith belief that they may achieve profitability, even if their decisions ultimately lead to greater losses for creditors.").

Similarly, the Trust's argument that Uphold's knowledge of Cred's purportedly risky business model must equate to knowledge of a breach of fiduciary duty is also unpersuasive.  It is not necessarily a breach of fiduciary duty to enter into a risky business transaction.[80] "[B]usiness failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit." *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006).  Whether a risky business strategy results in or otherwise causes a breach of fiduciary duty depends entirely on the facts and circumstances.  Here, while the Complaint alleges that Uphold knew generalities about Cred's risky business model, such as that intended to relend customers' cryptocurrency to MoKredit and then employ an aggressive hedging strategy to protect against the risk that arrangement created, it does not include allegations that show Uphold knew the details that might have alerted it that Cred's relationship with MoKredit was a problem.

Likewise, with respect to the falsity of the representations in the marketing materials, while the Complaint alleges that Uphold knew they were false, it includes no facts to support that conclusion.  For example, the Trust attempts to establish that Uphold knew that Cred did not loan to "reputable companies" by pointing to the fact that Uphold met with Hua on several occasions concerning MoKredit.  But there are no facts that would explain what about these meetings would have alerted Uphold that MoKredit was not reputable.  Likewise, the Trust argues that

---

[80] This is particularly true given that, as the Trust explains, the cryptocurrency landscape, was and is inherently risky.  Complaint ¶ 40 ("Yield earning platforms are generally risky due to their promises of high returns.  Cryptocurrency prices are highly volatile and the regulations concerning yield earning platforms are unclear.").

Uphold's awareness of Cred's risky hedging strategy means Uphold must have known that

CredEarn was not fully hedged and that investments were not secured.  But the allegations in the

Complaint suggest that Cred had told Uphold the investments were fully hedged and Uphold

believed them to be secured:

> 278.    Uphold knew about Cred's hedging strategy and the risks involved.  But in an email to Uphold board member and former CEO Adrian Steckel ("Steckel") regarding the potential that a customer would have natural doubts about Cred's ability to offer its advertised returns without substantial risk, Thieriot stated that the "principal is all hedged out:"
>
> On Feb. 1, 2019, at 10:50 AM, JuanPablo Thieriot   jp.thieriot@uphold.com wrote:
>
>> I hear you, but Lu Hua and James would obviously be happy to speak/meet with him – and they're pretty impressive.  **The principal is all hedged out.  It's the certainty of high interest that requires the explanation… And from a 'security' perspective – there's zero security risk when your BTC is in such a contract.**
>
> 279.    Thieriot directed Schatt to develop a presentation regarding Cred's "hedging mechanism" and how it mitigated consumer risk:
>
>> Dan,
>>
>> You're going to need to create a diagrammatic showing your flows. I'd recommend highlighting that while there is some market risk, **one is actually stepping entirely out of "security" risk via the hedging mechanism. I might also add some Mo9 collateral to substantiate the market risk behind the % return.** Consider Salinas the most financially sophisticated individual you've ever met.
>
> 280.    Schatt provided materials to Thieriot to attract high net worth investors, including a term sheet known as the "CredEarn BTC Yield Term Sheet," which stated that the "Loan Amount and Interest ***fully hedged*** with BTC forward contracts."[81]

---

[81] Complaint ¶¶ 278-80 (emphasis added).

Likewise, while the Trust cites to internal Cred emails discussing the fact that the marketing materials should not include references to insurance when there was no applicable insurance, there is nothing in the Complaint that demonstrates anyone at Uphold was informed about Cred's lack of insurance coverage.

While the Trust argues that Schatt's knowledge should be imputed to Uphold because Schatt was a director of both Uphold and Cred, I do not find this argument to be persuasive. Although Delaware law does recognize the general rule that a director's knowledge may be imputed to the corporation they serve, application of the rule is not automatic, but is dependent upon the circumstances. *See NAMA Holdings, LLC v. Related WMC LLC*, 2014 Del. Ch. LEXIS 232, *86 (Del. Chancery Ct. Nov. 17, 2014) ("Generally, the fact that two or more corporations have officers or agents in common will not of itself impute the knowledge gained by such officers while acting for one corporation to another corporation in which they also hold office.") (quotations omitted). Additionally, "[a]n exception to the general rule that the knowledge of an officer or agent will be imputed to the corporation arises when an officer . . . is acting in a transaction in which he is personally or adversely interested or is engaged in the perpetration of an independent fraudulent transaction, where the knowledge relates to such transaction and it would be to his interest to conceal it." *In re HealthSouth Corp. S'Holders Litig.*, 845 A.2d 1096, 1108 n.22 (Del. Ch. 2003) (alterations in original) (internal quotations omitted) ("When corporate fiduciaries -- such as HealthSouth managers -- have a self-interest in concealing information -- such as the falsity of the financial statements that they had helped prepare -- their knowledge cannot be imputed to the corporation."). This exception applies here where the Trust has alleged facts that suggest Schatt had reason to conceal the truth about Cred's management, liquidity, and its ability to repay CredEarn customers. See Complaint ¶ 472 ("Schatt and Hua

would never have achieved their goals of obtaining hundreds of millions of dollars of retail customer cryptocurrency and diverting it to MoKredit without Uphold's marketing engine and access to Uphold's thousands of customers.").

Application of the rule here would also be inappropriate for the additional reason that the Complaint fails to allege facts sufficient to establish that Schatt was acting on Uphold's behalf during the CredEarn negotiations.  The sole statement in the Complaint regarding Schatt's participation in the negotiations (or the negotiations at all) is the conclusory allegation that "Schatt acted both as director of Uphold and as CEO and a director of Cred during the negotiations of the SOW."[82]  What does this mean?  Does this mean he negotiated the deal with himself?  Does this mean there were additional representatives for each company involved but that Schatt participated on both sides?  It would not be reasonable to conclude from this allegation alone that Schatt acted on Uphold's behalf during the negotiations at all, let alone to such a degree that the company should be charged with his knowledge.[83]

Further, even if I were to find it appropriate to impute Schatt's knowledge to the Uphold entity on which he served as director, that would have no benefit to the Trust here since the allegations of the Complaint suggest that Schatt was director of a different Uphold entity than the one involved with the CredEarn program.  Although the Complaint states only that Schatt "served on Uphold's Board of Directors" (where "Uphold" is defined as including all three of the defendants), the board meeting minutes attached to the Complaint show that Schatt was a director of Uphold, Ltd.[84]  But it was Uphold HQ, Inc., not Uphold, Ltd., who entered into the

---

[82] Complaint ¶ 126.
[83] Additionally, there is nothing in the more than 450 pages of exhibits attached to the Complaint that support the notion that Schatt was involved in any capacity with Uphold's side of the CredEarn transaction.
[84] Complaint ¶ 3 and Ex. JJJ.

SOW that governs the CredEarn program.[85]  There is nothing in the Complaint that explains the relationship between the different Uphold entities or that would support the conclusion that Uphold, Ltd. was involved with the CredEarn program at all.[86]  Accordingly, imputing Schatt's knowledge to Uphold, Ltd. does nothing to assist the Trust in establishing that Uphold HQ, Inc. had the knowledge necessary to support the Trust's claim.

The Trust also argues, however, that "the Complaint alleges far more than just Schatt's knowledge," stating that "at the very least, Uphold had constructive knowledge of the fiduciary breaches, demonstrated by multiple Uphold executives and officers communicating their concerns about Cred's business model and management."[87]  Specifically, the Trust asserts that the following allegations show that "in addition to Schatt, at least Thieriot, Hansen, O'Connell, and Steckel knew and/or were put on notice of the various Cred executives' breaches":

a.  "[U]pon receipt of a CredEarn marketing email claiming that Cred was offering up to a 9% interest return through CredEarn, Uphold CFO Lee Hansen ("Hansen") forwarded the email to Thieriot and Uphold's Chief Revenue Officer Robin O'Connell ("O'Connell") asking "How can they do this?" In response, O'Connell responded 'Magic?'"

b.  Former Uphold Board member Steckel stated about an investor:  "***As with me, he will be curious and doubtful as to the risk [t]aken by [C]red to guarantee such a return ….***"

c.  Steckel further stated: "***The lack of visibility around the way Cred deploys its money and recourse is a conversation that [Thieriot] and I have engaged in before.***  As the amount of money that has been sent to Cred has increased significantly, their procedures and the protections afforded to our customers should be reviewed. A failure on their part would not just be a problem for our customer but also almost automatically result in lawsuits against Uphold."[88]

---

[85] Compare Complaint Ex. JJJ with Complaint Ex. O.
[86] The lack of any mention of the CredEarn program in the Uphold, Ltd. board minutes suggests that it was not.  Complaint Ex. JJJ.
[87] Opposition Br. at 15.
[88] Opposition Br. at 15-16 (citing Complaint ¶¶ 296, 297, 300, and Exs. MM and NN) (emphasis in original).

But these allegations do nothing to put Uphold on notice that Cred executives were purportedly breaching their fiduciary duties.  At best, they demonstrate that there were red flags.  But that is not enough to establish the required knowledge to state a claim for aiding and abetting a breach of fiduciary duty.  *See SB Liquidation Tr.*, 573 F. App'x at 163.  *See also Malpiede v. Townson*, 780 A.2d 1075, 1098 (Del. 2001) ("Although Knightsbridge's tactics here, as alleged, may have been somewhat suspect, we agree with the trial court's conclusion that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that Knightsbridge knowingly participated in a fiduciary breach."); *Weinshanker*, 602 B.R. at 904-05 (granting motion to dismiss aiding and abetting claims) ("The Amended Complaint repeatedly alleges that the non-Weinshanker Defendants and Van Ongevalle 'knew or should have known' of Weinshanker's actions and consequences, but fails to allege specific facts showing actual knowledge. 'Should have known' is not enough to plead a claim for aiding and abetting, and the Amended Complaint does not allege adequate information to show that Van Ongevalle knew that Weinshanker's actions would result in a breach of fiduciary duty.").

As the Third Circuit has explained, "[u]nlike the other causes of action, aiding and abetting liability requires proof of *scienter.  Persons committing the tort are fully aware that they are acting *against* the corporation." *Official Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, No. 07-1397, 2008 U.S. App. LEXIS 18823, at *18-19 (3d Cir. July 1, 2008) (citations omitted) (emphasis in original).  The Trust has not alleged facts that meet this standard.

## 2.  Uphold's Participation

To state a claim for aiding and abetting breaches of fiduciary duty, a plaintiff must also establish that the defendant participated in the breach.  *Radnor Holdings Corp. v. Tennenbaum*

*Capital Ptnrs*, 353 B.R. 820, 844 (Bankr. D. Del. 2006) ("a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of the fiduciary duties."); *In re Xura, Inc. Stockholder Litig.*, 2019 Del. Ch. LEXIS 255, at *11 (Del. Ch. July 12, 2019) ("'Knowing participation' means just that—the alleged aider and abettor must know the fiduciary is breaching his fiduciary duty and then must participate, in some way, in that breach.") (citing Restatement (Second) of Torts §876 ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself")). "[P]articipation must take the form of substantial assistance to the primary violator." *Lockton v. Rogers*, No. 2021-0058-SG, 2022 Del. Ch. LEXIS 47, at *42 (Del. Ch. Mar. 1, 2022) (quotations omitted). "Substantial assistance, 'by definition, implies active participation or affirmative action.'" *Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, Nos. 11-11722 (KBO), 14-50356 (KBO), 2020 Bankr. LEXIS 3358, at *16 n.21 (Bankr. D. Del. Dec. 2, 2020) (quoting *Miller v. American Capital, Ltd. (In re NewStarcom Holdings, Inc.)*, 547 B.R. 106, 117-18 (Bankr. D. Del. 2006)).

The Complaint alleges that Uphold assisted in the alleged breaches by designing, controlling, and facilitating the CredEarn Program, and by disseminating false marketing materials to its customers. Uphold argues the allegations in the Complaint are not sufficient to satisfy the participation requirement for either theory. Specifically, Uphold argues that there are no facts alleged that suggest Uphold designed or controlled CredEarn or had any involvement in what caused the marketing materials to be false or otherwise knew they were false. I agree.

28

a.  <u>Designing, Controlling, and Facilitating CredEarn</u>

With respect to the creation of CredEarn, the Trust argues that Uphold designed

CredEarn so that all of the risk would be assigned to Cred but Uphold would retain complete

control and collect "substantial fees."[89]  The Trust also argues that Uphold refused to allow

changes to the CredEarn program even when Cred experienced financial turmoil and continued

facilitating the program despite Uphold's knowledge of Cred's poor investments, lack of

recordkeeping, and distress.[90]  But there are simply no facts to support these conclusions.

To begin, there are no non-conclusory allegations that support the notion that the

CredEarn program was intentionally structured to allocate risk to Cred and give Uphold control.

The Complaint includes no allegations at all regarding the design process or contract

negotiations.  There are no facts alleged that would it make it any more likely that Uphold

designed the platform and drafted the SOW than that Cred did so.

The only things the Trust points to in support of its argument that Uphold had all the

control are specific terms of the SOW, including one that prohibits Cred from changing the

offering or end user agreements without Uphold's prior written consent, or changing its core

business plan or CredEarn interest rates without Uphold's consent.  But this is not enough.  On

their face, the terms of the SOW are not unusual.  While the Trust makes conclusory allegations

about how the provisions gave Uphold control, it includes no facts to support them.  Nothing in

the Complaint suggests that Cred ever requested Uphold's consent to change some aspect of the

program that was detrimental to Cred, let alone that Uphold refused such a request, or that

Uphold's alleged refusal to consent to changes somehow restricted Cred in an unreasonable

manner or otherwise caused Cred harm.

---

[89] Opposition Brief at 17.
[90] *Id.*

There is also little in the Complaint to support the Trust's argument that Uphold exerted functional control over Cred. The Trust points to the fact that Uphold held all of Cred's cryptocurrency in its wallets and had exclusive access to the records, but there are no allegations about whether or how this caused a problem for Cred or otherwise contributed in some way to its demise. There are no allegations about Cred informing Uphold of the need for access to the records, being denied access, or anything that would support a conclusion that Uphold was using its exclusive access to exercise control over Cred. Without more, the facts alleged are facts without significance.

Moreover, even if the Trust could establish that Uphold exerted contractual and function control over Cred, it fails to explain how such control would have "assisted" the purported breaches of fiduciary duty. The breach alleged is the gross mismanagement of Cred, but nothing in the Complaint suggests that Uphold was involved in any way with the management of Cred, let alone with the aspects of management that were lacking. The Trust seeks to hold Uphold liable for doing nothing more than creating circumstances that enabled Cred to assume more debt. But it was Cred's responsibility to assess if it could service additional debt, not Uphold's.

For all these reasons, Uphold's purported contractual and functional control over Cred cannot constitute the assistance required for the Trust to establish that Uphold aided and abetted a breach of fiduciary duty.

### b.   Dissemination of False Marketing Materials

The Trust next argues that Uphold's dissemination of false marketing materials should be sufficient to satisfy the participation element of its claim because the marketing materials drove more customers, and therefore more debt, to Cred. The Trust points to the fact that communications among customers and Uphold executives show that the marketing materials

were key to getting customers to participate in CredEarn and that the false aspects of those

materials were likely relied upon by customers in deciding to participate in the CredEarn

program.  But even assuming all of that is true, the Trust would still have to establish that

Uphold either falsified the materials itself, or at least knew the marketing materials were false in

order for their dissemination to constitute "knowing participation," and the allegations in the

Complaint do not support such a conclusion.  As discussed above, none of the allegations of the

Complaint give rise to the plausible inference that Uphold knew the marketing materials were

false.  Considering that, as discussed above, the Complaint also does not plausibly allege that

Uphold knew that the Cred executives were breaching their fiduciary duties, Uphold's

distribution of the marketing materials cannot constitute "knowing participation" for purposes of

stating a claim for aiding and abetting a breach of fiduciary duty.[91]

For these reasons, I find that the Complaint fails to allege Uphold's "knowing

participation" in the alleged breaches of the Cred executives' duty of care.  The Motion is

therefore granted with respect to Count I.[92]

## II.    <u>Count II - Aiding and Abetting Breach of the Duty of Loyalty and Good Faith</u>

In Count II the Trust asserts claims for aiding and abetting breach of both the duty of

loyalty and the duty of good faith.  While the duty of good faith is a subset of the duty of loyalty,

because the standard for each is different, I will address them separately.

---

[91] It is on this basis that the case the Trust relies on is distinguishable.  While the Court in *Rosener v. Majestic Mgmt.*, held the defendant's extension of loans to debtor could constitute participation sufficient for an aiding and abetting claim, it had also found that the complaint sufficiently alleged the knowledge component of the claim, unlike here.  *See Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) ("The Trustee has alleged that Carter and Large committed acts which were intended to defraud the creditors of the Selling Companies (and later of the Debtor) and that the Bank Group was aware of these activities and participated in them by extending loans to the Debtor to facilitate the actions of Carter and Large.").

[92] Uphold argues that both Count I and Count II fail for the additional reason that the Trust has not adequately pled damages.  Because I find these counts fail on the other elements of the claim, it is not necessary to address this issue.

"The duty of loyalty stands for the principle that 'the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder.'" *Nystrom v. Vuppuluri (In re Essar Steel Minn. LLC)*, Nos. 16-11626 (BLS), 17-50001, 2019 Bankr. LEXIS 1622, at *17-18 (Bankr. D. Del. May 23, 2019) (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009)).  "[C]laims for breach of the duty of loyalty are notably—and intentionally—difficult claims to assert." *Id.* at *17-18.  "To establish a breach of the fiduciary duty of loyalty, plaintiffs must show that the defendants either (1) stood on both sides of the transaction and dictated its terms in a self-dealing way, or (2) received in the transaction a personal benefit that was not enjoyed by the shareholders generally." *In re Coca-Cola Enters.*, 2007 Del. Ch. LEXIS 147, at *12 (Del. Ch. Oct. 17, 2007) (citations omitted).  The allegations of Count II satisfy neither element.

The Complaint alleges that "Schatt breached his duty of loyalty and good faith because he was an Uphold director and entered into a business relationship between Cred and Uphold that disproportionately benefitted Uphold to the detriment of Cred."[93]  This is not enough.  The mere fact that Schatt sat on the boards of two companies on opposite sides of a transaction does not establish that the transaction was self-interested.  Additionally, there are no non-conclusory allegations[94] that Schatt participated in the CredEarn negotiations on Uphold's behalf at all, let alone that he "dictated its terms in a self-dealing way."  He was one of seven

---

[93] Complaint ¶¶ 493-95.  The Complaint also alleges that Hua "breached his duty of loyalty and good faith because he was the founder of MoKredit and entered into a business relationship between Cred and MoKredit that disproportionately benefitted MoKredit to the detriment of Cred."  Complaint ¶ 495.  However, given that there are no allegations in the Complaint that suggest Uphold was in any way involved with Hua or MoKredit's relationship with Cred, or had anything other than cursory interaction with Hua at all, it is reasonable to conclude that this allegation does not form the basis for the Trust's claim of aiding and abetting.

[94] The Complaint alleges only that "Schatt acted both as director of Uphold and as CEO and a director of Cred during the negotiations of the SOW."  Complaint ¶ 126.

board members of a different Uphold entity than the one who executed the SOW and there are no

facts alleged that suggest he possessed any decision-making authority or otherwise exerted any

level of control over the Uphold board.   There are also no allegations that Schatt received any

personal benefit from the transaction.  The Trust fails to state a claim for the breach of the duty

of loyalty.  It therefore also fails to state a claim for aiding and abetting a breach of that duty.

The Trust fares no better with its allegations regarding a breach of the duty of good faith.

"The duty to act in good faith [ ] is a subsidiary element of the duty of loyalty."  *In re Fedders N.*

*Am., Inc.*, 405 B.R. at 540.  "The behavior that must be shown to prove a violation of the duty to

act in good faith 'requires conduct that is qualitatively different from, and more culpable than,

the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence).'" *Id.*

(quoting *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).  "Claiming a failure to act in good faith

must allege more than gross negligence.  "A lack of good faith is shown by alleging conduct

motivated by a subjective bad intent, or conduct that is an 'intentional dereliction of duty or the

conscious disregard for one's responsibilities.'"  *Barsa v. Theseus Strategy Grp., LLC (In re Old*

*BPSUSH, Inc.)*, Nos. 16-12373 (BLS), 19-50726 (BLS), 2020 Bankr. LEXIS 1697, at *28

(Bankr. D. Del. June 30, 2020).

The Complaint alleges that "Schatt and Hua breached their duties of loyalty and good

faith by, among other things, creating and disseminating false marketing materials and making

misrepresentations about the safety of Cred and CredEarn."  This is insufficient to state a claim

for breach of the duty of good faith.  The Complaint does not include any allegations that would

support the conclusion that Schatt or Hua acted intentionally in disregarding their duties.

Accordingly, I find the Complaint fails to state a claim for breach of the duty of good faith. It

therefore also fails to state a claim for aiding and abetting such a breach.  The Motion with respect to Count II is granted.

## III.   <u>Count III – Unjust Enrichment</u>

In Count III of the Complaint, the Trust asserts a claim for unjust enrichment, alleging that Uphold's collection of the Uphold Fees and fees it generated as a result of investment accounts held by its customers "were not justified because Uphold obtained such fees by directing customers to CredEarn, causing Cred to plunge further into debt."[95]  Uphold moves to dismiss this claim on the grounds that the parties' conduct is governed by a valid and binding contract.  The Trust counters that, at this stage in the proceedings, it is permissible to plead claims in the alternative.

To state a claim for unjust enrichment, the Trust must allege: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).  "While the 'absence of justification' prong encompasses broad principles of justice or equity and good conscience, a claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."  *Gordon v. Kohl's Dep't Stores, Inc.*, No. 15-730, 2017 U.S. Dist. LEXIS 123971, at *34 (E.D. Pa. Aug. 7, 2017) (quoting *Nemec*, 991 A.2d at 1130 and *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009)) (internal quotations omitted).  "Framed in terms of the elements of unjust enrichment, conduct authorized by a contract is justified and therefore cannot serve as the basis for an unjust enrichment claim."  *Id.  See also MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. 2129-VCN, 2007 Del. Ch. LEXIS 65, at *18 (Del. Ch. May 16, 2007) ("Of cardinal significance is whether a contract already governs the parties'

---

[95] *Id.* ¶ 517.

relationship. In short, if there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains 'the measure of [the] plaintiff's right.'").

Here, the payments that the Trust is seeking to recover were made in accordance with the SOW, which is the contract that governs the parties' conduct with respect to CredEarn.[96] Consequently, those transactions cannot serve as the basis for an unjust enrichment claim. While the Trust is correct that there are circumstances in which it may be proper for a pleading to contain claims for both breach of contract and unjust enrichment, those circumstances are not present here.

"Alternative pleading is generally permitted when there is a doubt as to the existence of a contract, or the enforceability or meaning of the terms of the contract." *Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Grp., Inc.)*, 339 B.R. 570, 577 (Bankr. D. Del. 2006). Here, however, there is no question as to the validity of the contract. Nor is there any question as to the enforceability or meaning of the contract's terms. These facts distinguish this case from *In re Lexington*, on which the Trust relies, where the existence of a contract was in question. *Id.* at 577 ("The Trustee notes that the existence of a written express contract is at issue. Although the Trustee believes a written contract exists, the Trustee has found no contract in the Debtors' books and records."). But even if I were to allow the Trust to plead in the alternative here, the unjust enrichment claim would still fail, as the Trust has not sufficiently alleged that the payments were unjustified.

---

[96] To the extent the Trust intends for its unjust enrichment claim to encompass more than just what Uphold received under the SOW (*see* Opposition Brief at 30) there are no factual allegations in the Complaint that would support the conclusion that the SOW and the agreements it incorporates by reference, did not govern the full extent of the parties' relationship with respect to CredEarn.

The absence of justification element "usually entails some type of wrongdoing or mistake at the time of the transfer." *Terr. of the U.S. V.I. v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007).  "Correspondingly, unjust enrichment is 'often deployed against persons who (although not acting with scienter themselves) are sufficiently aligned with a wrongdoer that they ought to disgorge an unearned benefit conferred upon them by the wrongdoer at the victim's expense.'" *Id.* (quoting *Teachers' Ret. Sys. of La. v. Aidinoff,* 900 A.2d 654, 673 n.25 (Del. Ch. 2006)).  Here, the Trust does not allege that the payments were not earned. The Trust does not dispute that Uphold provided the services it was contracted to provide.  Instead, it argues that it would be unjust for Uphold to retain the payments, despite its provision of the contracted services, because of Uphold's purported role in Cred's demise.  But as discussed above, I find the Complaint does not include plausible claims of wrongdoing on Uphold's part.  For this reason, the remaining cases the Trust cites are also readily distinguishable, as in each the plaintiff had adequately pled facts to support the belief that the payments were unjustified.

For example, in *In re FAH Liquidating Corp.*, the Trustee alleged that while the debtors made their contractually scheduled payments to the defendant, they received none of the product or services that the defendants were obligated to provide in return.  572 B.R. 117, 130-31 (Bankr. D. Del. 2017) (further stating that "[t]he Trustee has brought the adversary proceeding to recover more than $32.5 million that Debtors transferred to BMW for what appears to be little or nothing. . . . The Trustee has some viable claims.").  Here, by contrast, the Complaint includes no such allegations regarding Uphold's performance under the parties' contract.

Similarly, in *In re Green Field Energy Servs.*, 2015 Bankr. LEXIS 2914 (Bankr. D. Del. Aug. 31, 2015), the complaint alleged that the debtor transferred a nearly $200 million asset to defendant "in return for little or no compensation." *Id.* at *26.  Noting that it could "plausibly

infer the existence of the first four unjust enrichment factors" the Court held that "the Trustee may plead alternative claims for relief at this stage in the proceeding <u>so long as each is supported by sufficient factual material to move the needle from possible to plausible</u>". *Id.* at \*33 (emphasis added). The Trust's unjust enrichment claim falls short in this respect.

For these reasons, with respect to Count III, the Motion is granted.

## IV.   **Fraudulent Transfer – Counts IV through VII**

In Counts IV through VII of the Complaint, the Trust asserts claims for avoidance of the Uphold Fee payments as alleged fraudulent transfers pursuant to both the actual and constructive fraud provisions of the Bankruptcy Code (the "**Code**"), 11 U.S.C. § 548 (a)(1)(A) (actual fraud) and § 548(a)(1)(B) (constructive fraud), and Delaware's Uniform Fraudulent Transfer Act, 6 Del. C. §§ 1301, *et seq.*[97]

### A.   Actual Fraud

The Code provides that:

> The trustee may avoid any transfer… of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily - -
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

Actual fraudulent transfer claims, unlike constructive fraudulent transfer claims, "must meet the elevated pleading standards of Federal Rule of Civil Procedure 9(b)." *Charys Liquidating Tr. v. Growth Mgmt., LLC (In re Charys Holding Co.)*, No. 08-10289 (BLS), 2010 Bankr. LEXIS 2073, at \*7 (Bankr. D. Del. July 14, 2010). However, the requirements of Rule

---

[97] The standards for actual fraudulent transfer under the Bankruptcy Code and Delaware law are not materially different for purposes of this Motion.

9(b) are to be interpreted liberally where the claim is asserted by a trustee or trust, such as is the case here. *Id.* at *8.

Even with a liberal interpretation, the claims before me do not meet these standards. First, the Trust fails to include any details regarding the date or amount of the individual transfers. This alone is grounds for dismissal. *See Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, Nos. 16-11596 (KG), 18-50633 (KG), 2019 Bankr. LEXIS 2906, at *24 (Bankr. D. Del. Sep. 16, 2019) ("The Complaint does not identify the number of transfers Alchemy made, or the specific dates and amounts of those transfers. Instead, it aggregates the transfers into a lump sum over a one year period. Hence, the Trustee failed to satisfy the heightened pleading standards of Rule 9(b).").

Second, the Trust also fails to properly allege that the transfers were made with the intent to defraud the Debtors' creditors. "A plaintiff charging a violation under Section 548(a)(1) must prove that the transferor, here the Debtor, made the transfer with the 'actual intent to hinder, delay or defraud creditors.'" *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988). In determining "intent," courts look for "badges of fraud," which include:

> (i) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (iv) secrecy or concealment of the transaction.

*In re Hechinger Inv. Co., of Del.*, 327 B.R., 537, 551 (D. Del. 2005), aff'd on other grounds, 278 Fed. App'x 125 (3d Cir. 2008).

While the Trust argues that it has alleged the existence of multiple badges of fraud, a closer look at the Complaint reveals only conclusory statements. Facts to support these statements are missing. For example, in support of the "close relationship" badge of fraud, the

Trust argues that Schatt became a member of Uphold's board within two months of meeting

Uphold's CEO, remained on the board through Cred's existence, and negotiated on both sides of

the CredEarn startup transaction. But as discussed above, there are no facts alleged that support

the conclusion that Schatt negotiated on both sides of the CredEarn transaction.  And the mere

fact that he held a position at both companies is not enough, by itself, to establish a "close

relationship."

The Trust next alleges there was a lack of consideration for the transfer because "with

every customer that Uphold drove to Cred, Cred plunged further into debt yet continued to pay

Uphold the Uphold Fees."[98]  But as the Trust acknowledges itself, the Uphold Fees were made in

payment for Uphold's marketing of the program and referral of customers to CredEarn.

Complaint ¶¶ 96-97 ("In exchange for the integration of CredEarn on the Uphold website, the

SOW required Cred to pay a 'service fee' to Uphold.").  The Trust does not dispute that Uphold

performed these services.  Further, the Trust concedes that these services by Uphold had value.

Complaint ¶ 469 ("Uphold's marketing and delivery of its customers to Cred allowed Cred to

become a popular yield earning platform and expand its services."); ¶ 470 ("Uphold's marketing

efforts assisted in establishing Cred's name in the space and resulted in non-Uphold customers

enrolling with Cred.").

Lastly, though the Trust pleads that Cred's insolvency at the time of the transfers and

their temporal proximity to Cred's collapse both suggest fraudulent intent, its failure to specify

exactly when the transfers took place precludes it from establishing these badges of fraud.

For these reasons, the Motion with respect to Counts IV and V is granted.

---

[98]  Opposition Br. at 24.

B.  <u>Constructive Fraud</u>

Counts VI and VII of the Complaint plead claims for constructive fraudulent transfers.  A claim for constructive fraudulent transfer requires a plaintiff to establish that:

(i)     the transfers were made within two years of the petition date;

(ii)    the debtor received less than reasonably equivalent value in exchange of the transfers; and

(iii)   the debtor either (a) was insolvent on the date that the transfers were made or became insolvent as a result of the transfers; or (b) was or was about to engage in a business or transaction for which any remaining property remaining with the debtor was an unreasonably small capital; or (c) intended or believed that the debtor would incur debts beyond the debtor's ability to pay; or (d) the debtor made the transfer or incurred the obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).  Unlike the claim for actual fraud, a claim for constructive fraudulent transfer need only be pled pursuant to the requirements of Rule 8(a).  *Wahoski v. Classic Packaging Co. (In re Pillowtex Corp.)*, 427 B.R. 301, 310 (Bankr. D. Del. 2010).

"At the motion to dismiss stage, to plead adequately a constructive fraud claim 'all that is needed ... is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.'" *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 266 (Bankr. D. Del. 2019) (quoting *In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016).   "Moreover, disputes as to the actual value of the transfer or value given in exchange for the transfer do not need to be decided on a motion to dismiss so long as the Trustee has identified the transfer by date and face amount and has alleged that it was for no consideration." *Emerald Capital Advisors Corp. v. Bayerische Moteren Werke Aktiengesellschaft (In re Fah Liquidating Corp.)*, 572 B.R. 117, 127 (Bankr. D. Del. 2017) (internal quotations omitted).  This the Trust has not done.

As noted above, the individual transfers are not identified by date or amount. Additionally, the Complaint also fails to make clear which of the debtor entities made the transfers and which of the three Uphold entities received them.  Even under the more liberal pleading standard of Rule 8(a), this is insufficient.  See *JLL Consultants, Inc. v. Gothner (In re AgFeed USA, LLC)*, 546 B.R. 318, 336 (Bankr. D. Del. 2016) ("The complaint fails to allege specific facts relating to the date of any of the transfers, the amount of any of the transfers or the transferor of any of the transfers. Rather, the complaint makes a general reference to all 'payments made to Gothner under the Employment Agreement.' This language is insufficient to survive a 12(b)(6) motion."); *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 268 (Bankr. D. Del. 2019) ("A complaint based on a theory of collective responsibility must be dismissed.  Thus, to satisfy *Twombly* and *Iqbal*, the Trustee would have to provide specific facts as to which OpenGate Defendant received which transfer.").

Furthermore, this claim fails for the added reason that the Trust has not sufficiently pled a lack of reasonably equivalent value.  "[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007).  In support of its constructive fraud claim, the Trust alleges that:

> Cred LLC and Cred Inc. received no value from paying the Uphold Fees, because with every customer Cred received from Uphold, Cred plunged further into debt.[99]

But throughout the Complaint the Trust alleges facts that support the opposite conclusion: that Uphold's provision of advertising and referral services to Cred was quite valuable.[100] For example, the Trust avers that:

---

[99] Complaint ¶ 554.
[100] *Id.* ¶ 97 ("In exchange for the integration of CredEarn on the Uphold website, the SOW required Cred to pay a "service fee" to Uphold.  This "service fee" was effectively a "commission" to Uphold for driving its customers to Cred.").

On January 24, 2019, Schatt announced that CredEarn had signed its 1,000[th] customer in less than 24 hours after launching.  Uphold drove all of these initial customers to Cred.  ¶¶137-38.

At the beginning of 2019, Uphold was driving nearly all of Cred's customers to Cred . . . .

By March 25, 2019, Uphold's team identified a total of 691 CredEarn investors.[95] Of those 691 investors, "645 users were pre-existing in Uphold."

Uphold also identified that the remaining 46 new customers "joined [the Uphold Platform] to immediately use Cred."[96]

Uphold driving customers to Cred was crucial to Cred's early success.

These allegations contradict the Trust's claims that Cred did not receive reasonably equivalent value in exchange for the Uphold Fees.  *Amelio v. McCabe, Weisberg & Conway, P.C.*, No. 14-1611, 2015 U.S. Dist. LEXIS 98378, at *12-13 (W.D. Pa. July 28, 2015) ("While the court accepts all well-pleaded factual allegations in the complaint as true, it need not accept allegations that are internally inconsistent . . . .").  Although the Trust is correct that the question of whether reasonably equivalent value was received by a debtor in a particular transaction is often one that cannot be resolved at the motion to dismiss stage, this assumes the Complaint contains some facts that would ultimately support a finding regarding the lack of reasonably equivalent value.  The Complaint here does not.

For these reasons, the Motion with respect to Counts VI and VII is granted.

## V.  <u>Count VIII – Breach of Contract</u>

The last count of the Complaint is a claim for breach of contract, arising from Uphold's alleged failure to repay a loan issued to it by Cred.[101]  Uphold moves to dismiss this claim arguing that the Trust has failed to sufficiently plead the elements of a breach of contract claim. I agree.

---

[101] Complaint ¶¶ 569-75.

The Complaint alleges that in March of 2019, Uphold sought a bridge loan from Cred in the amount of $5 million, in the form of a line of credit.[102]  It further alleges that although the proposed loan was originally intended to be a direct loan from Cred to Uphold, Cred executives ultimately decided to provide the loans through the Trading Firm.[103]  Accordingly, the Trading Firm and Uphold entered into a Master Sale and Repurchase Agreement (the "**Repo Agreement**"), pursuant to which the Trading Firm made loan(s) to Uphold.

Despite the existence of an express agreement between Uphold and the Trading Firm, to which Cred is not a party, the Trust asserts a breach of contract claim against Uphold based on a draft Loan and Security Agreement (the "**Uphold LOC**"),[104] that Cred allegedly provided to Uphold.[105]  The Trust argues that the Uphold LOC, along with the conduct of the parties, forms the basis for an implied contract between Cred and Uphold.  Specifically, the Trust argues that although the Trading Firm made the loan to Uphold, "Cred guaranteed the loans that the Trading Firm lent to Uphold by lending the same amount of assets to the Trading Firm."[106] This arrangement, it alleges, was referenced in a third agreement, a Swap and Tranche Agreement (the "**Tranche Agreement**") between Cred and the Trading Firm.[107]

Under California law,[108] the elements for breach of contract are "(1) the existence of a contract; (2) the plaintiff's performance of the contract or excuse for non-performance; (3) the

---

[102] *Id.* ¶¶ 338, 340.

[103] *Id.* ¶ 348.

[104] Complaint ¶ 339, Exhibit YY.

[105] See *Id.* ¶ 570 ("Pursuant to Cred's loan offer to Uphold, the parties entered into the Uphold LOC, where Cred loaned funds to Uphold and Uphold agreed to repay the loan with interest.").

[106] *Id.* ¶ 350.

[107] *Id.* ¶ 350, and Exhibit VVV (stating "Cred hereby acknowledges that [Trading Firm's] obligations hereunder, including [Trading Firm's] obligation to pay Management Fees when due and to re-deliver the Number of Tokens at maturity is expressly conditioned upon [Trading Firm] receiving Management Fees and taking re-delivery of the Number of Tokens from Uphold Inc., pursuant to a Swap and Tranche Agreement executed between [Trading Firm] and Uphold on or about May 1, 2019.").

[108] The parties agree that California law applies through the choice of law provision contained in the Uphold LOC.  Opening Br. at 30 n. 54; Opposition Br. at 28 n.16.

defendant's breach of the contract; and (4) resulting damage to the plaintiff."  *Kooiman v. Siwell, Inc.,* 2022 WL 2287310, at *2 (C.D. Cal. June 23, 2022).  The Trust has failed to adequately plead three of these elements.

First, the Complaint does not sufficiently allege the existence of a contract.  The Trust's claim that Cred made a loan to Uphold through the Trading Firm is directly contradicted by the terms of the Repo Agreement between Uphold and the Trading Firm.  That agreement, to which Cred is not a party, indicates that the Trading Firm and not Cred, made the loan.  The agreement makes no mention of any guaranty by Cred, does not incorporate the Tranche Agreement or the Uphold LOC, and includes no reference whatsoever that would support the Trust's allegation that Uphold was ultimately liable to Cred.  For this reason alone, the Trust's claim fails.  *Rose v. Rothrock*, No. 8-3884, 2009 U.S. Dist. LEXIS 37032, at *18-19 (E.D. Pa. April 29, 2009) (granting motion to dismiss breach of contract claim where allegations regarding existence of a contract were contradicted by document plaintiff had attached to complaint) (citations omitted).

But even if I were to ignore the Repo Agreement and consider the Trust's assertion that "the Uphold LOC is an enforceable contract based on the conduct of Cred and Uphold," the claim would still fail, as the Trust has not pled any facts to support the conclusion that Uphold acted in a manner that suggested its intent to be bound to Cred.  *See Friedman v. Friedman*, 20 Cal. App. 4th 876, 887, 24 Cal. Rptr. 2d 892, 899 (1993) ("Although an implied in fact contract may be inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise.") (internal citations and quotations omitted). Instead, the Complaint contains only conclusory allegations about Uphold's conduct, including that "Uphold continuously utilized and relied on the Uphold LOC, and informally arranged for

additional tranches, extensions of repayments, and loan funds as needed"[109] with no facts to back them up.  On the contrary, the factually supported allegations discuss only Cred's conduct, not Uphold's, and show that Uphold was completely silent in the face of Cred's numerous attempts to finalize the terms of an agreement.[110]  These allegations contradict the Trust's claim that Uphold intended to be bound in the manner it suggests.

Lastly, even if I found the Trust had properly pled the existence of a contract, it has failed to allege enough facts regarding Uphold's purported breach or the resulting damages to satisfy the third and fourth elements of the claim.  "Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity." *Levy v. State Farm Mut. Auto. Ins. Co.,* 150 Cal.App.4th 1, 5, 58 Cal.Rptr.3d 54 (2007).  But once again, there are no specifics here.  The Complaint makes no mention of which provisions of the Uphold LOC were purportedly breached, how they were breached, or even what amount is owed.  Instead, it states only that "as of the date of this filing, Uphold has not paid the entire balance of the Uphold LOC."[111]  This is not enough.

For these reasons, the Motion is granted with respect to the breach of contract claim and Count VIII is dismissed.

---

[109] Complaint ¶¶ 346, 357.
[110] See *Id.* ¶ 347 ("Cred sent Uphold a line of credit term sheet…."); ¶ 351 ("Alexander continued to push for some form of security or collateralization from Uphold on the loan."); 352 ("Alexander sent Uphold a proposed Loan and Security Agreement…."); ¶ 355 ("Alexander continued to make proposals to Uphold…"); ¶ 356 ("Alexander proposed an alternative option to the Loan and Security Agreement….Uphold did not agree and never entered into an agreement with Cred to secure Uphold's obligations under the Uphold LOC.").
[111] Complaint ¶ 574.

## CONCLUSION

Uphold's Motion to Dismiss is granted in its entirety. The Court will issue an order consistent with this Opinion.

Dated: April 13, 2023

_____

JOHN T. DORSEY, U.S.B.J.